UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CAUSE OF ACTION, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-1342 (JEB) |
| | ) | |
| NATIONAL ARCHIVES AND | ) | |
| RECORDS ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF THOMAS E. MILLS

I, Thomas E. Mills, pursuant to 28 U.S.C. § 1746, do hereby declare and state:

1. I am the Chief Operating Officer ("COO") for the National Archives and Records Administration ("NARA" or the "National Archives"). I have served in this position since March 27, 2011. My duties as COO include oversight of NARA's six major program and support offices. As relevant to this case, those offices include: Legislative Archives, Presidential Libraries, and Museum Services, which includes the Center for Legislative Archives, and is responsible for processing and preserving Congressional records, among other duties; and Research Services, which is responsible for processing and preserving Federal records and making them accessible.

2. I have personal knowledge of the facts set out herein, based on my twelve years of service with NARA, save that where the knowledge is based on information or belief, I have so stated.

3. I have worked at the National Archives since 2000. Prior to being named Chief Operating Officer, I was the Assistant Archivist for Regional Records Services. In this position, I oversaw archives, records management, and records center programs in

NARA's nine regions and the National Personnel Records Center in St. Louis. I was in

that position for ten years, from 2001 to 2011.  Prior to serving as the Assistant Archivist

for Regional Records Services, I worked at NARA as a Regional Administrator for

NARA's Mid-Atlantic region, headquartered in Philadelphia. In this position, I provided

leadership and direction for archives, records management, and records center operations

in NARA's Mid-Atlantic region. I was in that position for one year, from 2000 to 2001.

4.  Prior to my work at NARA, I worked for the New York State Archives for twenty-one

years. I was the Director of Operations of the New York State Archives, from 1997-2000.

In this position, I provided strategic leadership and direction for records storage,

preservation and research services operations; records management advisory services to

state and local government agencies; and archival grant programs for local government

and historical organizations.

5.  I earned a Bachelor's degree in History as well as a Master's degree in History from the

State University of New York at Albany.  I have taken graduate courses at the SUNY

School of Public Administration, attended the Pittsburgh Advanced Institute for

Government Archivists, and participated as a Bentley Historical Library Fellow at the

University of Michigan.

## BACKGROUND ON THE NATIONAL ARCHIVES

6.  The Archivist of the United States is responsible for the use and custody of all records

transferred to NARA, and by statute is required to maintain adequate facilities for the

housing of those records.  44 U.S.C. §§ 2108(a), 2110, and 2203(f)(2).  NARA is the

depository of the permanently valuable historical records and documents of the Federal

Government of the United States of America.  The National Archives was created by Congress in 1934.

7.  NARA is unique within the Federal government as its mission includes the preservation of records originating from all three branches of the government of the United States. Pursuant to the Federal Records Act, the National Archives of the United States accepts for deposit "the records of a Federal agency, the Congress, the Architect of the Capitol, or the Supreme Court determined by the Archivist of the United States to have sufficient historical or other value to warrant their continued preservation by the United States Government."  44 U.S.C. § 2107(1).

8.  In addition to these records, the Archivist, when he considers it to be in the public interest, may accept for deposit "the papers and other historical materials of a President or former President of the United States, or other official or former official of the Government, and other papers relating to and contemporary with a President or former President of the United States, subject to restrictions agreeable to the Archivist as to their use" and documents "from private sources that are appropriate for preservation by the Government as evidence of its organization, functions, policies, decisions, procedures, and transactions."  44 U.S.C. § 2111.  See also ¶ 14, *infra* (discussing records covered under the Presidential Records Act).

9.  As stated above, NARA accepts records from all "Federal agencies." The Federal Records Act defines the term "Federal agency" to mean "any executive agency or any establishment in the legislative or judicial branch of the Government (except the Supreme Court, the Senate, the House of Representatives, and the Architect of the Capitol and any activities under the direction of the Architect of the Capitol)."  44 U.S.C. § 2901(14).

10. NARA's mission is to "serv[e] American democracy by safeguarding and preserving the records of our Government, ensuring that the people can discover, use, and learn from this documentary heritage." National Archives and Records Administration, *About the National Archives,* http://www.archives.gov/about/info/mission.html (Tab A). It is crucial to NARA's mission to "ensure continuing access to the essential documentation of the rights of American citizens and the actions of their government." *Id.*

11. Under prevailing law and practice, access to records in NARA's legal custody always has depended on the source of the records and the method by which they were obtained. Access considerations (including any restrictions on access) may be governed by the Freedom of Information Act ("FOIA"), the Federal Records Act, the Presidential Records Act, the Presidential Recordings and Materials Preservation Act, the President John F. Kennedy Assassination Records Collection Act, as well as other specific statutes, deeds, or written letters. NARA ensures that access to the records complies with the applicable restrictions on each set of records.

12. Access restrictions are identified on the signed and approved Standard Form 258, *Agreement to Transfer Records to the National Archives of the United States,* at the time records are transferred to the National Archives, if they are transferred by a "Federal agency."[1]

13. Out of NARA's vast collections of permanent archives, h is estimated that NARA holds over 900,000 cubic feet of textual records in its legal and physical custody that are either not considered subject to FOIA at all, or in the case of presidential records, are subject to

---

[1] More recent transfers may be governed by a Transfer Request made in the Electronic Records Archives. The process for this transfer is discussed m the Electronic Records Archives Agency User Manual, available online at http //www.archives.gov/records-mgmt/era/agency-user-manual.pdf. This Transfer Request replaces the SF 258 when it is used.

an alternate access regime that partially incorporates aspects of the FOIA. *See* National

Archives and Records Administration, Statistical Summary of Holdings,

http://www.archives.gov/research/guide-fed-records/index-numeric/; *see also* 36 C.F.R.

§ 1250.6. These holdings include presidential records, other forms of presidential

materials, judicial records, donated records, and legislative records.  These collections are

all held in custody in one of NARA's many facilities, either in the Washington D.C. area,

or in regional archives or presidential libraries located across the country. In further

illustration of NARA's uniqueness as an Executive branch agency that holds legal and

physical custody of widely disparate collections of records not strictly governed under the

FOIA, 1 wish to speak to several examples of such holdings in more depth.

*Presidential Records and Other Materials*

14. The Presidential Records Act of 1978 changed the legal status of Presidential and Vice

Presidential records from being the personal property of the President to comprising

official records of the United States.  *See* 44 U.S.C. § 2201 *et seq.* As a result of this

determination, the records of Presidents Ronald Reagan, George H.W. Bush, William J.

Clinton, and George W. Bush were transferred into the legal and physical custody of the

Archivist immediately upon the end of each Administration; however, FOIA access, as

incorporated into the provisions of the PRA, begins as a general rule only after a period

of five years from the time the president leaves office, with certain categories of records

exempt from FOIA up to twelve years.  44 U.S.C. § 2204; National Archives and

Records Administration, *Types of Presidential Materials*, available at

http://www.archives.gov/presidential-libraries/research/types.html#pra (Tab B).

15. Prior to the passage of the Presidential Records Act of 1978, the records of the president were viewed as the personal property of the president, who could dispose of the records as he wished. Presidents Herbert Hoover, Franklin D. Roosevelt, Harry S. Truman, Dwight D. Eisenhower, John F. Kennedy, Lyndon B. Johnson, Gerald Ford, and Jimmy Carter all chose to donate their presidential records to NARA. Access to these documents and materials is governed by the restrictions that were set by the donors, and agreed to by the Archivist at the time the records were accepted. National Archives and Records Administration, *Types of Presidential Materials*, available at http://www.archives.gov/presidential-libraries/research/types.html#pra, *supra* & Tab B. On information and belief, NARA holds approximately 160,000 cubic feet of presidential textual papers from these Presidents, along with other forms of electronic records.

16. The Presidential Recordings and Materials Preservation Act applied only to the records of the Nixon Administration. 44 U.S.C. § 2111, note, Presidential Recordings and Materials Preservation Act. Access to these records is controlled under terms of the Act, not by FOIA. See NARA, *Types of Presidential Materials*, *supra* & Tab B. On information and belief, NARA holds approximately 33,000 cubic feet of presidential textual papers from President Nixon, along with tape recordings and other materials.

*Judicial Records*

17. NARA accepts the records of the judicial branch, including the records of the Supreme Court, the Circuit Courts, the District Courts, the Administrative Office of the U.S. Courts, the Court of Claims, the U.S. Commerce Court, the U.S. Courts of Appeals, the U.S. Tax Court, the U.S. Court of International Trade, the Federal Judicial Center, the U.S. Court of Veterans' Appeals, the Bankruptcy Courts, and judicial agencies, such as

the U.S. Sentencing Commission.  As records of the judicial branch, these records are not

subject to FOIA, and are instead governed by the access restrictions noted by the court at

the time of transfer.  These restrictions are typically noted on the SF-258 transfer form

(see ¶ 12, *supra*).

18. NARA holds just under an estimated 500,000 cubic feet of records from the judicial

branch.  *See* National Archives and Records Administration, Statistical Summary of

Holdings, http://www.archives.gov/research/guide-fed-records/index-numeric/.  These

records are held at the National Archives facilities in the Washington D.C. area, as well

as in facilities around the country, such as in Waltham, Massachusetts; New York, New

York; Philadelphia, Pennsylvania; Atlanta, Georgia; Chicago, Illinois; Kansas City,

Missouri; Fort Worth, Texas; Denver, Colorado; Riverside, California; San Bruno,

California; Anchorage, Alaska; and Seattle, Washington.

*Donated Records*

19. As I stated above, the Archivist has the authority to accept documents from private

sources that are appropriate for preservation by the Government.  When the Archivist

determines such records are appropriate for acceptance, access to these donated records is

controlled by the deed of gift that the Archivist agrees to upon acceptance of the records.

20. NARA holds over 8,000 cubic feet of donated records.  *See* Donated Materials Holdings

of the National Archives, http://www.archives.gov/research/guide-fed-records/index-

numeric/statistics_donated_materials.html.  These records are held at the National

Archives facilities in the Washington D.C. area, as well as in its regional archives across

the country.

*Legislative Records*

21. Noncurrent records of the Congress are transferred to NARA for preservation. 44 U.S.C. § 2118. The records of Congress remain the property of Congress, but are preserved and made available by the Center for Legislative Archives in NARA. The official Committee records of the House and Senate also remain in the legal custody of Congress, but are made available through the Center for Legislative Archives.

22. NARA also accepts the records of agencies, committees, and commissions established within the legislative branch. As records created in the legislative branch and not subject to FOIA, access to the records of the agencies, committees, and commissions are governed by the controls placed by the agency head at the time of transfer (with NARA's concurrence). 44 U.S.C. § 2108(a).

23. The Director of NARA's Center for Legislative Archives is given responsibility to "[c]onsul[t] with legislative branch agencies and commissions to establish access provisions for their records as they are not subject to the Freedom of Information Act." NARA 101, NARA Organization and Delegations, Part 8: Legislative Archives, Presidential Libraries, and Museum Services, § 2(c)(11) (Tab C). The Center for Legislative Archives holds more than 190,000 cubic feet of records that are not subject to FOIA. Center for Legislative Archives, *Congressional Records*, available at http://www.archives.gov/legislative/research/ (Tab D).

24. The records of the Financial Crisis Inquiry Commission were accepted for deposit by the Center for Legislative Archives as a commission established within the legislative branch. The SF 258 transferring the records to NARA's custody was signed by the Center for Legislative Archives. The SF 258 incorporated access instructions specified in the

8

agency head's letter to the Archivist.  SF 258, NN3-14-8-11-001 (Tab E).  NARA has

treated these records as legislative records and has controlled access as specified in the

letter from the agency head.

## THE IMPORTANCE OF MAINTAINING RECORD COLLECTIONS IN ACCORDANCE WITH ARCHIVAL PRINCIPLES

25. I am familiar with the archival principles of original order and provenance and how they

are followed at NARA.  Original order and the provenance of records are fundamental

principles of the archival profession and are practiced at NARA.

26. According to the Society of American Archivists, "original order" is "a fundamental

principle of archives." Society of American Archivists, "Glossary of Archival and

Records Terminology: Original Order,"

http://www2.archivists.org/glossary/terms/o/original-order (Tab F). The purpose of

maintaining records in their original order is to preserve the "existing relationships and

evidential significance" and to use the "record creator's mechanisms to access the

records." *Id.*

27. NARA defines "original order" as the "principle that records should be maintained in the

order in which they were placed by the organization, individual, or family that created

them." Maygene F. Daniels, "Introduction to Archival Terminology,"

http://www.archives.gov/research/alic/reference/archives-resources/terminology.html

(Tab G).

28. NARA maintains the original order of the records to provide evidence of the business

operations and systems of the creating agency. In rare cases where original order has

been disturbed through neglect or an unforeseen event, NARA staff work to restore

original order as accurately as possible, and retain a description or an audit trail of the

restoration activities. Original order is maintained by ensuring that when documents are pulled for and used by researchers they are returned to the same order and location that they were in previously. *See* 36 C.F.R. § 1254.38 (requiring that researchers keep documents in the order they are received). The records are not otherwise intermixed or incorporated into other files maintained by NARA.

29. Provenance is also a "fundamental principle of archives, referring to the individual, family, or organization that created or received the items in a collection." Society of American Archivists, "Glossary of Archival and Records Terminology: Provenance," (Tab H). The principle of provenance, which can also be called *respect des fonds*, requires that "records of different origins (provenance) be kept separate to preserve their context." *Id.* At NARA, "provenance" requires that "records created or received by one recordskeeping unit should not be intermixed with those of any other," and defines "respect des fonds" by referring to provenance. Maygene F. Daniels, "Introduction to Archival Terminology," *supra* & Tab G.

30. NARA maintains provenance by retaining records together in a single fonds or record group, depending on the size of the collection. *See* Oliver W. Holmes, "Archival Arrangement" (1964), available at http://www.archives.gov/research/alic/reference/archives-resources/archival-arrangement.html (Tab I). In the case of the records of the FCIC, this translates into the designation RG148 (Records of Commissions of the Legislative Branch), with a sub-group specifically for the FCIC records.

31. The Archivist Code, which was created by former Archivist of the United States Wayne Grover, served as the primary guidance for the archival profession for many years. The

Archivist Code states that the archivist should "endeavor to promote access to records, ... but he should carefully observe any proper restrictions on the use of records." Wayne C. Grover, "The Archivist Code," http://www.archives.gov/preservation/professionals/archivist-code.html (Tab J).

32. The Society of American Archivists recognizes archivists' role to work with "donors and originating agencies to ensure that any restrictions are appropriate, well-documented, and equitably enforced." Society of American Archivists, "SAA Core Values Statement and Code of Ethics of Archivists," http://www2.archivists.org/statements/saa-core-values-statement-and-code-of-ethics (Tab K). One of the core values of archivists, as identified by the Society of American Archivists, is the "widest possible accessibility of materials, consistent with any mandatory access restrictions." *Id.*

33. The head of a Federal agency may state in writing the restrictions that the agency head believes "to be necessary or desirable in the public interest with respect to the use or examination of records" of that agency. 44 U.S.C. § 2108(a). If the Archivist concurs with the restrictions, the Archivist will impose the specified restrictions and "may not relax or remove such restrictions" without the consent of the head of the agency. *Id.* For a terminated agency with no successor in function, the Archivist has the authority to remove the restrictions if the Archivist determines it is in the public interest to remove such restrictions. *Id.* The restrictions, unless otherwise removed, "shall remain in force until the records have been in existence for thirty years." *Id.*

34. The Financial Crisis Inquiry Commission Chairman, serving as head of the Federal agency under the Federal Records Act, wrote to the Archivist specifying the restrictions

he believed to be necessary or desirable in the public interest. These restrictions were accepted by NARA in the SF 258.

35. To the best of my knowledge, I know of no instance in the history of the National Archives since its inception in 1934 where the Archivist of the United States or his staff intentionally overrode or contravened the expressed intent of a donor of records with respect to the imposition of restrictions on access. Moreover, I am unaware of any instance in which records that have been accepted, pursuant to 44 U.S.C. § 2107, into the legal custody of NARA from a component of government not covered by the FOIA have been subsequently deemed to be within the scope of the FOIA. By creating an administrative process outside of FOIA that provides for public access to legislative records, the Center for Legislative Archives is conscientiously fulfilling NARA's dual missions of promoting maximum public access to records while also respecting the provenance of records (and any restrictions that the originating entity imposed on those records).

I declare under penalty of perjury that the foregoing is true and correct.

THOMAS E. MILLS

Executed this 31st day of October, 2012.

# Tab A



Research Our Records | Veterans Service Records | Teachers' Resources | Our Locations | Shop Online

## About the National Archives

Home > About the National Archives > Vision and Mission

**About Us**

Visit Us
Vision & Mission
Organization
History

**Budgets, Plans, & Reports**

Strategic Plans
Performance Plans
Performance Budgets
Performance & Accountability Reports
E-Gov Report
State of the Archives and other Speeches & Writings
**All Reports & Plans ➡**

**Rules & Regulations**

Laws & Authorities
Regulatory Process
NARA's Regulations
Significant Guidance

**Feedback**

Contact Us
Comment on Draft Policy & Regulations
Inspector General Hotline
Customer Service Commitment

**Employment**

Jobs, Internships & Volunteering
Equal Employment Opportunity

**Resources**

Press Releases
Publications
Information Quality
Our Records Schedule
Electronic Records Archives (ERA)
Services to Members of

# Our Vision Statement

As the nation's record keeper, it is our vision that all Americans will understand the vital role records play in a democracy, and their own personal stake in the National Archives. Our holdings and diverse programs will be available to more people than ever before through modern technology and dynamic partnerships. The stories of our nation and our people are told in the records and artifacts cared for in NARA facilities around the country. We want all Americans to be inspired to explore the records of their country.

# Our Mission Statement

The National Archives and Records Administration serves American democracy by safeguarding and preserving the records of our Government, ensuring that the people can discover, use, and learn from this documentary heritage. We ensure continuing access to the essential documentation of the rights of American citizens and the actions of their government. We support democracy, promote civic education, and facilitate historical understanding of our national experience.

**For more information, see:**
**Our Strategic Plan: Preserving the Past to Protect the Future**

# Tab B



NATIONAL ARCHIVES

Blogs | Bookmark/Share | Contact Us

Research Our Records | Veterans Service Records | Teachers' Resources | Our Locations | Shop Online

## Presidential Libraries

Home > Presidential Libraries > Research > Types of Presidential Materials

**Presidential Libraries**

Learn about Presidential Libraries

Visit Presidential Libraries and Museums

Research Presidential Materials

Get Involved

Search Presidential Libraries Web Sites

# Types of Presidential Materials

There are three types of Presidential Materials. The law that applies to the materials depends on:

- how the materials are defined.
- the year it was created.

## Donated Historical Materials

Until the Reagan administration, materials created during the presidency, with the exception of Nixon, were considered the personal property of the President or his associates, and came to NARA as donated historical materials.

- The Presidential collections from Hoover through Carter, excluding Nixon, are maintained by the Presidential libraries and governed by individual donor deeds of gift.
- The acceptance of these collections is covered by the Presidential Libraries Act of 1955, and NARA observes any restrictions on access to these materials that have been set by the donors, and agreed to by the Archivist of the United States.
- As a result, some of the Presidential materials in the custody of the Presidential libraries may not currently be available for research.
- Staff at the individual Presidential libraries can advise researchers on the availability of particular collections.

## Presidential Records

In 1978, Congress passed the Presidential Records Act (PRA), which changed the legal status of Presidential and Vice Presidential materials. Under the PRA, the official records of the President and his staff are owned by the United States, not by the President.

- The Archivist is required to take custody of these records when the President leaves office, and to maintain them in a Federal depository.
- These records are eligible for access under the Freedom of Information Act (FOIA) five years after the President leaves office.
- The President may restrict access to specific kinds of information for up to 12 years after he leaves office, but after that point the records are reviewed for FOIA exemptions only.
- This legislation took effect on January 20, 1981, and the records of the Reagan administration were the first to be administered under this law.
- Staff at the Reagan Library, the George H. W. Bush Library, the William J. Clinton Library, and the George W. Bush Library can provide additional information regarding access to Presidential records in their collections.
-

**Types of Presidential Materials**

- Donated Historical Materials
- Presidential Records
- Presidential Historical Materials

*See Also:*

- Types of Documents
- Laws & Regulations

Staff at the libraries can provide additional information regarding access to Presidential records in their collections.

## Presidential Historical Materials

Only the Nixon Presidential Historical Materials are governed by the Presidential Recordings and Materials Preservation Act (PRMPA) of 1974.

- This only applies to the Nixon Presidential Historical Materials and none of the other libraries.
- The Nixon Presidential Materials Staff at the National Archives at College Park, MD is responsible for preserving these materials and preparing them for public access under the law.
- For information regarding the availability of these materials, researchers should contact the Nixon Staff directly.

| Information For… | Publications | Orgs & Offices | I Want To… | Resources | Connect With Us |
|---|---|---|---|---|---|
| Citizen Archivists | Federal Register | Federal Records Center | Get My Military Record | A-Z Index | Blogs |
| Federal Employees | Free Publications | Office of the Inspector General | Plan a Research Visit | America's Founding Docs | Facebook |
| Genealogists | Prologue Magazine | Presidential Libraries | View Online Exhibits | Contact Us | Flickr |
| Members of Congress | Purchase Publications | More... | Apply for a Grant | En Español | RSS Feeds |
| Preservation | More... | **About Us** | **Participate** | FAQs | Twitter |
| Records Managers | | What is the National Archives? | Attend an Event | Forms | YouTube |
| The Press | | Doing Business with Us | Donate to the Archives | | More... |
| | | Plans and Reports | Work at the Archives | | |
| | | Open Government | Volunteer at the Archives | | |
| | | Our Plain Language Efforts | | | |

# Tab C



Archives.gov    USA.gov    What's New

SEARCH

| Staff Resources & Services | Supervisor Resources | Policies & Guidance | Archives & Records Management | Safety Security & Emergency | Organizations | Acquisitions Budget & Finance | Project Information | Information Technology | Strategic Planning & Reporting |

▲ Home » NARA Policies & Guidance » Directives » 0100 Series » NARA 101, Part 08 - Legislative Archives, Presidential Libraries, and Museum Services

**Directives**

› Main Page

- 100 - Mission and Organization
- 200 - General Administration
- 300 - Human Resources
- 400 - Budget and Accounting
- 500 - Procurement (Acquisition)
- 600 - Travel
- 700 - Transportation
- 800 - Information Management
- 900 - Congressional and Legislative
- 1100 - Legal, Ethics, and Professional Conduct
- 1200 - Audits and Investigations
- 1300 - Records Lifecycle (general)
- 1400 - Front End
- 1500 - Archival
- 1600 - Access
- Interim Guidance
- Canceled or Superseded Guidance

**Search NARA Directives:**

SEARCH

› Help
› Advanced Search

**Employee Locator**

GO

›› Advanced Employee Locator.

🖨 Print Page      ✉ E-mail Page      ⭐ Add to Favorites      💬 Comment

# NARA 101, Part 08 - Legislative Archives, Presidential Libraries, and Museum Services

**July 31, 2011**

Organization chart 📄

## ORGANIZATION

1. Executive for Legislative Archives, Presidential Libraries, and Museum Services
2. Director, Center for Legislative Archives
3. Director, Presidential Libraries
4. Director, Presidential Materials Division
5. Presidential Libraries
6. Richard Nixon Library
7. Existing Presidential Libraries and museums
8. Presidential Libraries' Director's Council
9. Education and Public Programs
10. Exhibits

## DELEGATION OF AUTHORITIES

**Authorities Delegated to Legislative Archives, Presidential Libraries and Museum Services by the Archivist**

11. Accession and Transfers/Accept Records and Donated Historical Materials
12. Appraisal
13. Access to Records and Donated Historical Materials
14. Servicing Records and Donated Historical Materials
15. Implementation of Presidential Records and Materials Preservation Act
16. Other
17. General Administration

## ORGANIZATION

**1. Executive for Legislative Archives, Presidential Libraries, and Museum Services**

a. Ensures office coordination and direction by consulting and collaborating with staff, managers, and colleague executives across NARA, as well as the COO, the Deputy Archivist, and the Archivist. Evaluates feedback from key subordinates and considers evaluation reports from GAO, NARA's IG, OMB, and other relevant bodies.

b. Provides executive leadership ensuring coordination among programs within the scope of this Service, achieving "one NARA" and "one-voice" presentation to various audiences, with responsibility for ensuring coordination among NARA's museum and outreach programs; ensures "open NARA" principle of seeking input and participation from staff, stakeholders and customers is actively pursued.

c. In cooperation with the Director for Presidential Libraries, serves as principal consultant and adviser to the Archivist of the United States and Deputy Archivist on matters involving the Presidential Libraries, participating in policy development, implementation, or interpretation; planning proposed libraries for present and future Presidents in close coordination with the White House and other interested parties; assessing the business model of the Presidential Library system, conducting negotiations with key figures in American political life regarding deposit of personal papers in libraries; and initiating contacts with educational institutions, historical societies and other professional associations to foster awareness of NARA.

d. In cooperation with the Center for Legislative Archives Director, serves as principal consultant and adviser to the Archivist of the United States and Deputy Archivist on matters involving the Center for Legislative Archives, participating in policy development, implementation, or interpretation; planning programs and outreach to members of Congress and their staffs; and initiating contacts with educational institutions, historical societies and other professional associations to foster awareness of NARA.

e. In cooperation with the Director of the Presidential Materials Division, serves as a principal consultant and adviser to the Archivist of the United States and Deputy Archivist on courtesy storage for incumbent Presidential and Vice Presidential records and artifacts, White House records management and transition issues, declassification and classification management of Presidential Library records and materials, and access issues dealing with Presidential records.

f. In cooperation with the Education and Public Programs Director serves as principal consultant and advisor to the Archivist of the United States and the Deputy Archivist on matters relating to the educational use of NARA's records, participating in policy and strategy development and conducting negotiations with key partners in the development and delivery of educational services and public programs.

g. In cooperation with the Exhibits Director serves as principal consultant and advisor to the Archivist of the United States

and the Deputy Archivist on matters relating to the development of new exhibits and services for visitors as well as the loan of materials for exhibit outside the agency, participating in policy and strategy development and conducting negotiations with key partners in the development of exhibits.

h.   Provides executive direction supporting front-line teams and their management, encouraging them to propose process improvement and services development/delivery for better customer service. Ensures customer-driven focus in the development of new processes and services.

i.   Analyzes content and character of operating programs in terms of legal compliance and financial viability, responsiveness to customers, quality of relations with stakeholders, program cost-effectiveness, and other similar objective criteria. Assesses program strategies, objectives, and plans for short- and long-term effectiveness. Evaluates operations for resource utilization and stewardship, and for financial due diligence and impacts upon NARA. Proactively seeks data and input about the effectiveness of functions performed within the office's scope, and proactively seeks to rectify issues. Determines the priorities, objectives and policies of NARA's Legislative Archives, Presidential Libraries, and Museum Services office by consulting with team of directors, managers, and staff and executive colleagues.

j.   Enables gathering of the Presidential Library Directors' Council, ensuring creation of meeting agendas, schedules, and minutes. The Council consists of the Archivist, the Executive, the Director for Presidential Libraries, all Library Directors, and the Director of the Presidential Materials Division, gathered to discuss opportunities and concerns, and to participate in creating and implementing library strategies and initiatives.

k.   Collaborates with staff and managers in Research Services in shared support of archival access, exhibit, education, and public and outreach programs, especially in the preservation and loan of records for public outreach purposes.

l.   Collaborates with the Chief Strategy and Communications Officer to discuss NARA messaging and communications strategy related to the work of Legislative Archives, Presidential Libraries, and Museum Services.

m.   Collaborates with staff and managers across NARA on common practice and support for records management and archival issues including the declassification of records and access and use issues.

n.   Collaborates with Business Support Services to obtain services and to coordinate NARA property, facility, security, IT, finances, and purchasing matters.

o.   Collaborates with the Chief Financial Officer and the Chief Human Capital Officer in evaluation of budgetary data and information relating to planned utilization of personnel; analyzes plans and recommends changes, considering personnel impact of new or emerging mandates or trends.

p.   Provides executive direction to staff through management teams. Sets performance standards and appraises performance of key subordinates; approves promotions, reassignments, awards, training and other personnel actions; makes selections for key positions; hears and resolves formal complaints and grievances; makes final decisions on disciplinary and performance based actions; develops the organization's budget and monitors the expenditure of resources; and approves purchases.

q.   Participates in NARA executive teams, shaping NARA's strategic direction and producing practical and creative high-level approaches to address related matters such as: agency-wide aligned outcomes/goals and priorities, customer- and stakeholder-focused needs and expectations, internal change management, employee satisfaction, outreach and relationship-building, "one-voice" communication, and problem resolution.

r.   Collaborates with Regional Liaisons, who report to the COO, to explore and coordinate approaches regarding shared goals and outcomes.

**2.   Director, Center for Legislative Archives**

a.   Serves as the repository for the official records of the U.S. House of Representatives and the U.S. Senate, which remain in the permanent legal custody of the House of Representatives and Senate, respectively. House and Senate records are exempt from the Federal Records Act and, reflecting their status as records of independent institutions in a separate branch of government, are governed solely by House and Senate rules, respectively. Also holds records of legislative branch agencies and commissions.

b.   Reports to and implements the mandates, recommendations, and guidelines established by the Advisory Committee on the Records of Congress, which was established under the authority of Public Law 101-509 (November 5, 1990) to advise Congress and the Archivist of the United States on the management and preservation of the records of Congress.

(1)  Center serves as the administrative secretariat for the committee, providing administrative services and travel arrangements.

(2)  Center reports twice a year to the committee at its biannual meetings, providing formal mid-year and annual reports on Center resources, programs, activities, accomplishments, and challenges.

(3)  Center assists in the drafting of the committee's published reports (issued on a six-year cycle), reporting Center performance and results on the committee's mandates and recommendations.

c.   Center's Archival Programs

(1)  At the request of the House and Senate Archivists, Center staff assists in the appraisal of textual and electronic records of the House and Senate. Staff also assists NARA Agency Services staff in the appraisal of legislative branch agency and commission records.

(2)  At the request of the House and Senate Archivists, Center staff plans, coordinates, and tracks the transfer of textual and electronic records from the House and Senate to the Center.

(3)  Establishes safe, secure, and protected control of House and Senate records; access is restricted to Center staff only.

(4)  Identifies, locates, and delivers closed, sensitive House and Senate records to the appropriately designated committee staff in a timely manner to support the current business of the U.S. Congress.

(5)  Performs holdings maintenance and preservation activities on the textual and electronic records of the House and Senate; all major preservation treatments must be approved by the Clerk of the House of Representatives or Secretary of the Senate, as appropriate.

(6)   Administers restrictions on access to House committee records following the provisions of House Rule VII. Complex requests and access issues are referred to the Clerk of the House of Representatives for final determination.

(7)   Administers restrictions on access to Senate committee records following the provision of Senate Resolution 474 (96th Congress). Complex requests and access issues are referred to Senate committee chairs for final determination.

(8)   Procures, administers, and operates the local version of the Congressional Records Instance of the Electronic Records Archive (CRI-ERA) to transfer, ingest, verify, and process the electronic records of the House and Senate. Maintains compatibility, common functionalities, and communication linkages with the remotely stored version of CRI-ERA.

(9)   Provides public reference service on the open records of the House, Senate, and legislative branch agencies and commissions to researchers.

(10)   Coordinates the declassification of Congressional committee records and legislative branch agency records with the National Declassification Center.

(11)   Consults with legislative branch agencies and commissions to establish access provisions for their records as they are not subject to the Freedom of Information Act.

(12)   Creates, prepares, and presents finding aid information and records description to reflect the unique institutional characteristics of the House of Representative and the Senate and their records holdings.

d.   Center's Exhibition Program

(1)   Center staff serves on the exhibition content team for the Capitol Visitor Center. The team is chaired by Capitol Visitor Center staff in the Architect of the Capitol's Office, and includes staff from the Senate Historian's Office, House Historian's Office, and the Library of Congress. The team identifies thematic emphases for CVC exhibits, selects documents for display, and drafts content. All exhibit content must be approved by the Capitol Preservation Commission, which is an 18 member bipartisan and bicameral commission composed of the top leaders in the House and Senate. All loans of House and Senate records for exhibition purposes must be approved by the Clerk of the House of Representatives or the Secretary of the Senate, as appropriate.

(2)   On NARA exhibit projects with a major focus on Congress, Center staff collaborates with staff in Exhibits and Presidential Libraries.

e.   Center's Educational and Public Programs

(1)   Center staff performs outreach activities and services to disseminate House and Senate records that document the history of Congress and representative government, through the presentation of educational workshops, public lectures, and web and print publications for the general public, members of Congress, educators and educational institutions, students, and scholars. The Center partners with the House and Senate Historical Offices, fellow members of the Association of Centers for the Study of Congress, other congressionally-oriented groups and associations, and educational institutions on public programs and educational projects consistent with its mission to expand public understanding of Congress and the history of representative government.

(2)   On NARA public programs and educational projects with a major focus on Congress, Center staff collaborates with staff in Education and Public Programs and Presidential Libraries.

**3.   Director, Presidential Libraries**

a.   Plans, directs, and coordinates comprehensive programs for the acquisition, storage, preservation, and servicing, and disposal of Presidential records, Federal records, and donated historical materials (including artifacts) in Presidential libraries and Presidential materials projects.

b.   Plans and coordinates in conjunction with Director of Presidential Materials Division a comprehensive program for the review and disposal of Presidential papers, materials and records.

c.   Develops policies and procedures for the management and operation of Presidential libraries and Presidential materials projects.

d.   Develops, coordinates, and monitors overall plans, programs, and resource allocations for the Presidential Libraries.

e.   Develops and coordinates plans for the establishment of new Presidential Libraries.

f.   Coordinates system-wide education, museum, and public programs to advance the Presidential Libraries' ability to use its holdings for the support of civic education. Coordinates multi-library exhibit and conference programming in support of the Presidential Libraries.

g.   Represents the Presidential Libraries on agency-wide initiatives involving archives, museum, education, and public programming. Coordinates these efforts with other program offices.

h.   Serves as a representative of NARA and Presidential Libraries in the larger museum and education community and facilitates the National Archives' Presidential libraries' cooperative efforts with these institutions.

i.   Ensures collaboration with Research Services staff and Center for Legislative Archives staff to identify records useful in responding to customers' requests.

j.   Collaborates with Regional Liaisons, who report to the COO, to explore and coordinate approaches regarding shared goals and outcomes.

**4.   Director, Presidential Materials Division**

a.   Plans, directs and coordinates a comprehensive program for courtesy storage of Presidential records and other historical materials and artifacts, including those created or received by the incumbent Presidential administration pending their transfer to a Presidential Library or other authorized NARA facility.

b.   Provides assistance to White House Staff and officials on records creation, management, and disposition and conducts training to improve records management practices.

c.   Directs a program of providing access policy guidance and support to the Presidential Libraries working in conjunction with the Executive, the Deputy of Presidential Libraries and NARA's General Counsel.

d.  Directs an access staff team responsible for processing special access requests for Presidential records. Works directly with NARA's General Counsel, White House Counsel, the representatives of the former Presidents and Vice Presidents, and the Directors of the Presidential Record Act Libraries regarding access to Presidential and Vice Presidential records. Implements the required notification requirements of the Presidential Records Act (PRA) and EO 13489, and NARA's applicable regulations.

e.  In coordination with the Executive, the Director of Presidential Libraries, Presidential Library Directors and the National Declassification Center, plans and coordinates a comprehensive program to manage, review and declassify security classified materials in the Presidential Libraries.

f.  Directs the storage, preservation, servicing, access to, and processing of records and artifacts in the custodial control of the Presidential Materials Division.

g.  Coordinates with the White House on the movement of all Presidential records and artifacts at the end of the Administration. Directs the move staff assigned for this purpose including serving as the liaison with the military staff assigned for this function.

h.  Serves on special task forces or represents NARA or Presidential libraries dealing with archival issues of declassification, access, processing Presidential records.

i.  Plans and coordinates with the Director for Presidential Libraries on the training of new archival hires for the Presidential Libraries.

**5.  Presidential Libraries**

Perform the following functions for the libraries listed in para. 7:

a.  In accordance with applicable laws and regulations, appraises Presidential and Federal records in their custody to determine whether they have or will continue to have sufficient value to warrant preservation by the U.S. Government and recommends appropriate disposition action for approval by the Archivist.

b.  Solicits, negotiates, and reviews offers to donate documents or other historical materials, determines whether it is in the public interest to accept them for deposit, and recommends appropriate action for approval by the Archivist.

c.  Accepts for deposit, or affects the transfer of, records and other historical materials that have been determined by the Archivist to have sufficient value to warrant continued preservation.

d.  Disposes of records and other historical materials in accordance with applicable laws and regulations, and the terms of deeds of gift.

e.  Reviews Presidential records, Federal records, and donated historical materials for national security, statutory, and when applicable, donor's deeds of gift restrictions on access.

f.  Services records and other historical materials by furnishing the records or materials, or information from them, or copies of them, to U.S. Government agencies and the public.

g.  Operates research rooms for public or U.S. Government agency use of records and other historical materials or copies thereof.

h.  Reviews and responds to Freedom of Information Act (FOIA) requests, mandatory review requests and appeals, and appeals for access to records and other historical materials restricted by donor's deeds of gift.

i.  Establishes physical and management control over the records, including the storage, arrangement, and security of records and other historical materials and the space housing them.

j.  Inspects records and other historical materials to determine the state of their preservation; identifies those requiring preservation and repair or reproduction; determines the appropriate treatment; and carries out appropriate measures on site or arranges for appropriate treatment by another NARA unit, or by contract.

k.  Analyzes records and other historical materials to understand the origins, filing systems, content, technical and legal problems, and uses; prepares descriptive guides, lists, inventories, and other finding aids; and performs research in the administrative history of Presidential administrations.

l.  Plans and conducts programs for the documentary publication of records and other historical materials.

m.  Plans and conducts oral history projects relating to the holdings of the library.

n.  Exhibits records and other historical materials and assists other elements of NARA in the preparation of exhibits by recommending and providing records and other historical materials from the holdings.

o.  Develops joint exhibit projects internally and externally to NARA, partnering with organizations to advance the mission of the Presidential Library and Museum. Develops traveling exhibits.

p.  Serves as a representative of NARA in the larger museum community and facilitates NARA's cooperative efforts with these institutions.

q.  Loans materials to other NARA units and to institutions external to NARA that meet NARA standards for display.

r.  Develops, provides, and promotes public and educational programs that provide for greater understanding and use of NARA's cultural services and educational resources and services by educational and research institutions and the general public.

s.  Develops education programs with a local, regional, national, and international impact. Supports online educational and outreach tools and initiatives, including the use of social media.

t.  Recruits and trains volunteers for in-service and outreach programs.

u.  Operates a museum, a museum shop, and sells publications and historical mementos.

v.  Manages deposits to and expenditures from the library's National Archives Trust Fund account.

w.  Administers the day-to-day facilities management program of the library in coordination with Presidential Libraries, and

major renovation and restoration projects in coordination with Presidential Libraries and Business Support Services.

x.  Develops and administers the local program for the efficient operation of the library in an emergency, including the self-protection program for civil defense, fire prevention, and building safety.

y.  Collaborates with staff and managers across NARA on common practice and support for records management and archival issues including the declassification of records and access and use issues. Collaborates with Regional Liaisons, who report to the COO, to explore and coordinate approaches regarding shared goals and outcomes.

z.  Serves as lead on maintaining relationship with respective Presidential Foundation, Institute or Association. Collaborates with Foundation on joint programming and initiatives to advance the Presidential Library and Museum.

aa.  Serves as a representative of the Presidential Library and NARA to community groups, as well as national and international audiences. Representation spans scope of Presidential Library to include archives and research, museum, education, and public programming.

### 6.  Richard Nixon Library

In addition to the functions listed under para. 5, Presidential libraries, the Richard Nixon Library with support by the Richard Nixon Library - College Park, in accordance with Pub. L. 93-526, 88 Stat. 1695, as affected by existing court orders and as implemented by regulations issued by the Archivist:

a.  Inspects Nixon Presidential materials to determine the state of their preservation; identifies those requiring preservation and repair or reproduction; determines the appropriate treatment; and carries out appropriate measures on site or arranges for appropriate treatment by another NARA unit, or by contract.

b.  In accordance with the Presidential Recordings and Materials Preservation Act regulations governing Nixon materials and legal settlement, reviews for national security and statutory restrictions on access and materials to be returned to the Nixon estate.

c.  Disposes of Nixon Presidential materials in accordance with applicable laws and regulations.

### 7.  Existing Presidential Libraries and museums

a.  Herbert Hoover Presidential Library and Museum

b.  Franklin D. Roosevelt Presidential Library and Museum

c.  Harry S. Truman Presidential Library and Museum

d.  Dwight D. Eisenhower Presidential Library and Museum

e.  John F. Kennedy Presidential Library and Museum

f.  Lyndon Baines Johnson Presidential Library and Museum

g.  Richard Nixon Presidential Library and Museum

h.  Gerald R. Ford Presidential Library and Gerald R. Ford Presidential Museum

i.  Jimmy Carter Presidential Library and Museum

j.  Ronald Reagan Presidential Library and Museum

k.  George Bush Presidential Library and Museum

l.  William J. Clinton Presidential Library and Museum

m.  George W. Bush Presidential Library and Museum

### 8.  Presidential Libraries' Director's Council

Chaired by the Archivist, consists of the Executive for Legislative Archives, Presidential Libraries and Museum Services, the Director for Presidential Libraries, all Library Directors, and the Director of the Presidential Materials. This council is a forum for the directors to discuss opportunities and concerns, and to participate in creating and implementing library strategies and initiatives.

### 9.  Education and Public Programs

a.  Leads a defined, coordinated, and unified national education program for NARA, fostering K-12 and post-secondary educational programming as well as educational experiences for the general public.

b.  Supports initiative and management of educational services and products produced by the Education and Public Programs staff in Washington DC and at field locations, excluding Presidential Libraries.

c.  Collaborates and coordinates with the Director of Presidential Libraries and Library Directors and their education staff in the Presidential Libraries, the Center for Legislative Archives, and the education directors of the Regional Archives to achieve NARA's education program goals. Collaborates and coordinates with Research Services staff in shared support of outreach and education programs and archival access.

d.  Collaborates with Research Services staff to identify records useful in outreach programming and to conduct educational programming of interest to educators, students, and the general public.

e.  Develops and manages the programs of the William G. McGowan Theater, including the scheduling of film and author-lecture programs and special events. Develops and maintains the Guggenheim Center for the Documentary Film that uses NARA's film holdings as well as contemporary documentaries related to NARA's holdings for purposes of educational outreach.

f.  Manages the Boeing Learning Center including the ReSource Room and the Learning Lab as well as workshops and training for teachers at sites across the country.

g.  Develops and manages the development of online tools for teachers and students as well as videoconferences and other remote training opportunities.

h.  Manages the Modern Archives Institute.

i.  Manages NARA's volunteer program in the Washington, DC area, which provides extensive resources in support of NARA's archival work, customer service, and public programs, through local program coordinators.

j.  Promotes and publicizes NARA and its educational and cultural services to educational and research institutions and similar organizations through a variety of means including public lectures, scholarly conferences and symposia, open houses and tours, film festivals, presentations at historical archival and genealogical organization meetings, social media, special events and education workshops. Collaborates with Regional Liaisons, who report to the COO, for assistance, expertise, contacts, and resources supporting nationwide coordination of these services.

k.  Serves as a representative of NARA in the larger education community and facilitates NARA's collaborations with similar institutions.

**10.  Exhibits**

a.  Leads a defined, coordinated, and unified national exhibit program for NARA.

b.  Initiates and manages exhibits (including traveling exhibits), museum visitor services, and related web products produced by exhibits staff in Washington, DC, Kansas City's Exhibit Specialist, and the National Museum Exhibit Coordinator.

c.  Collaborates and coordinates with the Director of Presidential Libraries and Library Directors and their staffs, and the Center for Legislative Archives to achieve NARA's exhibits program goals.

d.  Collaborates and coordinates with Research Services staff in shared support of exhibit programs and archival access and with Preservation Programs staff within Research Services for expert advice and assistance on the care and control of artifacts.

e.  Develops and maintains the National Archives Experience in Washington, DC. Manages the signage program in the public lobbies; ensures the continuing intellectual and physical integrity of the exhibits in the Rotunda for the Charters of Freedom and the Public Vaults; prepares or rents exhibits for the Lawrence F. O'Brien gallery; assists other NARA units in the preparation of exhibits.

f.  Manages the exhibit loan registration program (except for the Presidential Libraries) including loans to other NARA units and outside organizations; coordinates review and approval of exhibit loan requests; documents exhibit history of federal and legislative records, ensures that NARA standards are upheld in the exhibition of original records, and develops traveling exhibits available to other NARA units and to outside organizations. Loans to originating agencies are the responsibility of custodial units, unless loans are for exhibit purposes.

g.  Establishes service standards for the National Archives Experience, and works closely with Business Support Services to effectively maintain a secure, clean and safe environment for visitors. Coordinates planning and scheduling of public space and equipment use, and for building services with both the Strategy and Communications Office and Business Support Services.

h.  Collaborates with the Strategy and Communications Office to assist in NARA's oversight of interests in exhibit contracts underwritten by the Foundation for the National Archives.

i.  Serves as a representative of NARA in the larger exhibits community and facilitates NARA's collaborations with similar institutions.

## DELEGATION OF AUTHORITIES

### Authorities Delegated to Legislative Archives, Presidential Libraries and Museum Services by the Archivist

**11.  Accession and Transfers/Accept Records and Donated Historical Materials**

a.  Solicit, negotiate terms of transfer, assume custody, and transfer personal papers and other historical materials of any President of the United States, any Vice President of the United States and of any official or former official of the U.S. Government and other contemporary papers relating to the President or former President of the United States, and from other private sources, and administer any restrictions agreed to upon transfer or accession of such papers and materials (44 U.S.C. 2111; and 2111 note 2203(f)(1); 2204). This authority may be redelegated to Presidential Libraries, Project and Staff Directors, and the Presidential Materials Director. The Archivist's approval is also required in cases of special terms of access or custody, or in high profile cases.

b.  Assume custody and control of Presidential and Vice-Presidential records at the conclusion of an incumbent's last consecutive term of office, transfer the records to an appropriate archival depository, provide for their preservation and archival processing, and establish means for public access thereto (44 U.S.C. 2203(f); 2204; 2207). The authority to preserve, process, and establish means for public access is delegated to Presidential Libraries, the Presidential Materials Director, and Project and Staff Directors. The authority to assume custody and control and to transfer records is retained by the Archivist of the United States and may be delegated to the Executive of Legislative Archives, Presidential Libraries and Museum Services.

c.  Accept for deposit with the National Archives of the United States records of the Congress determined by the Archivist to have sufficient historical value to warrant their continued preservation (44 U.S.C. 2107(1)). This authority may be redelegated to the Center for Legislative Archives, and is limited to records scheduled for deposit with the National Archives of the United States.

d.  Accept for deposit from private sources documents and other materials, including motion pictures, still pictures, and sound and video recordings, that are appropriate for preservation by the U.S. Government (44 U.S.C. 2107(4) and 2111(2)). This authority may be redelegated to the Center for Legislative Archives, in consultation with Records Management Services, DC Metro Access Coordinator, also may be redelegated to the Library Directors, the Presidential Materials Director and Project and Staff Directors and approval by the Archivist in cases of special terms of access or custody, or high profile cases.

**12.  Appraisal**

a.   Determine on behalf of the Archivist that records of the U.S. Senate, U.S. House of Representatives and the Joint Committees of Congress have sufficient historical or other value to warrant their continued preservation by the U.S. Government (44 U.S.C. 2107(1), (2)). This authority may be redelegated to the Center for Legislative Archives. There are no limitations on this delegation of authority.

b.   Review previously unappraised records included in disposition lists and schedules and recommend to the Archivist disposal of those that do not or will not, after the period specified, have sufficient administrative, legal, research, or other value to warrant their continued preservation by the U.S. Government (44 U.S.C. 3303a(a)). This authority may be redelegated to the Center for Legislative Archives. There are no limitations on this delegation of authority.

c.   Review and make a recommendation to the Archivist concerning the proposed disposal request for Presidential or Vice-Presidential records of an incumbent (44 U.S.C. 2203 (c), (d), (e); 2207). This authority is retained by Legislative Archives, Presidential Libraries and Museum Services and may not be redelegated.

d.   Recommend to the Archivist the disposal of Presidential and Vice Presidential records in NARA's legal custody that have insufficient administrative, historical, information, or evidentiary value to warrant continued preservation (44 U.S.C. 2203(f)(3); 2207). This authority may be redelegated to Presidential Library, Presidential Materials Director, Project, and Staff Directors, subject to the concurrence of Legislative Archives, Presidential Libraries and Museum Services.

### 13.   Access to Records and Donated Historical Materials

a.   Impose restrictions on the use of records, papers, documents, or other historical materials transferred to NARA when those restrictions have been stated in writing by the transferring agency (for Federal records in keeping with the withholdings allowed by the Freedom of Information Act, 5USC 552(b) or for donor deeded papers in keeping with the donor deed of gift restrictions and concurred in by the Archivist (44 U.S.C. 2108(a); 2111). This authority is retained by Legislative Archives, Presidential Libraries and Museum Services, the Director of Presidential Materials, and the Director of a Library, Project, or Staff. There are no limitations on this delegation of authority.

b.   Administer restrictions on access to Nixon Presidential Historical Materials in accordance with the Presidential Recordings and Materials Preservation Act, (44 USC 2111note) and the Nixon Regulations (CF cite). This authority may be delegated to the Director of the Nixon Presidential Library. There are no limitations on this delegation of authority.

c.   Administer restrictions on access to Presidential and Vice-Presidential records based on restrictions imposed by the President or Vice-President in accordance with requirements of the Presidential Records Act of 1978 (44 U.S.C. 2204; 2207). Also administers exemptions on access to Presidential and Vice Presidential records in keeping with the Freedom of Information Act as it is incorporated into the Presidential Records Act, 44 USC 2204. This authority may be delegated to Presidential Library, Presidential Materials Director, Project, and Staff Directors. There are no limitations on this delegation of authority.

d.   Downgrade and declassify classified information transferred or accessioned into the National Archives of the United States with delegated guidance or declassification authority from originating equity-holding agency in accordance with the requirements of E.O.13526. This authority may be delegated to Presidential Library, Presidential Materials Director, Project and Staff Directors and the Director of the Center for Legislative Archives. The review, downgrading, and declassification of White House originated national security information may be done only in consultation with the National Security Council and by personnel who are recommended by Legislative Archives, Presidential Libraries and Museum Services, the Director of Presidential Materials, the Director of a Library, Project, or Staff, and specifically designated by the Archivist. Other national security-classified information may be reviewed, downgraded, and declassified only by personnel designated by Legislative Archives, Presidential Libraries and Museum Services and with the authority of the original equity-holding agencies. All individuals must have been granted the necessary clearances by the NARA Personnel Security Officer or another clearance granting agency.

### 14.   Servicing Records and Donated Historical Materials

Preserve, arrange, repair, describe, rehabilitate, exhibit, and service accessioned records and donated materials; prepare and publish inventories, indexes, catalogs, and other finding aids (44 U.S.C. 2109; 2110). This authority may be redelegated to the Directors of the Center for Legislative Archives, Presidential Libraries, and Presidential Materials, and must be coordinated with Research Services, Preservation Programs Division and with Information Services, Online Public Access Branch.

### 15.   Implementation of Presidential Records and Materials Preservation Act

Assume custody and exercise control of all tape recordings, papers, documents, memorandums, transcripts, and other objects and materials that constitute the Nixon Presidential materials as defined in the Presidential Recordings and Materials Preservation Act and perform the duties and exercise the authorities of the Archivist as stated in Pu93 526; 88 Stat. 1695; 44 U.S.C. 2111 note; 36 CFR CXII, Subchapter F. This authority may be redelegated to the Director of the Richard M. Nixon Library. An opening of materials to public access must be approved by Legislative Archives, Presidential Libraries and Museum Services, General Counsel, and the Archivist and in accordance with the regulations governing access to Nixon Presidential Historical Materials.

### 16.   Other

a.   Provide advice, counsel, and assistance to the heads of executive departments and agencies in the preparation, production, or the creation of exhibits and displays that are found to have future value for exhibition as part of the archival and cultural heritage of the United States; accept exhibits and preserve or dispose of accepted exhibits and displays of executive departments and agencies (44 U.S.C. 2109; E.O. 11440 of December 11, 1968). This authority may be redelegated to the Directors of the Center for Legislative Archives, Presidential Libraries, Presidential Materials, Education and Public Programs, and Exhibits divisions. There are no limitations on this delegation of authority.

b.   Cooperate with and assist universities, institutions of higher learning, institutes, foundations, or other organizations or qualified individuals to conduct study or research in any historical materials deposited in a Presidential library or with the Presidential Materials Division.(44 U.S.C. 2111(1); 2112(d)). This authority may be redelegated to Presidential Library directors and the Director of the Presidential Materials Division subject to any limitations imposed by the deed of gift or other transfer document, and the restrictions contained in 36 CFR, CXII, Part 1256--Restrictions on the Use of Records.

c.   Make and preserve motion picture films, still pictures, video tapes, and sound recordings, pertaining to and illustrative of the historical development of the U.S. Government and its activities, and release for nonprofit educational purposes motion

picture films, still pictures, video tapes, and sound recordings (44 U.S.C.2114). This authority may be redelegated to the Directors of the Center for Legislative Archives, Presidential Libraries, Presidential Materials, Education and Public Programs, and Exhibits divisions. Production of audiovisual materials must be approved as part of the NARA product planning program.

**17.  General Administration**

a.  Accept and use voluntary and uncompensated personal services for NARA (44 U.S.C. 2105(d)). This authority may be redelegated to the Director of the Center for Legislative Archives, directors of Presidential Libraries, the Director of the Presidential Materials Division, Director of the Education and Public Programs Division, and Director of the Exhibits Division. There are no limitations on this delegation of authority.

b.  Solicit and accept gifts or bequests of money, securities, or other personal property, for the benefit of, or in connection with, the national archival and records activities administered by NARA (44 U.S.C. 2305). This authority may be redelegated to the Directors of the Center for Legislative Archives, Presidential Libraries, Presidential Materials, Education and Public Programs, and Exhibits divisions. This delegation of authority is subject to the requirements of NARA 404, National Archives Gift Fund, and may not be redelegated.

c.  Accept orders from other departments, establishments, bureaus, or offices for materials, supplies, equipment, work, or service (31 U.S.C. 1535). This authority is retained by Legislative Archives, Presidential Libraries, Presidential Materials Director and Museum Services, and may not be redelegated.

d.  Reproduce, authenticate and certify records or other documentary materials; certify as to facts and make administrative determinations on the basis of records transferred from other agencies when authority has been delegated by the transferring agency (44 U.S.C. 2109, 2901, 3104). This authority may be redelegated to the Director of the Center for Legislative Archives and all Library Directors. There are no limitations on this delegation of authority.

e.  Charge and collect fees for making or authenticating copies or reproductions of materials transferred to NARA and deposit such fees in the National Archives Trust Fund (44 U.S.2116(c)). This authority may be redelegated to the Director of the Center for Legislative Archives, all Library Directors, and the Director of Presidential Materials. There are no limitations on this delegation of authority.

f.  Solicit and accept gifts and bequests of money or other property for the benefit of, or in connection with, the national archival and records activities administered by NARA, or for the purpose of maintaining, operating, protecting, or improving a Presidential archival depository (44 U.S.C. 2112 (g)(1); 2305). This authority may be redelegated to Presidential Library, Director of Presidential Materials, Project and Staff Directors, subject to the requirements of NARA 404, National Archives Gift Fund.

g.  Expend gifts, bequests, and the proceeds from sales of historical materials, copies or reproductions, catalogs, or other items, that have been paid into the library's account in the National Archives Trust Fund (U.S.C. 2112 (g)(1)). This authority may be redelegated to Presidential Library, Project and Staff Directors, subject to the requirements of NARA 404, National Archives Gift Fund.

h.  Utilize the services of officials and personnel of other executive agencies, including the armed services, and with the consent of the agency concerned, to review for declassification purposes records and other papers and historical materials that are or may be deposited with NARA (44 U.S.C. 2105(d)). This authority may be redelegated to Presidential Library, Presidential Materials Director, Project and Staff Directors. There are no limitations on this delegation of authority.

i.  Charge and collect reasonable fees for the privilege of visiting exhibit room or museums (44 U.S.C. 2112(e)). This authority may be redelegated to the Directors of the Center for Legislative Archives, Presidential Libraries, Presidential Materials, Education and Public Programs, and Exhibits divisions. There are no limitations on this delegation of authority.

j.  Operate a museum shop and sell publications, historical materials, copies or reproductions, catalogs, and other items having to do with the Presidential library (44 U.S.C. 2112(g)(1)). This authority may be redelegated to Presidential Library, Project and Staff Directors. There are no limitations on this delegation of authority.

k.  Maintain, operate, and protect the land, facility and equipment as a Presidential depository. This authority may be redelegated to Presidential Library and Project Directors. Day-to-day operation of a facility; oversight of approved alterations, additions, improvements, or preservation work on the facility; liaison with the Public Building Service (PBS); and service as the Government technical expert when directed to do so; are delegated to the Director. Approval of alterations, additions, improvements, or preservation work paid for out of the Legislative Archives, Presidential Libraries, and Museum Services allocation is retained by the Archivist. Office-wide renovation, restoration, or facility improvement planning is retained by Legislative Archives, Presidential Libraries, and Museum Services. Legislative Archives, Presidential Libraries, and Museum Services, exercises this authority with the aid of Business Support Services, which manages 117X funds, provides special expertise and liaison with PBS when necessary, and compiles and maintains a prioritized list of facility-related projects that is the basis for fund allocation.

l.  Develop and administer the program for the efficient operation of NARA facilities in an emergency, including the self-protection program for civil defense, fire prevention, and building safety (44 U.S.C. 2112(a)(1)(A)(iii); (B)(ii)). This authority may be redelegated to Presidential Library Directors, in coordination with, and subject to review by, Business Support Services.

m.  Approve expenditures for additions, improvements, alterations, or preservation of all NARA-leased, -owned, or -operated facilities (44 U.S.C. 2903). This authority is retained by Legislative Archives, Presidential Libraries, and Museum Services, and may not be redelegated. Business Support Services may authorize a dollar limit.

n.  Solicit and accept gifts or money for the benefit of naming spaces in a Presidential library (44 U.S.C. 2112 (a)(1); 44 U.S.C. 2112 (g)(1). This authority may be redelegated to Presidential Library Directors, subject to the concurrence of Legislative Archives, Presidential Libraries and Museum Services.

# Tab D



Research Our Records | Veterans Service Records | Teachers' Resources | Our Locations | Shop Online

## The Center for Legislative Archives

Home > Legislative Branch: The Center for Legislative Archives > Research

**Legislative Archives**

About Us
Directions
Contact Us
Advisory Committee on the Records of Congress
Publications
Internships

**Researching Congress**

Congressional Records
   Special Collections
   Rules of Access
   Citing the Record of Congress
Finding Aids to Legislative Records
9/11 Commission Records
Image Gallery
Fellowship

**Resources**

Educational Resources
Other Congressional Collections
Online Resources
Featured Document
Congressional Affairs Staff



**Visit Us in Washington**

# Congressional Records

## The Historical Records of Congress

The Center for Legislative Archives holds the historically valuable records of

- **The U.S. Senate, and**
- **The U.S. House of Representatives,**

including the official Committee records, all of which remain the legal property of the House and Senate.

Records from legislative branch support organizations, such as the Congressional Budget Office and the Office of Technology Assessment, as well as publications from the Government Printing Office, are also available at the Center. These records total more than 190,000 cubic feet (380 million pages) and require 33 miles of shelving!

The Center has a variety of finding aids that are useful when conducting research in the records of Congress.

## Special Collections

### Oral History, Research Interviews, and Political Cartoons

To supplement the official records of Congress housed at the Center, the Center for Legislative Archives maintains other materials in its holdings:

- Clifford K. Berryman Political Cartoon Collection
- Oral History and Research Interviews
- Issac Bassett Manuscript Collection

For more information, please contact the Center for Legislative Archives.



The First Journal of the United States House of Representatives, First Congress, 1789-1791, Records of the United States House of Representatives.



The First Journal United States Senate, First Congress, 1789-1791, Records of the United States Senate.

## The Center for Legislative Archives >

**Information For...**
Citizen Archivists
Federal Employees
Genealogists
Members of Congress

**Publications**
Federal Register
Free Publications
Prologue Magazine
Purchase Publications

**Orgs & Offices**
Federal Records Center
Office of the Inspector General
Presidential Libraries
More...

**I Want To...**
Get My Military Record
Plan a Research Visit
View Online Exhibits
Apply for a Grant

**Resources**
A-Z Index
America's Founding Docs
Contact Us
En Español

**Connect With Us**
 Blogs
 Facebook
Flickr

# Tab E

Jan 12 12 12:48p    Legislative Archives    2025017006    P. 1

## AGREEMENT TO TRANSFER RECORDS TO THE NATIONAL ARCHIVES OF THE UNITED STATES

FRC

1 INTERIM CONTROL NO. (NARA Use Only)

### TERMS OF AGREEMENT

The records described below and on the attached _____ pages are deposited in the National Archives of the United States in accordance with 44 U.S.C. 2107. Reproduction/agency certifies that any limitations on the use of these records are in conformance with the requirements of 5 U.S.C. 552.

In accordance with 44 U.S.C. 2108, custody of these records becomes the responsibility of the Archivist of the United States at the time of transfer of the records. It is agreed that these records will be administered in accordance with the provisions of 44 U.S.C. Chapter 21, 36 CFR Part 1250, and such other rules and regulations as may be prescribed by the Archivist of the United States (the Archivist). Unless specified and justified below, no restrictions of the use of these records will be imposed other than the general and specific

restrictions on the use of these records will be imposed other than the general and specific restrictions on the use of records in the National Archives of the United States that have been published in 36 CFR Part 1256 or in the Guide to the National Archives of the United States. The Archivist may destroy, donate, or otherwise dispose of any containers, duplicate copies, unused forms, blank stationery, nonarchival printed or processed material, or other non-record material in any manner authorized by law or regulation. Without further consent, the Archivist may destroy, deteriorating or damaged documents after they have copied in a form that retains all of the information in the original document. The Archivist will use the General Records Schedule and any applicable records disposition schedule (SF 115) of the transferring agency to dispose of nonarchival materials contained in this deposit.

| 2A. AGENCY APPROVAL | | 3A. NARA APPROVAL | |
|---|---|---|---|
| Signature | Date 2/11/11 | Signature | Date 2/8/2011 |

2B. NAME, TITLE, MAILING ADDRESS
Sarah Zuckerman
Financial Crisis Inquiry Commission
1717 Pennsylvania Ave, NW
Washington, DC 20006

3B. NAME, TITLE, MAILING ADDRESS
Matt Fulgham
Assistant Director, Center for Legislative Archives (NARA)
700 Pennsylvania Ave, NW
Washington, DC 20408

### RECORDS INFORMATION

4A. RECORDS SERIES TITLE    Records of the Financial Crisis Inquiry Commission

4B. DATE SPAN OF SERIES 2009-2011    (Attach any additional description)

5A. AGENCY OR ESTABLISHMENT
Legislative branch commission

5B. AGENCY MAJOR SUBDIVISION

5C. AGENCY MINOR SUBDIVISION

5D. UNIT THAT CREATED RECORDS

5E. AGENCY PERSON WITH WHOM TO CONFER ABOUT THE RECORDS
Name  Sarah Zuckerman
Telephone Number: 202-292-1388

6. DISPOSITION AUTHORITY
pending records schedule (NN1-148-  )

7. IS SECURITY CLASSIFIED INFORMATION PRESENT?  X  NO  ___ YES
LEVEL:  ___ Confidential  ___ Secret  ___ Top Secret
SPECIAL MARKINGS:  ___ RD/FRD  ___ SCI  ___ NATO  ___ Other
INFORMATION STATUS:  ___ Safeguarded  ___ Declassified

8. CURRENT LOCATION OF RECORDS
  X  Agency (Complete 8A only)
  ___ Federal Records Center (Complete 8B only)

8A. ADDRESS:
1717 Pennsylvania Ave, NW
Washington, DC 20006

| 9. PHYSICAL FORMS | | |
|---|---|---|
| X  Paper Documents | ___ Posters | |
| X  Paper Publications | ___ Maps and Charts | |
| ___ Microfilm/Microfiche | ___ Architing Drawings | |
| X  Electronic Records | ___ Motion/Sound/Video | |
| ___ Photographs | ___ Other (specify): | |

10. VOLUME    CONTAINERS
Cu Mtr:    Cu.Ft. 293  Number: 293  Type  FRC

11. DATE RECORDS LIGIBLE FOR TRANSFER TO THE ARCHIVES
Feb. 2011

12. ARE RECORDS FULLY AVAILABLE FOR PUBLIC USE?
___ YES    X  NO    (If no, attach limits on use and justification)

13. ARE RECORDS SUBJECT TO THE PRIVACY ACT?

___ YES    X  NO
(If yes, cite Agency System Number and Federal Register volume and page number of most recent notice and attach a copy of this notice.)

14. ATTACHMENTS
  ___ Agency Manual Except  ___ Listing of Records Transferred
  ___ Additional Description  ___ NA Form 14097 or Equivalent
  ___ Privacy Act Notice  ___ Microform Inspection Report
  X  Other (specify): Access letter  ___ SF-(s) 135

8B. FRC ACCESSION NUMBER    CONTAINER NUMBERS    FRC LOCATION

### NARA PROVIDES

S. SHIPPING INSTRUCTIONS TO AGENCIES/REMARKS REGARDING DISPOSITION    RG 148

| 6. RECORDS ACCEPTED INTO THE NATIONAL ARCHIVES OF THE UNITED STATES | | 17. NATIONAL ARCHIVES ACCESSION NO. |
|---|---|---|
| Signature | Date 3/11/11 | NN3-148-11-001 |

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

SF 258 (9/55)
Prescribed by NARA 36 CFR 1228

# Tab F



Join SAA | Contact Us | Login

Google™ Custom Search

| Home | The Archives Profession ▼ | About Us ▼ | Education & Events ▼ | Publications ▼ | Members ▼ | Groups ▼ |

Home » The Archives Profession » Glossary of Archival and Records Terminology » Browse Terms »

## GLOSSARY SEARCH

A B C D E F G H I J K L M N O P Q R S T U V W X Y Z

### A GLOSSARY OF ARCHIVAL AND RECORDS TERMINOLOGY

- Home
- Preface: The Archival Lexicon
- Introduction
- BROWSE TERMS
- Bibliography

# original order

Relationships

**Related Term:**
aggregated records; arrangement; context; provenance; restoration of original order

(also **registry principle**, **respect for original order**, *l'ordre primitif*, *respect de l'ordre intérieur*), n. ~ The organization and sequence of records established by the creator of the records.

**Notes:**

Original order is a fundamental principle of archives. Maintaining records in original order serves two purposes. First, it preserves existing relationships and evidential significance that can be inferred from the context of the records. Second, it exploits the record creator's mechanisms to access the records, saving the archives the work of creating new access tools.

Original order is not the same as the order in which materials were received. Items that were clearly misfiled may be refiled in their proper location. Materials may have had their original order disturbed, often during inactive use, before transfer to the archives; see **restoration of original order**.

A collection may not have meaningful order if the creator stored items in a haphazard fashion. In such instances, archivists often impose order on the materials to facilitate arrangement and description. The principle of respect for original order does not extend to respect for original chaos.

**Citations:**

† (Guercio 2001, p. 249) Since files and series reflect the aggregation of records in relation to the activity undertaken, this order should be maintained not only during the phase when the records are current, but also in the phase of preservation, whether through the identification of records selected for preservation or for purposes of research, in order to guarantee the possibility of meaningful future use.

Privacy & Confidentiality | Disclaimer | Credits | Contact Us

Copyright © 2012
Developed by CommonPlaces e-Solutions, LLC

# Tab G



Blogs | Bookmark/Share | Contact Us

| Research Our Records | Veterans Service Records | Teachers' Resources | Our Locations | Shop Online |

## Archives Library Information Center (ALIC)

Home > Research Our Records > ALIC > Reference > Archives Resources > Archives and Records Management Resources

**About ALIC**

Main Page
ALIC Mission
ALIC Staff
Hours and Locations
What's New?
Services
Policies
Volunteer Opportunities
Customer Service Center

**Reference at Your Desk**

Archives & Records Management
Biography
Black History
Congress
Diplomacy
Exploration
Genealogy
Geography & Maps
Government Documents
History
Indians/ Native Americans
More....

**Research Tools**

Library Catalog
Online Databases
Periodicals
Government Publications
Special Collections
Bibliographies
Virtual Library

**Other Resources**

NARA Electronic
Publications
U.S. Serial Set Digital
Collection
Ancestry
Heritage Quest
ProQuest (Journals/
Newspapers)

# Introduction to Archival Terminology

by Maygene F. Daniels (1984)

Note on Web Version

> The following glossary, developed by the then National Archives and Records Service in 1984 for *A Modern Archives Reader: Basic Readings on Archival Theory and Practice*, is provided on this website as an aid to persons unfamiliar with common archival terms. These definitions are not legally binding and do not represent NARA policy. The updated and more comprehensive *A Glossary for Archivists, Manuscript Curators, and Records Managers*, compiled by Lewis J. Bellardo and Lynn Lady Bellardo, was published in 1992 and may be purchased from the Society of American Archivists.

Archival terminology is a flexible group of common words that have acquired specialized meanings for archivists. Since World War II, archivists worldwide have devoted considerable attention to the definition of these words. In 1964, an international lexicon of archival terminology was published.(1) This dictionary in 6 languages, the work of a committee of the International Council on Archives, provides a basis for international comparison of archival terms.

The Society of American Archivists published its own glossary of archival terms in 1974 after several years of debate, drafting, and review.(2) Definitions in the SAA glossary have been widely accepted as the basis for discussion of archival terminology in North America and have been the starting point for subsequent efforts to define American archival terms. Since publication of the SAA glossary, however, many archivists have concluded that some of its definitions require revision and that additional terms should be included. Teachers of archives administration and authors of basic archival texts, consequently, have developed their own glossaries that revise, update, or expand the 1974 work. At present, no single glossary of archival terms can be considered definitive.(3)

The most frequently used archival terms are those that describe documentary materials and archival institutions. Documentary materials can be characterized as "records," "personal papers," or "artificial collections" on the basis of who created and maintained the documents and for what purpose.(4) Records are documents in any form that are made or received and maintained by an organization, whether government agency, church, business, university, or other institution. An organization's records typically might include copies of letters, memoranda, accounts, reports, photographs, and other materials produced by the organization as well as incoming letters, reports received, memoranda from other offices, and other documents maintained in the organization's files.

In contrast to records, personal papers are created or received and maintained by an individual or family in the process of living. Diaries, news clippings, personal financial records, photographs, correspondence received, and copies of letters written and sent by the individual or family are among the materials typically found in personal papers.

Traditionally, records and personal papers have been considered distinct entities, each with clearly definable characteristics. In the twentieth century, the physical qualities of records and personal papers have become more alike, however, and archivists increasingly have emphasized the similarities between these materials rather than their differences.(5) In particular, today's archivists recognize that both records and personal papers are bodies of interrelated materials that have been brought together because of their function or use. Archivists respect and seek to maintain the

Archives and Records Management Resources

Archives USA

America: History and Life

Fold3 (Formerly Footnote)

JSTOR

Declassified Documents
Reference System

Biography and Genealogy
Master Index (BGMI)

Digital National Security
Archive

Interagency Working
Group: War Crimes

Holocaust-era Assets

Career Development
Resource Center

established relationships between individual items in groups of records and in personal papers.(6)

Artificial collections are fundamentally different both from records and from personal papers. Instead of being natural accumulations, artificial collections are composed of individual items purposefully assembled from a variety of sources. Because artificial collections comprise documents from many sources, archivists may elect to change established relationships in order to improve access or control.

Archival institutions can be termed either "archives" or "manuscript repositories" depending on the types of documentary material they contain and how it is acquired. "Archives" traditionally have been those institutions responsible for the long-term care of the historical records of the organization or institution of which they are a part.(7) Many archives are public institutions responsible for the records of continuing value of a government or governmental body. The National Archives of the United States and the Public Archives of Canada are examples of public archives at the national level. Public archives also may be found at every other level of government, including state or province, county, and municipal levels. Nonpublic or nongovernmental archives care for the records of any other institution or organization of which they are a part. Church archives, for example, administer the historical records of a religious denomination or congregation. University archives are responsible for records of the university's administration. Archives acquire historical material through the action of law or through internal institutional regulation or policy.

"Manuscript repositories" are archival institutions primarily responsible for personal papers, artificial collections, and records of other organizations. Manuscript repositories purchase or seek donations of materials to which they have no necessary right. They therefore must document the transfer of materials by deed of gift or by other legal contract.

The distinctions between archives and manuscript repositories can be precisely stated, yet few archival institutions are simply "archives" or "manuscript repositories." Most archives hold some personal papers or records of other organizations. Even the National Archives of the United States is responsible for a small group of donated personal papers and nongovernment records. Similarly, many manuscript repositories serve as the archives of their own institutions. In recognition of this, the term "archives" gradually has acquired broader meaning for some archivists and is used by them in reference to any archival institution. This trend has been accelerated by the use of the word "archives" or "archive" in the names of some institutions that in the past might have been termed "manuscript repositories."(8)

Contemporary archival terminology provides a useful and necessary means of specialized communication within the archival profession. Its terms can be precise enough to preserve important distinctions among types of materials and archival institutions, and yet its usage also can be sufficiently flexible to reflect the changing nature of record materials and developments in the administration of archival institutions. As the archival profession grows and matures and as new technologies and records media affect the practice of archives administration, both the precision and flexibility of archival terminology will prove to be of continuing benefit to archivists.

**Glossary**

This glossary of commonly used archival terms is based in part on and draws several definitions from "A Basic Glossary for Archivists, Manuscript Curators, and Records Managers," compiled by Frank B. Evans, Donald F. Harrison, and Edwin A. Thompson (*The American Archivist* 37 [July 1974]: 415-433). The glossary includes most important archival terms with specialized meanings. Terms that are adequately described in dictionaries; technical manuscript, records management, and preservation terms; and terms relating to automated data processing are not included.

ACCESS
      The archival term for authority to obtain information from or to perform research in archival materials.

ACCESSION
      (v.) To transfer physical and legal custody of documentary materials to an archival institution.
      (n.) Materials transferred to an archival institution in a single accessioning action.

ACCRETION
An addition to an accession.

ACQUISITION
The process of identifying and acquiring, by donation or purchase, historical materials from sources outside the archival institution.

ADMINISTRATIVE VALUE
The value of records for the ongoing business of the agency of records creation or its successor in function.

APPRAISAL
The process of determining whether documentary materials have sufficient value to warrant acquisition by an archival institution.

ARCHIVAL INSTITUTION
An institution holding legal and physical custody of noncurrent documentary materials determined to have permanent or continuing value. Archives and manuscript repositories are archival institutions.

ARCHIVAL VALUE
The value of documentary materials for continuing preservation in an archival institution.

ARCHIVES
(1) The noncurrent records of an organization or institution preserved because of their continuing value.
(2) The agency responsible for selecting, preserving, and making available records determined to have permanent or continuing value.
(3) The building in which an archival institution is located.

ARCHIVES ADMINISTRATION
The professional management of an archival institution through application of archival principles and techniques.

ARCHIVIST
The professional staff member within an archival institution responsible for any aspect of the selection, preservation, or use of archival materials.

ARRANGEMENT
The archival process of organizing documentary materials in accordance with archival principles.

COLLECTING POLICY
A policy established by an archival institution concerning subject areas, time periods, and formats of materials to seek for donation or purchase.

COLLECTION
(1) An artificial accumulation of materials devoted to a single theme, person, event, or type of document acquired from a variety of sources.
(2) In a manuscript repository, a body of historical materials relating to an individual, family, or organization.

COLLECTION DEVELOPMENT
The process of building an institution's holdings of historical materials through acquisition activities.

CONTINUOUS CUSTODY
(1) In contemporary U.S. usage, the archival principle that to guarantee archival integrity, archival materials should either be retained by the creating organization or transferred directly to an archival institution.
(2) In British usage, the principle that noncurrent records must be retained by the creating organization or its successor in function to be considered archival.

**CUBIC FEET (or METERS)**

A standard measure of the quantity of archival materials on the basis of the volume of space they occupy.

**DEED OF GIFT**

A legal document accomplishing donation of documentary materials to an archival institution through transfer of title.

**DEPOSIT AGREEMENT**

A legal document providing for deposit of historical materials in physical custody of an archival institution while legal title to the materials is retained by the donor.

**DESCRIPTION**

The process of establishing intellectual control over holdings of an archival institution through preparation of finding aids.

**DISPOSITION**

The final action that puts into effect the results of an appraisal decision for a series of records. Transfer to an archival institution, transfer to a records center, and destruction are among possible dispositions.

**DISPOSITION SCHEDULE**

Instructions governing retention and disposition of current and noncurrent recurring records series of an organization or agency. Also called a RECORDS CONTROL SCHEDULE.

**DOCUMENT**

Recorded information regardless of form or medium with three basic elements: base, impression, and message.

**DONATED HISTORICAL MATERIALS**

Historical materials transferred to an archival institution through a donor's gift rather than in accordance with law or regulation.

**EVIDENTIAL VALUE**

The value of records or papers as documentation of the operations and activities of the records-creating organization, institution, or individual.

**FIELD WORK**

The activity of identifying, negotiating for, and securing historical materials for an archival institution.

**FINDING AID**

A description from any source that provides information about the contents and nature of documentary materials.

**HOLDINGS**

All documentary materials in the custody of an archival institution including both accessioned and deposited materials.

**INFORMATIONAL VALUE**

The value of records or papers for information they contain on persons, places, subjects, and things other than the operation of the organization that created them or the activities of the individual or family that created them.

**INTRINSIC VALUE**

The archival term for those qualities and characteristics of permanently valuable records that make the records in their original physical form the only archivally acceptable form of the records.

**LEGAL CUSTODY**

Ownership of title to documentary materials.

LIFE CYCLE OF RECORDS

The concept that records pass through a continuum of identifiable phases from the point of their creation, through their active maintenance and use, to their final disposition by destruction or transfer to an archival institution or records center.

LINEAR FEET (or METERS)

A standard measure of the quantity of archival materials on the basis of shelf space occupied or the length of drawers in vertical files or the thickness of horizontally filed materials.

MACHINE-READABLE RECORDS

Records created for processing by a computer.

MANUSCRIPT

A handwritten or typed document, including a letterpress or carbon copy, or any document annotated in handwriting or typescript.

MANUSCRIPT

See PERSONAL PAPERS.

MANUSCRIPT CURATOR

The professional staff member within a manuscript repository responsible for any aspect of the selection, preservation, or use of documentary materials.

MANUSCRIPT REPOSITORY

An archival institution primarily responsible for personal papers.

NONRECORD MATERIAL

Material that is not record in character because it comprises solely library or other reference items, because it duplicates records and provides no additional evidence or information, or because its qualities are nondocumentary.

ORIGINAL ORDER

The archival principle that records should be maintained in the order in which they were placed by the organization, individual, or family that created them.

PERSONAL PAPERS

A natural accumulation of documents created or accumulated by an individual or family belonging to him or her and subject to his or her disposition. Also referred to as MANUSCRIPTS.

PRIMARY VALUES

The values of records for the activities for which they were created or received.

PROCESSING

All steps taken in an archival repository to prepare documentary materials for access and reference use.

PROVENANCE

(1) The archival principle that records created or received by one recordskeeping unit should not be intermixed with those of any other.
(2) Information on the chain of ownership and custody of particular records.

RECORD COPY

The copy of a document which is designated for official retention in files of the administrative unit that is principally responsible for production, implementation, or dissemination of the document.

RECORD GROUP

A body of organizationally related records established on the basis of provenance with particular regard for the complexity and volume of the records and the administrative history of the record-creating institution or organization.

RECORDS

All recorded information, regardless of media or characteristics, made or received and maintained by an organization or institution. [The Federal Records Act definition of "records" can be found at: 44 USC Sec. 3301.]

RECORDS CENTER

A records storage facility established to provide efficient storage of inactive records. Legal title to records deposited in a records center is retained by the originating agency.

RECORDS MANAGEMENT

The profession concerned with achieving economy and efficiency in the creation, use, and maintenance of current records.

REFERENCE MATERIALS

Nonaccessioned items maintained by an archival institution solely for reference use.

REFERENCE SERVICE

The archival function of providing information about or from holdings of an archival institution, making holdings available to researchers, and providing copies, reproductions, or loans of holdings.

RESPECT DES FONDS

See PROVENANCE.

REVIEW

The process of surveying documentary materials in an archival institution to determine whether the materials may be open for access by researchers or must be restricted in accordance with law, a donor's requirements, or an institution's regulations.

SANCTITY OF ORIGINAL ORDER

See ORIGINAL ORDER.

SCHEDULE

(v.) To establish retention periods for current records and provide for their proper disposition at the end of active use.
(n.) See DISPOSITION SCHEDULE.

SECONDARY VALUES

The values of records to users other than the agency of record creation or its successors.

SERIES

A body of file units or documents arranged in accordance with a unified filing system or maintained by the records creator as a unit because of some relationship arising out of their creation, receipt, or use.

SUBGROUP

A body of related records within a record group, usually consisting of the records of a primary subordinate administrative unit or of records series related chronologically, functionally, or by subject.

**Endnotes for "Introduction"**

1. *Elsevier's Lexicon of Archive Terminology*. Compiled in French, English, German, Spanish, Italian, and Dutch by a committee of the International Council on Archives. New York: Elsevier Publishing Company, 1964. Return to text.

2. "A Basic Glossary for Archivists, Manuscript Curators, and Records Managers," compiled by Frank B. Evans, Donald F. Harrison, and Edwin A. Thompson. Edited by William L. Rofes. *The American Archivist* 37 (July 1974): 415-433. Return to text.

3. The glossary included in this *Reader* was developed for the Modern Archives Institute. It is included here to provide assistance for readers who are unfamiliar with archival terminology. Return to text.

4. Documentary materials also may be characterized on the basis of their various physical forms: textual, audiovisual, machine-readable, cartographic, printed and others. The term "manuscript" is used for any handwritten or typed document, including press or carbon copy, or any document annotated in handwriting or typescript. In common usage, the term "manuscripts" also often is used as a synonym for "personal papers." Return to text.

5. The term "records" now is even used occasionally as a general term for both records and personal papers. The Presidential Records Act of 1980 codified this usage by employing the term "personal records" to describe strictly personal and private or political papers of the President. Return to text.

6. Although some groups of personal papers and, less frequently, some series of records may have no perceptible order, if any order does exist it is likely to be meaningful and archivists seek to protect it. If no internal order is perceptible, the archivist's concern for protecting established relationships does not come into play. Return to text.

7. Records in an archival institution also are called "archives." A building in which an archival institution is located also is often referred to as an "archives." "Archives" is a collective noun. Return to text.

8. The Smithsonian Institution's Archives of American Art and the Dada Archive of the University of Iowa are both examples of this phenomenon. Return to text.

**Note:** This web version was prepared in 1999, based on:
Maygene F. Daniels, *Introduction to Archival Terminology*, Published in **A Modern Archives Reader: Basic Readings on Archival Theory and Practice** (National Archives Trust Fund Board, 1984): 336-342.
This version may differ from the printed version.

---

See Also:

- Archives and Preservation Home Page
- Archives and Related Professions Training
- Professional Organizations
- Bibliographies, Weblinks, and Professional Organizations
- Frequently Asked Questions (FAQs)
- Contact Us

**Archives Library Information Center (ALIC) >**

**Online Research**
By Topic
By Media Type
By Government Organization
Presidential Materials
Access to Archival Databases
Archival Research Catalog
Archives Library Information Center
Online Exhibits

**Resources For…**
Genealogists
Military Historians
Preservation and Archives Professionals
Records Managers
Veterans

**Research Guides**
Getting Started
Guide to Federal Records
Declassified Records
Where to Look for Records
Why Aren't All Records Online?

**What's New**
News and Notices
New Acquisitions
The Buzz: Online Newsletter

**I Want To…**
Attend an Event
Order Copies of Records
Hire a Researcher
Report Lost or Stolen Documents

**Connect With Us**
Blogs
Facebook
Flickr
RSS Feeds
Twitter
YouTube
More…

# Tab H

SOCIETY OF
AMERICAN
Archivists

Google™ Custom Search

Home | The Archives Profession ▼ | About Us ▼ | Education & Events ▼ | Publications ▼ | Members ▼ | Groups ▼

Home » The Archives Profession » Glossary of Archival and Records Terminology » Browse Terms

## GLOSSARY SEARCH

A B C D E F G H I J K L M N O P Q R S T U V W X Y Z

### provenance

Relationships

**Related Term:**
arrangement; context; creator; custodial history; entity of origin; fonds; office of origin; original order; provenience

n. (**provenancial**, adj.) ~ 1. The origin or source of something. - 2. Information regarding the origins, custody, and ownership of an item or collection.

**Notes:**

Provenance[1] is a fundamental principle of archives, referring to the individual, family, or organization that created or received the items in a collection. The **principle of provenance** or the **respect des fonds** dictates that records of different origins (provenance) be kept separate to preserve their context.

**Citations:**

[†](Duranti 1998, p. 177) The principle of provenance, as applied to appraisal, leads us to evaluate records on the basis of the importance of the creator's mandate and functions, and fosters the use of a hierarchical method, a 'top-down' approach, which has proved to be unsatisfactory because it excludes the 'powerless transactions,' which might throw light on the broader social context, from the permanent record of society.

[†](Gilliland-Swetland 2000a, p. 12) The principle of provenance has two components: records of the same provenance should not be mixed with those of a different provenance, and the archivist should maintain the original order in which the records were created and kept. The latter is referred to as the principle of original order in English and *Registraturprinzip* in German. The French conception of *respect des fonds* did not include the same stricture to maintain original order (referred to in French as *respect de l'ordre intérieur*), largely because French archivists had been applying what was known as the principle of pertinence and rearranging records according to their subject content.

[†](Hensen 1993, p. 67) APPM recognizes the primacy of *provenance* in archival description. This principle holds that that significance of archival materials is heavily dependent on the context of their creation, and that the arrangement and description of these materials should be directly related to their original purpose and function.

### A GLOSSARY OF ARCHIVAL AND RECORDS TERMINOLOGY

- Home
- Preface: The Archival Lexicon
- Introduction
- BROWSE TERMS
- Bibliography

Copyright © 2012
Developed by CommonPlaces e-Solutions, LLC

# Tab I

Archives and Records Management Resources



Blogs | Bookmark/Share | Contact Us

| Research Our Records | Veterans Service Records | Teachers' Resources | Our Locations | Shop Online |

## Archives Library Information Center (ALIC)

Home > Research Our Records > ALIC > Reference > Archives Resources > Archives and Records Management Resources

**About ALIC**

Main Page
ALIC Mission
ALIC Staff
Hours and Locations
What's New?
Services
Policies
Volunteer Opportunities
Customer Service Center

**Reference at Your Desk**

Archives & Records
Management
Biography
Black History
Congress
Diplomacy
Exploration
Genealogy
Geography & Maps
Government Documents
History
Indians/ Native Americans
More....

**Research Tools**

Library Catalog
Online Databases
Periodicals
Government Publications
Special Collections
Bibliographies
Virtual Library

**Other Resources**

NARA Electronic
Publications
U.S. Serial Set Digital
Collection
Ancestry
Heritage Quest
ProQuest (Journals/
Newspapers)

# Archival Arrangement -- Five Different Operations at Five Different Levels

by Oliver W. Holmes (1964)

[Note on Web Version]

Archives are already arranged -- supposedly. That is to say, an arrangement was given them by the agency of origin while it built them up day after day, year after year, as a systematic record of its activities and as part of its operations. This arrangement the archivist is expected to respect and maintain. Arrangement is built into archives; it is one of the inherent characteristics of "archives," differentiating them from nonarchival material.

Theoretically in the archives of an agency of government, or of any organization -- and therefore in the archival depository that has custody of such archives -- each document has its place, a natural place, so that its association and relation with all other documents produced or received by the creating agency remain clear. The archivist preserves and uses the arrangement given the records by the agency of origin on the theory that this arrangement had logic and meaning to the agency and that if the agency's employees could find and use the records when they were active, in connection with the multitudinous daily transactions of the agency, the archivist surely can do the same, using the contemporary registers, indexes, and other finding aids that came with the records as part of them. Thus artificial finding aids that the archival establishment must create are reduced to a minimum. The filing system used by the agency may not have been the best that could have been devised to start with, or it may not have been effectively carried out. It may even have broken down badly because of inefficient filing, sudden expansion or shifting of programs without adequate assistance in the file room, or for other reasons. Still, no major archival establishment will ever be given money to revise filing systems. It will have to get along with what it inherits, making minor adjustments at most.

Beyond such practical considerations as lack of time and money to create new systems, however, is the more important truth that, if the archival agency could reorganize the records, to try to do this would be unwise and undesirable. Perhaps no two archivists could agree on the arrangement concept to be built into any new system. Furthermore, what an agency has created in the past no man today can completely tear asunder. One cannot, for example, tear volumes apart. This author has seen such a process actually tried with press copy letter books, but with minute books or account books it becomes impossible. To the degree that it could be done with loose papers, the original groupings, which have meaning in themselves, would be lost; the sequences of operations and events would be difficult, or almost impossible, to reconstruct; the efficiency or inefficiency of the agency itself would be obscured; and all the registers, indexes, and other finding aids created over the years by the agency, at great cost in manpower and money, would be rendered useless. (We are here considering physical rearrangement, not rearrangement on paper, which the archivist is free to do to his heart's content if he can find time and money for it. Paper rearrangements by the archivist may usefully supplement the physical arrangement established by the agency of origin; they cannot supplant it.)

To the energetic novitiate, who usually wants to start classifying and cataloging documents all over in some schematic arrangement of his own, these observations must sound strange -- like the lazy man's way out. But every professional archivist knows these things. He has learned them from experience or from archivists who have had experience. These lessons have been expounded

Archives and Records Management Resources

Archives USA

America: History and Life

Fold3 (Formerly Footnote)

JSTOR

Declassified Documents Reference System

Biography and Genealogy Master Index (BGMI)

Digital National Security Archive

Interagency Working Group: War Crimes

Holocaust-era Assets

Career Development Resource Center

frequently in archival literature. The classic expression of them is in the 1898 manual of the Dutch archivists, Samuel Muller, J. A. Feith, and R. Fruin, translated into English by Arthur H. Leavitt (*Manual for the Arrangement and Description of Archives*; 1940). They are embodied also in the well - - known treatises in English by Sir Hilary Jenkinson (*A Manual of Archive Administration*; rev. ed., 1937) and T. R. Schellenberg (*Modern Archives: Principles and Techniques*; 1956). They have been written into the instructional material of the National Archives, notably *Staff Information Papers* nos. 15 and 18, entitled respectively *The Control of Records at the Record Group Level* and *Principles of Arrangement*.

The overall principle discussed above is, of course, what archivists call the "principle of provenance." This is signified on an upper level by the French expression *respect des fonds* (maintaining the natural archival bodies of creating agencies or offices separately from each other) and on a lower level, that is, within the *fonds*, by the phrase *respect pour l'ordre primitif* (respect for the original order). Arrangement becomes then, for the records of any one agency, the task of determining and verifying the original order, filling and labeling of the archives containers to reflect it, and shelving of the containers in the established order.

But if this is all there is to arrangement, it would seem to be relatively easy and even somewhat routine -- perhaps chiefly a physical operation. A first answer to such an observation would be that, although in theory arrangement is simple, in practice it always presents many problems. Almost the whole of the Muller, Feith, and Fruin manual is devoted to the exposition of these problems and suggested solutions to them. A second answer is that these authors treat only part of the arrangement function, the arrangement of the records of an agency -- any agency -- whereas archivists in the National Archives and in most State archival establishments have custody of the records of hundreds of agencies, more or less related to each other. There must be, first, overall arrangement policies involving the grouping of these agency records and, second, controls to implement the policies. In other words, there are in any large depository many decisions that must be made above the level of the *fonds*.

Much confusion that arises in discussing the arrangement function could be avoided, this author believes, if it could be recognized at the start that the term "arrangement" covers several different types of operations, of varying degrees of difficulty, depending in large part on the level at which they are being carried out. An identification of these levels and some analysis of the operations at each level, beginning at the top level and moving down -- the order in which control should be established -- may lead to a better understanding of this function by archivist and layman alike. In attempting this analysis, the author has had in mind as audience chiefly would -- be archivists (and position classifiers), but he hopes what is written will also make sense and ring true to those who have often dirtied their hands by actually doing arrangement work.

**THE LEVELS OF ARRANGEMENT**

In all large archival depositories there can be distinguished, usually, at least five levels of arrangement:

1. Arrangement at the depository level -- the breakdown of the depository's complete holdings into a few major divisions on the broadest common denominator possible and the physical placement of holdings of each such major division to best advantage in the building's stack areas. This major division of holdings is usually reflected in parallel administrative units (divisions or branches in the depository organization that are given responsibility for these major groupings).

2. Arrangement at the record group and subgroup levels -- the breakdown of the holdings of an administrative division or branch (as these may have been established on the first level) into record groups and the physical placement of these in some logical pattern in stack areas assigned to the division or branch. This level should include the identification of natural subgroups and their allocation to established record groups.

3. Arrangement at the series level -- the breakdown of the record group into natural series and the physical placement of each series in relation to other series in some logical pattern.

4. Arrangement at the filing unit level -- the breakdown of the series into its filing unit components and the physical placement of each component in relation to other components in some logical sequence, a sequence usually already established by the agency so that the archivist merely verifies and accepts it.

5. Arrangement at the document level -- the checking and arranging, within each filing unit, of the individual documents, enclosures and annexes, and individual pieces of paper that together comprise the filing unit and the physical placement of each document in relation to other documents in some accepted, consistent order.

The above five steps refer to the arrangement of the records themselves, independently of their containers. They establish the order or sequence in which records ought to be placed in containers and in which the containers ought to be labeled and shelved.

When all these steps have been completed the archival holdings of a depository may be said to be under control. This control may never be established completely (sometimes arrangement at the filing unit or document level may never be fully carried out), but it must be established to an acceptable degree before records description work is possible because finding aids have to refer to specified units in an established arrangement.

## ARRANGEMENT AT THE DEPOSITORY LEVEL

A large archival depository, holding the records of hundreds of different agencies, each considered a record group, requires a first division of its holdings above the record group level, chiefly for administrative purposes. Each such division thus holds a number of record groups. This division may be:

(1.) on a chronological basis, the breaks often coming at major changes in the organization of government (as in Latin American countries, where one usually finds at least a colonial section and a national-period section, with sometimes an independence-period section sandwiched between)
(2.) on a hierarchical basis, according to major organizational divisions of government (as in the National Archives, where administrative divisions were first organized around the records of one or two major departments along with the records of related independent agencies, although through the years these boundaries keep changing)
(3.) on the basis of levels of government (as central and local) ; or
(4.) some combination of the above.

In the National Archives there is also a tendency to consider broad subject areas as a guide at this arrangement level, but this may be more apparent than real. Government organization itself normally follows subject areas to a considerable degree. Subject areas can hardly be a controlling guide but they may be an auxiliary consideration. So also are such important matters as the size and arrangement of storage areas, the physical nature of the records themselves (often necessitating special areas in the case of technical records such as maps, pictures, and film), the reference activity of the records, the degree of security to be given them, and the number and caliber of personnel needed to work with them. Because of all these considerations, this first division of the records is usually made at the highest level of administration and embodied in issuances approved by the head of the agency. Personnel of lower grade usually have no part in the decisions and no responsibility for them. Small archival depositories may not feel the need of dividing their holdings at this level; but over the years, as transfers continue from an increasing number of agencies and offices, the need to consider such a division will almost certainly arise.

## ARRANGEMENT AT THE RECORD GROUP LEVEL

The basic principle of *respect des fonds* requires that the records of different creating agencies and offices be kept separate and never mixed. Under this principle an archival establishment must:

(1) decide what creating agencies and offices are represented by records and
(2) identify all records as belonging to one agency or another.

In the early years of the archival establishment concern for these matters may seem a bit academic, for the agencies represented are generally known to the staff and the identification of records with particular agencies is fairly obvious. Sooner or later, however, arguments will arise and decisions will be called for. How long an archival establishment may "get by" without carefully dividing its holdings into sharply delimited "record groups" to use the term coined in the National Archives in 1941 -- will depend on how far back in time and through how many agency reorganizations its holdings extend

and on how many attics and basements filled with accumulations of these records, confused by many movings over the years, it has cleaned out.

Before the National Archives began using the term "record group" the Public Record Office in Great Britain was using the term "archive group" to designate the records of an entire agency, no matter how large, including the records of entire ministries. The British practice, we believed, if applied in the National Archives, could lead sometimes to groupings too large for administrative convenience. We thought it better to divide the records of such large "agencies" as departments into a number of separate record groups, usually reflecting the bureaus within departments and of "convenient size" for administration.

On the Continent the French term "*fonds d'archives*" -- meaning the body or stock of records of a record -- creating unit -- was widely known in archival literature and accepted as the basis of arrangement work. (The Dutch term "*archief*" also had wide usage because of the influence of the Dutch manual.) As applied in practice, the records of any subordinate office that kept records, no matter how small the office, were considered a "*fonds*." This was going to the other extreme of "convenient size," and the "record group" principle as defined in the National Archives united the records of subordinate offices under their superior offices, usually up to the bureau level. Also the records of small though essentially independent satellite agencies were often included with the records of major agencies to which they were related. Many smaller *fonds*, such as the records of claims commissions or arbitration boards, were grouped together into what became known as "collective record groups," of which a number were established. There would otherwise be thousands of *fonds*. Thus, the National Archives, partly for administrative convenience, has aimed at the intermediate level in establishing its record groups. It established 206 such record groups in 1943 for its then existing holdings. Additional record groups have since been established and the number, considering the entire holdings of the National Archives and Records Service, now approaches 350.

Although the term "record group" has never seemed to this author a happy one for the concept, no one has suggested a better, and both the term and the concept seem to be spreading in use to other archival depositories in the United States and Canada. It is not certain that the term is always defined exactly as it is in the National Archives, and perhaps it need not be -- so long as the definition is applied consistently throughout the establishment. Some such concept is needed in all archival depositories having the care of records created by many different agencies and organizations. Once established, record groups are usually the basic units for administrative control; that is, for arrangement, description, reference service, and statistical accounting and reporting.

Inasmuch as the records of each record group are to be kept separate from those of all other record groups, any unit of records -- whether bound volume, series of loose papers, single paper or map, or whatever -- has to be identified as constituting a part of one record group and no other. There can be no overlapping, for records cannot be placed physically in two different places. Each new accession must be allocated to its proper record group; if none exists, a new record group must be established and a proper location in the depository found for it. So far as possible, all the contents of a record group should be kept together in one place in the stacks. Exceptions will often have to be made for technical records. Because decisions at the highest level are governed more by administrative than professional considerations, the establishment of a record group with the delimitation of its boundaries is the first real professional operation as one moves downward in the arrangement function. It is impossible to discuss here all of the many considerations governing decisions about allocation of records to one group or another. They are set forth clearly and in detail, so far as the National Archives is concerned, in its *Staff Information Paper* no. 15,

*The Control of Records at the Record Group Level.*

Recommendations for the establishment of new record groups and for their delimitation are made usually by branch or division chiefs of senior archivist level and require the approval of the head of the archival agency or a specially designated assistant. Topmost officials must also decide which division or branch is to be assigned responsibility for the record group. The division or branch chief, or a higher official in some cases, must decide where in the branch areas the record group is to be physically located. The amount of use the records may have, the quantity of additional records to be expected in the record group, and other considerations may affect the decision on the area in which the record group is to be shelved. Physical limitations of stack areas and equipment may not permit an ideal

arrangement to be fully carried out and compromises then must be made.

All natural subgroups should also be recognized at this level of arrangement, accounted for in the registration statement prepared for the record group, and kept separate physically as subdivisions of the record group when it is arranged in the stacks. Subgroups must be identified and their affiliation determined when the boundaries of the record group are established; otherwise, the determination of subgroups could amount to a separate level in arrangement.

In many simpler record groups, some of which may be sizable, there are no subgroups. The subgroup determination can be made quickly except in cases of collective record groups or of records of an agency that has undergone frequent reorganizations and numerous changes of field offices, for the records of each field office ought properly to be considered a subgroup. Moreover, if the records over the years have become badly disarranged, the determination of existing subgroups can be most difficult. The untangling of the records themselves may have to be postponed to the next level of arrangement, the identification and allocation of series. The identification of subgroups and recommendations for the order of their arrangement within a record group is work of middle-professional grade or higher and is approved by the chief of the division or branch that has custody of the record group.

Although many difficult problems enter into decisions with respect to record groups and the decisions are of major importance, the time spent in arrangement at the record group level is so little as to be an almost negligible part of the total time an archival agency must devote to the arrangement function.

**ARRANGEMENT OF SERIES WITHIN THE RECORD GROUP**

It is arrangement at the three levels within the record group that represents the time-consuming work. Record groups in the National Archives average nearly 3,000 cubic feet each (the contents of nearly 500 4-drawer file cabinets). In other archival depositories the average may be smaller. Some record groups are so large and complicated that they contain thousands of series in many subgroups. These series must be identified and arranged in some logical order in relation to each other, so that the whole record group is given an orderly sequence on the shelves.

Although through classification schemes and filing practices an agency may have given a definitive arrangement to documents and filing units within each series, it almost never established a sequential arrangement for the many different series it created. It never dictated that a certain series was to come first, a certain other series last, and that each of the others was to have its place at some definite point in between. This larger classification sequence is what the archivist must establish for each record group. It is an operation that requires a full knowledge of the principles of archival arrangement and a knowledge of the administrative history of the agency or agencies whose records are involved. In many ways this is the heart of archival work, because the inventory and all other finding aids merely reflect this level of arrangement and are keyed into it. The person to whom the work is assigned should be well trained and experienced and should prepare himself for his specific assignment by reading laws and regulations governing the organization and programs of the agency in question; its annual reports, special reports, and other publications; and all serious historical and analytical studies of its work and accomplishments. He must pay special attention to changes in its function and organization: these are usually reflected in the records and over a long period of years will be considerable. He must know the history of predecessor agencies whose records may have been inherited and of successor or liquidating agencies that have had custody of the records and that may have disposed of some, reorganized others, absorbed some into their own record bodies, or otherwise complicated the picture. He must study particularly the agency's way of keeping its records. If he studies also the records themselves he will learn much from them that is not in print or otherwise available. By putting together the knowledge gained from all sources, he will be in a position to identify and interpret the many series and to give them an arrangement that is not only logical but revealing of an agency's history and accomplishments. His arrangement scheme should have two dimensions. It should not only present the series maintained by the agency at any given time but through time, whether it existed 10 years or 150 years.

This arrangement process is much easier to carry out if the archivist has seen the records in the agency before they are accessioned. Ideally, records should be taken directly from an agency's file room by the archivist as soon as they become inactive enough for transfer to the archives depository.

Perhaps the agency has had a central file, but certain important exceptions to centralization have been allowed. Perhaps the agency has had a number of file rooms or filing stations reflecting major functions or organizational units. Perhaps general decentralization has been the practice if not the rule. Knowing how the agency grouped its records is always helpful because the original groupings should be reflected in the final arrangement. It is less possible in these days of intermediate records centers for the archivist to see this picture. Nor is it possible to any extent with respect to the older records of agencies that existed for decades before the archival depository was established. These agencies may have moved their inactive records from building to building innumerable times before relinquishing them to the archives depository, each time further confusing any arrangement the records may have had when they were active and growing files. Even so, however, the archivist's opportunity to inspect the older records in attics or other places of storage, especially if they were still in their original containers with original labels, may have taught him much about them. In this sense arrangement begins before accessioning, and knowledge gained at this stage should be reflected so far as possible in the inventory prepared at the time of accessioning. The archivist who has had a share in the accessioning process always has a head start in arrangement if he can carry through in an advisory or supervisory capacity until the records are on the shelves.

The next step is the identification of the different series that must be assigned an order. This brings us to the definition of the word "series," one of the basic technical terms in the archivist's vocabulary. Until an archivist understands this term and is able to recognize a series, he should not undertake arrangement work on this level.

A true series is composed of similar filing units arranged in a consistent pattern within which each of the filing units has it proper place. The series has a beginning and it has an end, and everything between has a certain relationship. The pattern may be a simple one -- alphabetical, numerical, or chronological -- or a complex one, as, for example, annual reports arranged first by years, then by States, and then by counties within States. This may be complicated further by an agency's practice of filing reports of State officials in a certain order at the State level and of county officials in a like established order under each county. Such a filing pattern may be followed year after year until the records fill several thousand feet of shelving, but no matter how complex the pattern, so long as that pattern is being repeated, we still have a single series. Another series may consist of only a few feet of reports relating to Territories in a somewhat different arrangement. The boundaries of these true series are never difficult to determine; gaps and disarrangements are easily recognized.

There will occasionally be a series made up of only one file unit. Perhaps this is more often true of book records, as when some special record has been maintained in a single volume that has no successor. "Series" may not seem to be the proper word in such cases unless one thinks of the item as the beginning of an intended series that did not advance beyond the first unit. In a short-lived agency there may be many such series. It might seem that a number of these one-volume series could be brought together at the end of the record group, but this would be the equivalent of giving up in determining their proper location. They would not belong together unless they had a common provenance. Instead they might belong properly in widely separated parts of the record group, some of them perhaps between series of unbound papers that they might help to elucidate.

There will also be cases where no discernible pattern seems to exist for certain groupings of documents although a subject or transaction relationship is obvious. Often one really has just an accumulation or aggregation of documents relating to some matter because, apparently, the agency did not take the time to rationalize their arrangement. These accumulations can hardly be called "series" in the strict sense of the word, but arbitrarily we treat them as such -- just as we are somewhat arbitrary about what constitutes a record group. They represent a block of material that has to be assigned a place in the arrangement. There is no succession of file units and therefore no obvious beginning or end, so that the special problem for this type of series is to determine its boundaries. One has to look for the common denominator in subject or provenance that separates this accumulation from other true or artificial series. Perhaps these papers or other materials were collected by some investigator because they were useful in a special matter he was handling. Perhaps they related to some special operation that came to a sudden end. Whatever their history and purpose, they must be identified by their boundaries and kept separate if they ever are to be understood and assigned their places in relation to the whole.

The different series, once they are identified, are the elements of the record group that at this level of

arrangement are to be given a meaningful physical order that will later be reflected in the order of inventory entries on paper. Indeed, the entries of an inventory (which are the series) are probably at this stage on paper in the form of cards or slips that can be shuffled as the arrangement is being worked out.

Although the record groups and subgroups should have been established and their order decided upon at the second level of arrangement, the final allocation of series to subgroups (if not reallocation to other record groups) may have to await the detailed identification of series that comes at the third level of arrangement. Once all series are assigned to record groups and subgroups so that the boundaries of these are finally certain, the archivist looks within the group or subgroup and works out a logical arrangement sequence for the series so assigned. It must be admitted that there is no one perfect arrangement sequence for series. Considerable variation is possible in any large record group, and no two archivists, no matter how experienced, would make the same decisions. But there are better arrangements and poorer arrangements, and the poorer one must be wrestled with until it is acceptable.

Arrangement of series is a relatively simple task if the records are the creation of a small, unified agency. Such a record group or subgroup, therefore, may be assigned to a younger archivist for training purposes. He will draw upon a few accepted principles such as the Dutch rule giving precedence to the correspondence series unless there happens to be a "backbone" series from which all else depends. Indexes and other agency-created finding aids usually precede the series they index. Facilitating and housekeeping records, if preserved, usually come last. In between, functions and the sequence of action within functions may govern the grouping of series. In larger record groups the series may be grouped according to chronological periods, by major breaks in the filing systems, or on a functional basis, and these groupings become also major divisions or breakdowns of the resulting inventory.

In most record groups of any age and size, however, there are almost certain to be many complicating factors. These may be caused by:

(1) changes in the organization;
(2) changes in the functions;
(3) changes in the filing schemes;
(4) the existence of records from one or more predecessor agencies that have not been, or have been only partially, incorporated into records series created by the later agency; and
(5) records that have been reclassified or otherwise reorganized for proper reasons, that have been incompletely reorganized (some ambitious scheme not carried through to completion), or that have been merely tampered with by would -- be "methodizers" before being transferred to the archives depository.

The Dutch manual gives rules for dealing with these and many other complications that cannot be presented here. Although younger archivists with some experience can identify series in complicated record groups as well as they can in simpler ones, it is necessary usually for a more experienced archivist to take over and work out a rational arrangement. A person with experience can be expected not only to do a better job but to do it faster. It is a waste of time and money to employ a worker of too low a grade for arrangement work at this level. The arrangement finally decided upon should be approved by the division or branch chief having responsibility for the record group.

## ARRANGEMENT OF FILING UNITS WITHIN SERIES

Although filing units within series may be single documents or single documents with enclosures and annexes, they are more likely to be assemblages of documents relating to some transaction, person, case, or subject, depending upon the filing policy or system used by the agency. The filing policy, in turn, is likely to be conditioned by the nature of the agency's operations. In the past these filing units were usually controlled in a system of registers and indexes that tied the whole body together in intricate but orderly fashion; and efficient servicing of the records now, as then, is dependent generally upon keeping the body in the same order so that all the contemporary finding aids remain valid as guides. These registry systems continue to be used, notably in the courts and regulatory agencies and in many other agencies that operate largely upon a case or project system. In still other agencies, however, they have been superseded by classified files without registry controls or with partial registry

controls. In these modern instances the registry numbers do not control the filing order. Instead the filing units are the folders established for the classes of the classification scheme. All sorts of combinations may be encountered.

Arrangement work at this level, obviously, is not original arrangement; it is rather a simple but time-consuming checking operation to verify the original order and correct obvious displacements that have taken place over the years. It is necessary for efficient and certain reference service. No archivist has control over his records without it, and delay can soon cost more time, if the records are at all active, than is required to carry it out immediately after accessioning. Moreover, it is best done in connection with boxing and labeling. This is not to say that if a record group is without immediate importance from the point of view of service, or if it is never likely to be very active, such arrangement cannot be delayed or even dispensed with: when a decision such as this is made the records are boxed and labeled without close checking. Although nothing is so lost as a misplaced file, one can delay file unit checking until it can be seen that the records are active enough to justify the work. The highly active series in a record group should receive the more careful checking. These decisions, including the determination of priorities, should be made by branch chiefs on the basis of recommendations of their experienced professional assistants. If the series is composed of numbered or lettered volumes, nothing is simpler than to arrange these in sequence on the shelves. It can be done by a laborer once the place for them is decided upon. Only when backstrip or other identification marks are missing, so that one must determine sequence from internal evidence, need an archivist or subprofessional employee, depending upon the complexity of the problem, be called upon. The alphabetical, numerical, or otherwise designated files (fastened together by various devices) or the folders containing loose papers are lined up and checked for order and completeness as they are placed in archives boxes, and a box list is prepared for labeling purposes. This becomes more than a routine job only if the agency's filing system is complicated or if an apparent arrangement has been disturbed intentionally or through accident or neglect. Inadvertent irregularities may call for considerable detective work in the records themselves and in outside sources to arrive at the explanation. Only when the facts are known can the archivists decide whether to allow space for what appears to be missing or whether to leave what appears to be an alien intrusion where he finds it. Some checking for irregularities can be done by the more intelligent and careful laborers and certainly by subprofessional personnel. It is more efficiently and reliably done by the latter if filing systems are complicated, for there are more elements to be watched. Perhaps three-fourths of the arrangement work on this level can be done by experienced subprofessionals; the degree of experience needed depends on the complexity of the filing system.

Frequently this level of arrangement calls for the integration of files drawn from different chronological blocks. The central files of an agency may have been accessioned in three chronological blocks -- for example, 1905-10, 1911-15, and 1916-20 with so much overlapping that they cannot be serviced efficiently. Maintained originally in the agency as one series, they had been arbitrarily broken into period blocks, as the older files became less active, to facilitate interim storage in a records center. Now, permanent storage and frequent use for research call for restoring the records to their original order. As this is done certain categories that can be disposed of are dropped out; in other words, three or four tasks can be performed simultaneously. Ideally, so that the records can be shelved to stay, everything that has to be done to a series should be done in one multiple-purpose operation before it is boxed and labeled. Nothing is more wasteful than to have to go over and over the same records because all operations were not planned and carried through at once. Such multiple-purpose arrangement projects require at least subprofessional personnel of higher grades or professional workers in the beginning grades.

In many record groups there are rats' nests of bundles, irregularly sized papers, or other groupings that appear never to have been incorporated into systematically arranged and controlled series or that have been pulled out of such series for forgotten purposes and never put back, perhaps because a file clerk did not know where they belonged. The longer the records have remained in storage in attic or basement -- so that over the years they have been serviced by many different persons, most of them unfamiliar with the old filing systems -- the larger the rats' nests. Yet, they are often made up of fairly important records. Going through them calls for the skill of an archivist thoroughly familiar with not only the record group in question but also related record groups. Indeed, if the responsible person does not know the record group thoroughly, he had better keep away from the rat's nest. This is time-consuming arrangement work that must be done unless disorder is to be perpetuated, but is hardly ever done properly and efficiently by anyone but an experienced archivist of at least middle grade.

A final type of operation that may be encountered in the arrangement of file units is the deliberate reorganization of these units in cases where an arrangement different from the original one would seem to serve more efficiently to meet longterm reference demands. For example, an agency often lazily allows reports to pile up year after year, keeping those for each year together in some repetitive pattern, arranged perhaps alphabetically by jurisdiction. In reference service, however, the reports will almost always be called for by jurisdiction, which means that the archivist must draw them from as many places as there may be years involved. It is a relatively simple job to reorder the reports so that all for a jurisdiction are together in sequence. This is physical rearrangement, of course, but it is the simplest sort of rearrangement and does not really violate the integrity of the files. It can be entrusted to subprofessional personnel under proper supervision.

More complicated reorganizations may be decided upon if records have been so badly disarranged that the original organization cannot be fully restored with confidence unless excessive time is spent in research. One does not decide lightly to reorganize a series completely, for in the end the work can prove to be more difficult than expected. It is not easy to devise a new scheme; the records will not fit into any scheme of reorganization as well as they fitted into the original scheme; and they will not be the same body of records when so reordered even though all the documents have been worked into a new arrangement. In cases where an agency has allowed records to accumulate without organization, the archivist must decide whether to leave the records in this disorganized state (which he probably will do if they are not in much demand) or to devise an organization for them. Usually these are short series and the organization can be relatively simple; for example, chronological, alphabetical, or by personal name. Some organization is prerequisite if the records are to be microfilmed. The planning of such organization or reorganization must be by professional archivists of high grade and much experience. It may be carried out by middle-grade archivists working under supervision.

It is obvious that arrangement work on the level involving filing units is of various grades of difficulty and calls for the time of personnel of various grades from that of literate laborers through the subprofessional grades, and from the lower professional grades up to the middle grades. A professional archivist must supervise arrangement work performed by workers of any grade in the sense of spot checking, being present to answer questions, investigating gaps and irregularities, making decisions on whether to go ahead despite irregularities, bringing larger matters to the attention of his superiors, and the like. Planning and supervising arrangement on this level is work of considerable complexity and responsibility and should be done by middle-grade archivists and above. Finally, such projects before their inauguration should be approved by senior archivists and even division chiefs, depending on the amount of equipment and manpower involved or the lack of guiding precedent.

## ARRANGEMENT OF DOCUMENTS WITHIN FILE UNITS

A bound volume may contain many individual documents, but their arrangement was fixed at the time of recording; they cannot get out of order, nor can their order be altered. Loose papers are a different matter. Many ways have been tried over the years to keep related papers of a file unit together and in some kind of order, but none is entirely satisfactory. In the days before flat files, order was maintained by folding papers together. Modern ways to preserve the order involve the use of paper clips, wire staples, or rivets -- the two last in connection with cover and backing sheets -- or of folders and metal fasteners of various kinds within folders. In the days of folded records -- roughly before World War I -- enclosures were folded within the covering letters, and enclosures often had enclosures folded within them. A letter of transmittal might cover many enclosures, some of which had their own enclosures. This was true especially of legal records, vouchers, and reports. When records such as these are flattened, considerable ingenuity, careful checking, and use of folders or envelopes are all necessary to ensure that the proper documents are kept together and their relationships thus preserved. An archivist is likely to develop considerable admiration for the old system of folded records and the revealing endorsements on the middle fold, and he is not likely to want to unfold them permanently until the physical condition of the records requires that he do so. Increased handling to find and scrutinize flattened endorsements can result in more rapid deterioration than if the records had been left unflattened.

It is partly in connection with the flattening of records, then, that one is required to ensure that proper documents and individual sheets of paper are kept together and in a consistent order.

The other major process requiring arrangement within the file unit and down to the individual document is in connection with microfilming. There is an increasing amount of this these days as:

(1) scholars blithely order hundreds of dollars worth of film of records they have not seen,
(2) we are trying to include more and more of our best and most valuable records in microfilm publications,
(3) we are filming vast quantities of records either with a view of destroying the originals or, contrariwise, to preserve them by encouraging the use of microfilm rather than of originals.

One using film instead of originals suffers under many handicaps at best, and if the records are not in perfect order and filmed in a consistent manner -- so that endorsements come first, for example, and enclosures are in their proper order and all sheets of a multi-paged document are in order -- the film becomes unusable and therefore useless. There are many instances of film made but never used in government agencies because the records were not carefully arranged beforehand.

One does not normally go within folders or cases to arrange original documents if they are going to be retained and used in their original form. If there is disorder, one can usually see by size or color of sheets which ones belong together and can, if he is interested in those particular records, puzzle out their arrangement more quickly and confidently than he could if they had been placed on microfilm in the same disorder.

Arrangement on this lowest level, then, is done chiefly in connection with flattening and microfilming (often both at once). It can be done by experienced subprofessional employees, or by lower grade -- that is, less experienced professional workers. It is usually a good task for a beginner because it familiarizes him with filing methods and the contents of files at the same time. Always a more experienced archivist should be on hand as supervisor, to answer questions and to iron out complications. Often arrangement of file units and individual documents is performed simultaneously, especially when records are being prepared for microfilming. This usually saves time and labor, but, insofar as the process becomes more complicated, a person of higher grade may be required. If the filing unit is the document, which happens in some files, arrangement on the file unit level and on the document level becomes one and the same job, usually a relatively simple one.

## BOXING, SHELVING, AND LABELING

The five levels of arrangement described above have to do with the analysis and identification of records and with checking them to determine their proper arrangement. Presumably the decisions have been made and recorded on paper or are otherwise well understood. We have now to discuss the execution of the decisions. This can be done in relatively quick time by laborers, typists, and lower grade subprofessional personnel operating under higher grade subprofessional or professional supervision, depending on the complexity of the job. Usually the professional personnel responsible for decisions on arrangement should supervise their execution, lest time be wasted in identifying subgroups and series and determining their boundaries all over again. Checking arrangement on the file unit level and boxing the series can proceed with one crew while the supervisor works on the overall arrangement of the series. The shelving of the boxed series in the determined order is then the last operation except for typing and affixing the labels.

## Boxing

Normally only loose papers are "boxed," that is, put into archival containers that afterwards are placed on shelves. In transferring a file to these containers, one tries to divide it at natural breaks (between file units if possible) and yet not to pack the box so tightly that records cannot be withdrawn or inserted without damage or so loosely that papers slump and bend and space is wasted. One checks the arrangement of the file units placed in the box and writes down the necessary data, usually the beginning and ending file numbers, for the label. Efforts are made to end a series in one box, without a waste of space, and to begin a new series in a new box. Unless the order of series has been worked out ahead of time with finality and the series are boxed in order, these boxed series will, of course, be given only temporary positions on the shelves. Only with smaller and simpler record groups or accessions is it likely that everything can be ready for shelving at once. Boxing can be the work of high-grade laborers or subprofessional employees. Professional personnel is rarely needed unless complicated arrangement work is being done at the same time and is really the controlling operation,

of which the boxing is an inconsequential part.

### Shelving

Both boxes containing loose papers and bound volumes must be shelved. When the arrangement of their contents has been finished, the boxes can be shelved by laborers in locations and in the order, so far as series are concerned, that professional archivists have determined. This is largely a physical operation. The shelving of volumes, especially if they are of all sizes, is more complicated. Although it will be done with the aid of laborers, it will have to be closely supervised by professionals or experienced subprofessionals unless there are long runs of volumes, well labeled and of uniform size, to be set on the shelves. The supervisor should decide whether volumes are too large or too poorly bound to stand vertically on shelves. He must watch the order very closely if there are many series of a few volumes or of one volume each. He must approve any shelving of volumes out of order, deciding when enough space can be saved thereby to warrant it, or when the condition of the volumes demands it, or perhaps when the leaving of indexes and registers out of sequence so that they can be placed near desks or made available to searchers in a searchroom is desirable to save time or to permit a degree of self-service. These irregularities in the established order should be signaled by cross-references in the proper places.

### Labeling

Labeling is of two kinds:

(1) of the containers,
(2) of row ends in the stack areas after the shelving has been completed.

The container labeling usually comes first. Lists of box contents should have been made up at the time of boxing. A container label must show the name and number of the record group, the name of any subgroup, the name of the series, and the particular contents of the box. It should also bear a number to show the place of the box in the record group or subgroup or at least in the series sequence. The first two or three elements, if they extend over a hundred containers or more, should be typed on stencils so that the labels can be processed in sheets; if this is done, only the contents of the individual boxes will need to be typed on individual labels. Sometimes there will be no subgroup. If a subgroup is well known, there need be shown only the number of the record group of which it is a part. Row -- end labels must be typed in full, since each one varies so much in wording. Labels can be worked out by lower grade professional personnel or higher grade subprofessional personnel, but they should be reviewed by higher grade professionals before time is wasted in processing and typing. The affixing of the labels can be done by literate and careful laborers if work is reviewed by high-grade subprofessionals or low-grade professionals. The assignment of the lower or higher grade worker is determined by the complexity of the job.

There are of course reboxing, and reshelving, and relabeling jobs that follow after the internal disposal of accessioned material in order to consolidate the space gained by such disposal. They can be handled by the same grades of personnel that handled the original jobs of this nature. Occasionally there are major reshiftings of holdings as a record group or several of them are assigned to different areas. Such shiftings afford the opportunity to improve arrangement and correct any errors that may have been made originally. The planning of such a shift in order to get the most out of the available space in the new areas is usually work of professional level, but the execution can be by laborers and supervision by experienced subprofessional personnel.

### REPORTING ARRANGEMENT RESULTS IN WRITING

For each level of arrangement except the lowest, there is likely to result some kind of archival instrument:

1. Depository level -- an administrative issuance.
2. Record group level -- a record group registration statement or summary for each established record group.
3. Series level -- an inventory of the record group in which each series appears as a numbered entry.

4. Filing unit level checklists of filing units for important series. These checklists are sometimes, for very long and important series, offered as separate documents, but more often they are presented as appendixes to inventories of the record groups. Very short series and series of lesser importance are deemed sufficiently accounted for in the inventory itself.

On the document level a written statement is not normally produced to reflect arrangement.

Most of these archival instruments serve a double purpose in that, although really produced as control documents to account for the holdings and show their arrangement, they serve also as finding aids. In one sense the depository-level document might be said to tell a searcher which way to turn when he enters the depository, the record group statement tells him which threshold to cross, the inventory tells him in which part of the room to look, and the filing-unit list tells him which unit to take off the shelf as likely to contain the document or documents he wishes to see. The searcher will not take these steps except in imagination as he consults the finding-aid documents, but some member of the archives staff must take them physically if the documents are to be made available to the searcher in a central searchroom.

It will be seen that with respect to finding-aid documents that reflect arrangement, which we may designate as primary finding aids, the real work involved is determining the arrangement. Presenting that arrangement in writing afterwards is a subsidiary activity. There are, of course, archival finding aids that do not follow the arrangement pattern of the records but cut across these patterns in index fashion. These may be designated as secondary finding aids. They must come later because established units of arrangement with fixed designations must first exist to which units of entry in secondary finding aids can refer. Thus, arrangement is the basic internal activity of an archival establishment. All other internal activities depend upon its proper accomplishment.

**Note:** This web version was prepared in 1999, based on:
Oliver W. Holmes, *Archival Arrangement -- Five Different Operations at Five Different Levels*, published by the Society of American Archivists in the **American Archivist**, Volume 27, Number 1 (January 1964): 21-41.
By permission of the Society of American Archivists.
This version may differ from the printed version.

See Also:

- Archives and Preservation Home Page
- Archives and Related Professions Training
- Professional Organizations
- Bibliographies, Weblinks, and Professional Organizations
- Archival Terminology
- Frequently Asked Questions (FAQs)
- Contact Us

 Top of Page

**Online Research**

By Topic
By Media Type
By Government Organization
Presidential Materials
Access to Archival Databases
Archival Research Catalog
Archives Library Information Center
Online Exhibits

**Resources For…**

Genealogists
Military Historians
Preservation and Archives Professionals
Records Managers
Veterans

**Research Guides**

Getting Started
Guide to Federal Records
Declassified Records
Where to Look for Records
Why Aren't All Records Online?

**What's New**

News and Notices
New Acquisitions
The Buzz: Online Newsletter

**I Want To…**

Attend an Event
Order Copies of Records
Hire a Researcher
Report Lost or Stolen Documents

**Connect With Us**

 Blogs
 Facebook
 Flickr
 RSS Feeds
 Twitter
 YouTube

More…

# Tab J



Blogs | Bookmark/Share | Contact Us

# NATIONAL ARCHIVES

| Research Our Records | Veterans Service Records | Teachers' Resources | Our Locations | Shop Online |

## Preservation

Home  >  Preservation  >  Information For Archives Professionals  >  The Archivist's Code

**Resources**

Introduction

Questions About Archives and Archivists

What is the Archivist's Code?

Quick Facts about the National Archives

What's the Difference between the National Archives and the Library of Congress?

Professional Organizations

Professional Certification Programs

Archives and Records Managment Links

Other Archives and Organizations

Researching in an Archive

# The Archivist's Code

Note: The The Archivist's Code, presented below, was developed by the National Archives in 1955 to guide staff in making professional decisions. For many years, it was the only written guidance on this topic for the archival profession in the United States. Although the guidance remains sound even today, as archival issues increased in complexity the profession saw the need for a fuller code of ethics. Accordingly, in 1992, the Council of the Society of American Archivists adopted the Code of Ethics for Archivists.

- The Archivist has a moral obligation to society to take every possible measure to ensure the preservation of valuable records, not only those of the past but those of his own times, and with equal zeal.

- The Archivist in appraising records for retention or disposal acts as the agent of future generations. The wisdom and impartiality he applies to this task measure his professionalism, for he must be as diligent in disposing of records that have no significant or lasting value as in retaining those that do.

- The Archivist must protect the integrity of records in his custody. He must guard them against defacement, alteration, or theft; he must protect them against physical damage by fire or excessive exposure to light, dampness, and dryness; and he must ensure that their evidentiary value is not impaired in the normal course of rehabilitation, arrangement, and use.

- The Archivist should endeavor to promote access to records to the fullest extent consistent with the public interest, but he should carefully observe any proper restrictions on the use of records. He should work unremittingly for the increase and diffusion of knowledge, making his documentary holdings freely known to prospective users through published finding aids and personal consultation.

- The Archivist should respond courteously and with a spirit of helpfulness to reference requests. He should not place unnecessary obstacles in the way of researchers but should do whatever he can to save their time and ease their work. He should not idly discuss the work and findings of one researcher with another; but where duplication of research effort is apparent, he may properly inform another researcher.

- The Archivist should not profit from any commercial exploitation of the records in his custody, nor should he withhold from others any information he has gained as a result of his official duties—either in order to carry out private professional research or to aid one researcher at the expense of another. He should, however, take every legitimate advantage of his situation to develop his professional interests in historical and archival research.

- The Archivist should freely pass on to his professional colleagues the results of his own or his organization's research that add to the body of archival and historical knowledge. He should leave

to his successors a true account of the records in his custody and of their organization and arrangement.

Wayne C. Grover
Archivist of the United States
1948-1965

## Preservation >

| Information For… | Publications | Orgs & Offices | I Want To... | Resources | Connect With Us |
|---|---|---|---|---|---|
| Citizen Archivists | Federal Register | Federal Records Center | Get My Military Record | A-Z Index |  Blogs |
| Federal Employees | Free Publications | Office of the Inspector General | Plan a Research Visit | America's Founding Docs |  Facebook |
| Genealogists | Prologue Magazine | Presidential Libraries | Apply for a Grant | Contact Us |  Flickr |
| Members of Congress | Purchase Publications | More... | | En Español |  RSS Feeds |
| Preservation | More... | **About Us** | **Participate** | FAQs |  Twitter |
| Records Managers | | What is the National Archives? | Attend an Event | Forms | YouTube |
| The Press | | Doing Business with Us | Donate to the Archives | | More... |
| | | Plans and Reports | Work at the Archives | | |
| | | Open Government | Volunteer at the Archives | | |
| | | Our Plain Language Efforts | | | |

# Tab K

Join SAA  |  Contact Us  |  Login



**SOCIETY OF AMERICAN ARCHIVISTS**

Google™ Custom Search

| Home | The Archives Profession ▼ | About Us ▼ | Education & Events ▼ | Publications ▼ | Members ▼ | Groups ▼ |

Home » About Us » Position Statements & Resolutions » SAA Core Values Statement And Code Of Ethics

# SAA Core Values Statement and Code of Ethics

### Introduction

Statements of ethics emerge from the core values of a profession. The *Core Values of Archivists* and the *Code of Ethics for Archivists* are intended to be used together to guide archivists, as well as to inform those who work with archivists, in shaping expectations for professional engagement.  The former is a statement of what archivists believe; the latter is a framework for archivists' behavior.

## Core Values of Archivists

*(Approved by the SAA Council May 2011.)*

**PURPOSE**

Archivists select, preserve, and make available primary sources that document the activities of institutions, communities and individuals. These archival sources can be used for many purposes including providing legal and administrative evidence, protecting the rights of individuals and organizations, and forming part of the cultural heritage of society. The modern archives profession bases its theoretical foundations and functions on a set of core values that define and guide the practices and activities of archivists, both individually and collectively. Values embody what a profession stands for and should form the basis for the behavior of its members.

Archivists provide important benefits and services such as: identifying and preserving essential parts of the cultural heritage of society; organizing and maintaining the documentary record of institutions, groups, and individuals; assisting in the process of remembering the past through authentic and reliable primary sources; and serving a broad range of people who seek to locate and use valuable evidence and information. Since ancient times, archives have afforded a fundamental power to those who control them. In a democratic society such power should benefit all members of the community. The values shared and embraced by archivists enable them to meet these obligations and to provide vital services on behalf of all groups and individuals in society.

This statement of core archival values articulates these central principles both to remind archivists why they engage in their professional responsibilities and to inform others of the basis for archivists' contributions to society. Archivists are often subjected to competing claims and imperatives, and in certain situations particular values may pull in opposite directions. This statement intends to provide guidance by identifying the core values that guide archivists in making such decisions and choices. Core values provide part of the context in which to examine ethical concerns.

**CORE VALUES OF ARCHIVISTS**

**Access and Use:** Archivists promote and provide the widest possible accessibility of materials, consistent with any mandatory access restrictions, such as public statute, donor contract, business/institutional privacy, or personal privacy. Although access may be limited in some instances, archivists seek to promote open access and use when possible. Access to records is essential in personal, academic, business, and government settings, and use of records should be both welcomed and actively promoted. Even individuals who do not directly use archival materials benefit indirectly from research, public programs, and other forms of archival use, including the symbolic value of knowing that such records exist and can be accessed when needed.

**Accountability:** By documenting institutional functions, activities, and decision-making, archivists provide an important means of ensuring accountability. In a republic such accountability and transparency constitute an essential hallmark of democracy. Public leaders must be held accountable both to the judgment of history and future generations as well as to citizens in the ongoing governance of society. Access to the records of public officials and agencies provides a means of holding them accountable both to public citizens and to the judgment of future generations. In the private sector, accountability through archival documentation assists in protecting the rights and interests of consumers, shareholders, employees, and citizens. Archivists in collecting repositories may not in all cases share the same level of responsibility for accountability, but they too maintain evidence of the actions of individuals, groups, and organizations, which may be required to provide accountability for contemporary and future interests.

**Advocacy:** Archivists promote the use and understanding of the historical record. They serve as advocates for their own archival programs and institutional needs. They also advocate for the application of archival values in a variety of settings including, to the extent consistent with their institutional responsibilities, the political arena. Archivists seek to contribute to the formation of public policy related to archival and recordkeeping concerns and to ensure that their expertise is used in the public interest.



Tell us how you celebrated!
Send to **saahq@archivists.org**







IT'S HERE! *How to Manage Processing in Archives and Special Collections*



**Diversity:** Archivists collectively seek to document and preserve the record of the broadest possible range of individuals, socio-economic groups, governance, and corporate entities in society. Archivists embrace the importance of identifying, preserving, and working with communities to actively document those whose voices have been overlooked or marginalized. They seek to build connections to under-documented communities to support: acquisition and preservation of sources relating to these communities' activities, encouragement of community members' use of archival research sources, and/or formation of community-based archives. Archivists accept and encourage a diversity of viewpoints on social, political, and intellectual issues, as represented both in archival records and among members of the profession. They actively work to achieve a diversified and representative membership in the profession.

**History and memory:** Archivists recognize that primary sources enable people to examine the past and thereby gain insights into the human experience. Archival materials provide surrogates for human memory, both individually and collectively, and when properly maintained, they serve as evidence against which individual and social memory can be tested. Archivists preserve such primary sources to enable us to better comprehend the past, understand the present, and prepare for the future.

**Preservation:** Archivists preserve a wide variety of primary sources for the benefit of future generations. Preserving materials is a means to this end not an end in itself. Within prescribed law and best practice standards, archivists may determine that the original documents themselves must be preserved, while at other times copying the information they contain to alternate media may be sufficient. Archivists thus preserve materials for the benefit of the future more than for the concerns of the past.

**Professionalism:** Archivists adhere to a common set of missions, values, and ethics. They accept an evolving theoretical base of knowledge, collaborate with colleagues in related professions, develop and follow professional standards, strive for excellence in their daily practice, and recognize the importance of professional education, including lifelong learning. They encourage professional development among their co-workers, foster the aspirations of those entering the archival profession, and actively share their knowledge and expertise. Archivists seek to expand opportunities to cooperate with other information professionals, with records creators, and with users and potential users of the archival record.

**Responsible Custody:** Archivists ensure proper custody for the documents and records entrusted to them. As responsible stewards, archivists are committed to making reasonable and defensible choices for the holdings of their institutions. They strive to balance the sometimes competing interests of various stakeholders. Archivists are judicious stewards who manage records by following best practices in developing facilities service standards, collection development policies, user service benchmarks, and other performance metrics. They collaborate with external partners for the benefit of users and public needs. In certain situations, archivists recognize the need to deaccession materials so that resources can be strategically applied to the most essential or useful materials.

**Selection:** Archivists make choices about which materials to select for preservation based on a wide range of criteria, including the needs of potential users. Understanding that because of the cost of long-term retention and the challenges of accessibility most of the documents and records created in modern society cannot be kept, archivists recognize the wisdom of seeking advice of other stakeholders in making such selections. They acknowledge and accept the responsibility of serving as active agents in shaping and interpreting the documentation of the past.

**Service:** Within the mandates and missions of their institutions, archivists provide effective and efficient connections to (and mediation for) primary sources so that users, whoever they may be, can discover and benefit from the archival record of society, its institutions, and individuals. Archivists serve numerous constituencies and stakeholders, which may include institutional administrators, creators and donors of documentary materials, rights holders, un/documented peoples, researchers using the archives for many distinct purposes, corporate and governmental interests, and/or citizens concerned with the information and evidence held in archival sources. Archivists seek to meet the needs of users as quickly, effectively, and efficiently as possible.

**Social Responsibility:** Underlying all the professional activities of archivists is their responsibility to a variety of groups in society and to the public good. Most immediately, archivists serve the needs and interests of their employers and institutions. Yet the archival record is part of the cultural heritage of all members of society. Archivists with a clearly defined societal mission strive to meet these broader social responsibilities in their policies and procedures for selection, preservation, access, and use of the archival record. Archivists with a narrower mandate still contribute to individual and community memory for their specific constituencies, and in so doing improve the overall knowledge and appreciation of the past within society.

## Code of Ethics for Archivists

*(Approved by the SAA Council February 2005; revised January 2012.)*

Archives are created by a wide array of groups and provide evidence of the full range of human experience. Archivists endeavor to ensure that those materials, entrusted to their care, will be accessible over time as evidence of human activity and social organization. Archivists embrace principles that foster the transparency of their actions and that inspire confidence in the profession. A distinct body of ethical norms helps archivists navigate the complex situations and issues that can arise in the course of their work.

The Society of American Archivists is a membership organization comprising individuals and organizations dedicated to the selection, care, preservation, and administration of historical and documentary records of enduring value for the benefit of current and future generations.

The Society endorses this Code of Ethics for Archivists as principles of the profession. This Code should be read in conjunction with SAA's "Core Values of Archivists." Together they provide guidance to archivists and increase awareness of ethical concerns among archivists, their colleagues, and the rest of society.  As advocates for documentary collections and cultural objects under their care, archivists aspire to carry out their professional activities with the highest standard of professional conduct.  The behaviors and characteristics outlined in this Code of Ethics should serve as aspirational principles for archivists to consider as they strive to create trusted archival institutions.

**Professional Relationships**

Archivists cooperate and collaborate with other archivists, and respect them and their institutions' missions and collecting policies. In their professional relationships with donors, records creators, users, and colleagues, archivists are honest, fair, collegial, and equitable.

**Judgment**

Archivists exercise professional judgment in appraising, acquiring, and processing materials to ensure the preservation, authenticity, diversity, and lasting cultural and historical value of their collections.  Archivists should carefully document their collections-related decisions and activities to make their role in the selection, retention, or creation of the historical record transparent to their institutions, donors, and users. Archivists are encouraged to consult with colleagues, relevant professionals, and communities of interest to ensure that diverse perspectives inform their actions and decisions.

**Authenticity**

Archivists ensure the authenticity and continuing usability of records in their care. They document and protect the unique archival characteristics of records and strive to protect the records' intellectual and physical integrity from tampering or corruption. Archivists may not willfully alter, manipulate, or destroy data or records to conceal facts or distort evidence. They thoroughly document any actions that may cause changes to the records in their care or raise questions about the records' authenticity.

**Security and Protection**

Archivists protect all documentary materials for which they are responsible. They take steps to minimize the natural physical deterioration of records and implement specific security policies to protect digital records.  Archivists guard all records against accidental damage, vandalism, and theft and have well-formulated plans in place to respond to any disasters that may threaten records.  Archivists cooperate actively with colleagues and law enforcement agencies to apprehend and prosecute vandals and thieves.

**Access and Use**

Recognizing that use is the fundamental reason for keeping archives, archivists actively promote open and equitable access to the records in their care within the context of their institutions' missions and their intended user groups. They minimize restrictions and maximize ease of access. They facilitate the continuing accessibility and intelligibility of archival materials in all formats.  Archivists formulate and disseminate institutional access policies along with strategies that encourage responsible use.  They work with donors and originating agencies to ensure that any restrictions are appropriate, well-documented, and equitably enforced.  When repositories require restrictions to protect confidential and proprietary information, such restrictions should be implemented in an impartial manner. In all questions of access, archivists seek practical solutions that balance competing principles and interests.

**Privacy**

Archivists recognize that privacy is sanctioned by law.  They establish procedures and policies to protect the interests of the donors, individuals, groups, and institutions whose public and private lives and activities are recorded in their holdings.  As appropriate, archivists place access restrictions on collections to ensure that privacy and confidentiality are maintained, particularly for individuals and groups who have no voice or role in collections' creation, retention, or public use.  Archivists promote the respectful use of culturally sensitive materials in their care by encouraging researchers to consult with communities of origin, recognizing that privacy has both legal and cultural dimensions. Archivists respect all users' rights to privacy by maintaining the confidentiality of their research and protecting any personal information collected about the users in accordance with their institutions' policies.

**Trust**

Archivists should not take unfair advantage of their privileged access to and control of historical records and documentary materials.  They execute their work knowing that they must ensure proper custody for the documents and records entrusted to them.  Archivists should demonstrate professional integrity and avoid potential conflicts of interest. They strive to balance the sometimes-competing interests of all stakeholders.

Login to post comments

## Comments

2005 CODE OF ETHICS FOR ARCHIVISTS

Jane Zhang - 07/28/2012 - 5:56pm

http://web.archive.org/web/20110725013613/http://www2.archivists.org/code-of-ethics

Login to post comments

## REVISIONS TO THE CODE OF ETHICS

jsn14 - 03/29/2012 - 12:37pm

While I am glad that the Code of Ethics is posted online and is updated as changes are made, I am disappointed because there is no way to view the Code's previous iterations.  Not only does this make it more difficult for those not directly involved in revising it to track changes and comment on them, but it is an example of poor documentation.  I have been searching in vain to find the Code as it existed in 1992 without much success.  Including links to previous versions of the Code, highlighting changes, and allowing comments directly on the text would make this page a lot more useful and hopefully encourage more particpation in the Code's development.

Login to post comments

Privacy & Confidentiality  | Disclaimer  | Credits  | Contact Us

Copyright © 2012
Developed by CommonPlaces e-Solutions, LLC