EXHIBIT 7



# AN EXAMINATION OF ATTACKS AGAINST THE FINANCIAL CRISIS INQUIRY COMMISSION

**Democratic Staff**
**Committee on Oversight and Government Reform**
**U.S. House of Representatives**

**Prepared for Ranking Member Elijah E. Cummings**

**July 13, 2011**

**http://democrats.oversight.house.gov/**

# TABLE OF CONTENTS

Executive Summary ........................................................................................   3

Background ....................................................................................................   7

I.      Work Guided by Politics Rather Than Fact-Finding   .................................   9

II.     Campaign to Blame Economic Crisis on Government Housing Policy   .........  11

        A.      Wallison Leaked Confidential Information ............................................  12

        B.      Other Republicans Called Wallison a "Parrot" for Pinto ....................  15

        C.      Wallison Inaccurately Claimed Commission Ignored AEI Position ...  16

        D.      All Other Republican Commissioners Rejected AEI Position   .........  18

III.    Questions About Vice Chairman Thomas and the CEO of a
        Political Consulting Firm   ..................................................................  21

IV.     Unsubstantiated Allegations by Chairman Issa   ............................................  25

        A.      Financial Mismanagement   ......................................................................  25

        B.      Conflicts of Interest and Partisan Staff   ............................................  27

        C.      Decision to Delay Report   ....................................................................  29

        D.      Disclosure of Confidential Information   ............................................  31

# EXECUTIVE SUMMARY

In the wake of the most severe economic crisis since the Great Depression, Congress established the Financial Crisis Inquiry Commission in May 2009 to "examine the causes, domestic and global, of the current financial and economic crisis in the United States." There were ten Commissioners, including six Democrats and four Republicans, led by Democratic Chairman Phil Angelides and Republican Vice Chairman Bill Thomas.

In July 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act. Based on testimony from former Federal Reserve Chairman Alan Greenspan and others that there had been deficient regulation of the financial markets leading up to the crisis, the Dodd-Frank Act included significant new protections for consumers of financial products.

House Republicans voted almost unanimously against the Dodd-Frank Act. On the day it passed the Senate, then-House Minority Leader John Boehner stated: "I think it ought to be repealed." Since then, House Republicans have been aggressive in their efforts to repeal the Act and prevent its protections from being implemented.

On July 27, 2010, then-Ranking Member Issa announced an investigation into the activities of the Commission. In a letter to Chairman Angelides, Ranking Member Issa wrote that, although he had hoped that the Commission would "be able to conduct a fair and effective investigation which would help Congress as it considered financial regulatory reform legislation," he was launching his investigation in part because "the Administration and congressional Democrats have instead chosen to ram through a partisan financial regulation bill before the FCIC has completed its work."

Ranking Member Issa made a number of allegations focused almost exclusively on Democratic Commissioners and staff. He asserted that "potential financial mismanagement" caused the Commission to "run out of money"; that "commissioners and staff of the FCIC may have conflicts of interest"; that some senior staff had "extensive ties" to "partisan Democrat politics"; and that the decision to delay the Commission's final report by a month and a half was caused by "continued management problems."

As part of Chairman Issa's investigation, he requested a wide range of internal Commission documents. In response, the Committee has now obtained more than 400,000 e-mails, memoranda, draft reports, and other documents from both Democratic and Republican Commissioners and staff.

These documents indicate that Chairman Issa's allegations are largely unsubstantiated, and this report addresses each allegation in turn. In contrast, the documents raise significant new questions about whether Republican Commissioners geared their efforts on the Commission toward helping House Republicans in their campaign to repeal the Dodd-Frank Act, rather than determining the facts that led to the economic crisis. The documents also raise a host of new ethical questions about Republican Commissioners and staff, including evidence that they leaked confidential information to outside parties on multiple occasions.

***Work Guided by Politics Rather Than Fact-Finding***

Although the purpose of the Commission was supposed to be to conduct in-depth fact-finding to determine the causes of the economic crisis, internal Commission documents obtained by the Committee include e-mails from a Republican Commissioner urging his colleagues to use their positions on the Commission to help House Republicans in their efforts to repeal the Dodd-Frank Act.

For example, on November 3, 2010, the day after the mid-term congressional elections in which Republicans took control of the House, Republican Commissioner Peter Wallison e-mailed Republican Commissioner Douglas Holtz-Eakin: "It's very important, I think, that what we say in our separate statements not undermine the ability of the new House GOP to modify or repeal Dodd-Frank."

The next day, he sent a similar e-mail to Vice Chairman Thomas, attaching an article entitled "GOP Pledges Major Changes to Dodd-Frank, Fannie and Freddie, CFPB." He wrote: "Garrett [Rep. Scott Garrett] has also suggested in the past a complete repeal of Dodd-Frank. This effort should not be undermined. That law will suppress economic growth because it was based on the idea that more regulation was necessary. Boehner also said yesterday that changing this law was a priority."

By December, Republican Commissioners had decided not to join the Commission's report. Instead, they issued their own paper on December 15 providing dissenting views about the causes of the economic crisis. In addition, on January 27, 2011, Commissioner Wallison wrote in his dissenting views that "the Dodd-Frank Act was legislative overreach and unnecessary." He added: "The appropriate policy choice was to reduce or eliminate the government's involvement in the residential mortgage markets, not to impose significant new regulation on the financial system."

On January 3, 2011, *Politico* reported that Chairman Issa planned to hold a hearing with Chairman Angelides and Vice Chairman Thomas "to determine whether there was any agreement in relation to the cause of the meltdown." Two days later, Chairman Issa joined several other Members in introducing H.R. 87 to repeal the Dodd-Frank Act in its entirety.

***Campaign to Blame Economic Crisis on Government Housing Policy***

Internal Commission documents indicate that Commissioner Wallison used his position to promote a theory of the economic crisis supported by Chairman Issa and put forth by Edward Pinto, a Resident Fellow at the American Enterprise Institute (AEI). This theory, that government housing policy was the primary cause of the nation's economic crisis, was ultimately rejected as flawed by every other member of the Commission.

Before joining AEI in 1999, Commissioner Wallison served as White House Counsel and as General Counsel at the Treasury Department under President Reagan where, according to his biography, "he had a significant role in the development of the Reagan administration's

proposals for the deregulation of the financial services industry." Mr. Pinto is a former Fannie Mae official whose work at AEI focuses "on the role of housing policies in the financial crisis."

Internal Commission documents indicate that Commissioner Wallison violated the Commission's ethics provisions by leaking confidential information to Mr. Pinto on several occasions. In response to one of these violations, the Commission's General Counsel concluded that Commissioner Wallison disclosed "a confidential Commission staff memorandum" to Mr. Pinto, and that this "was a violation of the Commission's Ethics Guidelines, and our written confidentiality agreement with the Federal Reserve."

Internal Commission e-mails indicate that Republican Vice Chairman Thomas and his staff became worried that Commissioner Wallison was unduly influenced by AEI. In one exchange, Vice Chairman Thomas' special assistant referred to Commissioner Wallison as "intractable" and wrote: "Everyone agrees that there is simply no way to make Peter happy." Later in the exchange, he wrote:

> I can't tell re: who is the leader and who is the follower. If Peter is really a parrot for Pinto, he's putting a lot of faith in the guy.

In response, a colleague at Vice Chairman Thomas' law firm wrote: "I think wmt [William M. Thomas] is going to push to find out if pinto is being paid by anyone."

Despite repeated claims by Commissioner Wallison that the Commission failed to consider AEI's position that the economic crisis was caused by government housing policies, internal Commission documents demonstrate that Commission staff went above and beyond in fully considering the AEI position, and that all of the other Commissioners—including the three other Republicans—rejected this position as fundamentally flawed.

For example, Republican Commissioner Holtz-Eakin sent an e-mail to Vice Chairman Thomas stating: "I continue to think that Peter overplays the mortgage issue." In addition, the separate dissent issued by Republican Commissioners Thomas, Hennessey, and Holtz-Eakin stated that such "single-cause explanations" are "too simplistic."

Chairman Angelides sent an e-mail to Commissioner Wallison explaining that the Commission staff had fully considered the AEI position, but concluded it was "flawed." He added: "the staff has spent more time responding to your questions and requests for information than any other Commissioner."

### *Questions About Vice Chairman Thomas and the CEO of a Political Consulting Firm*

Internal Commission documents raise questions about the extent to which Vice Chairman Thomas and his Commission staff were providing information to, and receiving information from, a CEO of a political consulting firm who is also employed by the Vice Chairman's law firm.

Alex Brill is the CEO of Matrix Global Advisors, a firm that provides "economic and political consulting services for clients seeking to effect change in Washington" and "works with clients spanning a variety of industries and has advised both small firms and large corporations," including a "Wall Street investment bank" seeking insights into "financial services legislation."

Mr. Brill is also an Economic Policy Advisor at the law firm of Buchanan, Ingersoll, and Rooney in Washington, DC, where Vice Chairman Thomas is a Senior Advisor, and where Mr. Brill "provides clients with economic and legislative insight" into "financial markets and policies affecting capital investment."  Mr. Brill is also a Research Fellow at AEI and previously served as "senior advisor to former chairman of the House Ways and Means Committee Bill Thomas."

Although some Commissioners utilized non-Commission staff for scheduling, appointments, and other administrative functions, Mr. Brill received confidential information about the Commission's work and provided substantive input based on that information. According to the internal Commission documents, Mr. Brill was provided:

- copies of outlines of internal drafts of Commission staff memos;
- information about internal conversations among Commissioners and staff about deliberations regarding potential witnesses for upcoming hearings;
- a media advisory that had not yet been made public;
- information about the Commission's plans to investigate foreign banks (including the identities of target banks); and
- information about how the Commission staff would treat specific corporations under investigation (such as Citigroup).

Committee staff have identified no record of Mr. Brill being an official, employee, consultant, contractor, or adviser to the Commission.  Similarly, Committee staff have identified no record of Mr. Brill signing a confidentiality agreement.

The documents produced to the Committee do not indicate whether Mr. Brill conveyed any of this internal Commission information to corporate clients, entities represented by his company or his law firm, or any other outside parties.  However, Mr. Brill's law firm aggressively markets his services by stating that they "use this influence to advance causes and cases for clients all over the nation."

As the culmination of a year-long investigation, Chairmen Issa and McHenry scheduled a hearing on these matters for July 13, 2011.  Despite previous reports, Chairman Issa did not invite Vice Chairman Thomas to testify.  For this reason, on July 1, 2011, Ranking Members Cummings and Quigley requested that Committee staff conduct a bipartisan staff interview of Vice Chairman Thomas, as they had done with Chairman Angelides.  Chairman Issa declined to grant this request.  Instead, he notified the Committee that the hearing had been postponed indefinitely.

## BACKGROUND

The Financial Crisis Inquiry Commission was established by the Fraud Enforcement and Recovery Act of 2009, which was passed by Congress and signed by the President in May 2009.[1]   The Commission was created in the wake of the most severe financial crisis in the United States since the Great Depression to "examine the causes, domestic and global, of the current financial and economic crisis in the United States."[2]

The Act authorized the appropriation of "such sums as are necessary."[3]   The Commission received an initial appropriation of $8 million from the Supplemental Appropriations Act of 2009 (enacted June 24, 2009).[4]   The Commission was subsequently appropriated an additional $1.8 million by the Supplemental Appropriations Act of 2010, which was enacted on July 29, 2010.[5]

The Commission was required to "submit to the President and to the Congress a report containing the findings and conclusions of the Commission on the causes of the current financial and economic crisis in the United States" on December 15, 2010, and it was then to "terminate 60 days after the date on which the final report is submitted."[6]

On November 17, 2010, the Commission announced it "had resolved, by majority vote, to deliver its report in January 2011, rather than on December 15, 2010."[7]   The Commission indicated that this delay would "allow the Commission to produce and disseminate a report which best serves the public interest and more fully informs the President, the Congress and the American people about the facts and causes of the crisis."[8]   On December 15, 2010, the four Republican commissioners, Bill Thomas, Peter Wallison, Keith Hennessey, and Douglas Holtz-Eakin, sent to the President and Congress a nine-page primer entitled "Financial Crisis Primer: Questions and Answers on the Cause of the Financial Crisis."[9]

---

[1] P.L. 111-21.

[2] *Id*.

[3] *Id.*

[4] P.L. 111-32.

[5] P.L. 111-212.

[6] P.L. 111-21.

[7] Financial Crisis Inquiry Commission, *Financial Crisis Inquiry Commission Announces New Date for Final Report* (Nov. 17, 2010).

[8] *Id.*

[9] Republican Commissioners on the Financial Crisis Inquiry Commission, *Financial Crisis Primer:  Questions and Answers on the Causes of the Financial Crisis* (Dec. 15, 2010) (online at http://keithhennessey.com/wp-content/uploads/2010/12/Financial-Crisis-Primer.pdf).

The Commission issued its final report on January 27, 2011.[10]  The report concluded that "the crisis was avoidable" and was caused by "[w]idespread failures in financial regulation," "[d]ramatic breakdowns in corporate governance," and "[a]n explosive mix of excessive borrowing and risk by households and Wall Street," among other factors.[11]  The Commission also published on its website "nearly 2,000 documents and more than 300 witness interviews in audio, transcript or summary form" on which its report was based.[12]

The six Democratic Commissioners voted in favor of the report.[13]  The four Republican Commissioners issued two separate dissenting views.  Commissioners Bill Thomas, Keith Hennessey, and Douglas Holtz-Eakin issued a joint dissenting statement.[14]  Commissioner Peter Wallison issued a separate dissenting statement.[15]

The Commission ceased work on February 13, 2011.  The Commission's website is now maintained by the Rock Center for Corporate Governance at Stanford University, and materials associated with its work were deposited at the National Archives and Records Administration.[16]

---

[10] Financial Crisis Inquiry Commission, *Financial Crisis Inquiry Commission Releases Report on the Causes of the Financial Crisis* (Jan. 27, 2010) (online at http://fcic-static.law.stanford.edu/cdn_media/fcic-news/2011-0127-fcic-releases-report.pdf).

[11] *Id.*

[12] Financial Crisis Inquiry Commission, *Financial Crisis Inquiry Commission Releases Additional Material and Concludes Work* (Feb. 10, 2011) (online at http://fcic-static.law.stanford.edu/cdn_media/fcic-news/Press_Release_2.10.11.pdf).

[13] Financial Crisis Inquiry Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (online at http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_commissioner_votes.pdf).

[14] Financial Crisis Inquiry Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States – Dissenting Statement of Commissioner Keith Hennessy, Commissioner Douglas Holtz-Eakin, and Vice Chairman Bill Thomas* (Jan. 2011) (online at http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_hennessey_holtz-eakin_thomas_dissent.pdf).

[15] Financial Crisis Inquiry Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States – Dissenting Statement of Peter J. Wallison* (Jan. 2011) (online at http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_wallison_dissent.pdf).

[16] *Id.*

## I.    WORK GUIDED BY POLITICS RATHER THAN FACT-FINDING

Although the purpose of the Commission was to conduct in-depth fact-finding to determine the causes of the economic crisis, internal Commission documents obtained by the Committee include e-mails from a Republican Commissioner urging his colleagues to use their positions on the Commission to help House Republicans in their efforts to repeal the Dodd-Frank Act.

In July 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protections Act in response to the 2008 economic crisis.[17]  Based on testimony from former Federal Reserve Chairman Alan Greenspan and others that there had been inadequate and insufficient regulation of the financial markets leading up to the crisis, the Dodd-Frank Act included significant new protections for consumers of financial products.[18]

When the Dodd-Frank Act passed the House in 2010, House Republicans voted almost unanimously against it.[19]  On the day it passed the Senate, then-House Minority Leader John Boehner stated:  "I think it ought to be repealed."[20]

Less than two weeks later, then-Ranking Member Issa announced an investigation into the activities of the Commission.  In a letter to Chairman Angelides on July 27, 2010, Rep. Issa stated that, although he had hoped that the Commission would "be able to conduct a fair and effective investigation which would help Congress as it considered financial regulatory reform legislation," he was launching his investigation in part because "the Administration and congressional Democrats have instead chosen to ram through a partisan financial regulation bill before the FCIC has completed its work."[21]

On November 3, 2010, the day after the mid-term congressional elections in which Republicans took control of the House, Commissioner Wallison sent an e-mail to Republican Commissioner Douglas Holtz-Eakin.  He wrote:

> It's very important, I think, that what we say in our separate statements not undermine the ability of the new House GOP to modify or repeal Dodd-Frank.[22]

---

[17] P.L. 111-203.

[18] *The Dodd-Frank Wall Street Reform and Consumer Protection Act:  Issues and Summary*, Congressional Research Service (July 29, 2010) (online at www.llsdc.org/attachments/files/232/CRS-R41350.pdf).

[19] H.R. 4173, Dodd-Frank Wall Street Reform and Consumer Protection Act (June 30, 2010) (House vote on conference report) (online at thomas.gov/cgi-bin/bdquery/z?d111:HR04173:@@@R).

[20] *Senate Passes Wall Street Reform,* The Hill (July 15, 2010) (online at thehill.com/homenews/senate/109053-senate-passes-wall-st-reform).

[21] Letter from Darrell E. Issa to Phil Angelides (July 27, 2010).

[22] E-mail from Peter J. Wallison to Douglas Holtz-Eakin (Nov. 3, 2010).

The next day, on November 4, 2010, Commissioner Wallison sent an e-mail to Republican Vice Chairman Bill Thomas, again underscoring support for efforts to repeal the Dodd-Frank Act.  Attaching an article entitled "GOP Pledges Major Changes to Dodd-Frank, Fannie and Freddie, CFPB," Commissioner Wallison wrote:

> Bill:  In case this did not make the main media sources, I thought you should see this. Garrett [Rep. Scott Garrett] has also suggested in the past a complete repeal of Dodd-Frank.  This effort should not be undermined.  That law will suppress economic growth because it was based on the idea that more regulation was necessary.  Boehner also said yesterday that changing this law was a priority.[23]

By December, Republican Commissioners had decided not to join the Commission's report.  On December 15, 2010, the four Republican commissioners, Bill Thomas, Peter Wallison, Keith Hennessey, and Douglas Holtz-Eakin, sent to the President and Congress a nine-page primer entitled "Financial Crisis Primer:  Questions and Answers on the Cause of the Financial Crisis."[24]

On January 3, 2011, an article in *Politico* reported that Rep. Issa planned an inquiry into the Commission's activities as one of his first investigations.  It stated:

> Issa also wants to study why the financial crisis commission couldn't reach consensus last year.  He'd like to call commission Chairman Phil Angelides and former Rep. Bill Thomas (R-Calif.), vice chairman of the panel, to determine whether there was any agreement in relation to the cause of the meltdown.[25]

Two days later, on January 5, 2011, Chairman Issa joined seven other Members in introducing H.R. 87 to repeal the Dodd-Frank Act in its entirety.[26]

Although the Commission was scheduled to issue its report on January 27, 2011, Chairman Issa sent a letter to Chairman Angelides two days earlier, on January 25, 2011, to "renew the request for documents in the original letter."  He directed the production of all documents in less than a week, by January 31, 2011.[27]

---

[23] E-mail from Peter Wallison to Bill Thomas (Nov. 4, 2010).

[24] Republican Commissioners on the Financial Crisis Inquiry Commission, *Financial Crisis Primer:  Questions and Answers on the Causes of the Financial Crisis* (Dec. 15, 2010) (online at http://keithhennessey.com/wp-content/uploads/2010/12/Financial-Crisis-Primer.pdf).

[25] *Darrell Issa Reveals List of Investigations*, Politico (Jan. 3, 2011) (online at www.politico.com/news/stories/0111/46952.html#ixzz1RSoPXlnR).

[26] H.R. 87, To Repeal the Dodd-Frank Wall Street Reform and Consumer Protection Act (introduced Jan. 5, 2011) (online at http://thomas.loc.gov/cgi-bin/bdquery/z?d112: HR00087:@@@P/|).

[27] Letter from Darrell E. Issa, *et al.*, to Phil Angelides (Jan. 25, 2011).

Two days later, when the Commission issued its final report, Commissioner Wallison's dissent stated that "the Dodd-Frank Act was legislative overreach and unnecessary."  He concluded:  "The appropriate policy choice was to reduce or eliminate the government's involvement in the residential mortgage markets, not to impose significant new regulation on the financial system."[28]

On May 23, 2011, Chairman Issa sent letters to former Chairman Angelides, former Commissioner Byron Georgiou, former General Counsel Gary Cohen, and former Executive Director Wendy Edelberg, requesting that they make themselves available for transcribed interviews with Committee staff.[29]

On July 1, 2011, Representatives Elijah Cummings and Mike Quigley, Ranking Members of the Oversight Committee and Subcommittee on TARP, Financial Services, and Bailouts of Public and Private Programs, sent a letter to Chairmen Issa and Patrick McHenry requesting that the Committee also conduct bipartisan staff interviews of former Vice Chairman Thomas and Commissioner Peter Wallison.[30]  Chairman Issa declined to grant this request.

## II.      CAMPAIGN TO BLAME ECONOMIC CRISIS ON GOVERNMENT HOUSING POLICY

Internal Commission documents obtained by the Committee indicate that Commissioner Peter J. Wallison used his position on the Commission to promote a theory supported by Rep. Issa and put forth by Edward Pinto, a Resident Fellow at the American Enterprise Institute (AEI), that was ultimately rejected as flawed by every other member of the Commission— namely, that government housing policy was the primary cause of the nation's economic crisis.

Peter Wallison joined AEI in 1999 and became the Arthur F. Burns Fellow in Financial Policy Studies in 2007.[31]   In his previous positions as White House Counsel and General Counsel at the Treasury Department under President Reagan, "he had a significant role in the development of the Reagan administration's proposals for the deregulation of the financial

---

[28] Financial Crisis Inquiry Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States – Dissenting Statement of Commissioner Peter Wallison* (Jan. 2011) (online at http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_wallison_dissent.pdf).

[29] *See, e.g.,* Letter from Darrell E. Issa to Phil Angelides (May 23, 2011).

[30] Letter from Elijah E. Cummings and Mike Quigley to Darrell E. Issa and Patrick McHenry (July 1, 2011).

[31] American Enterprise Institute, *Peter J. Wallison Appointed to the AEI's Arthur F. Burns Chair* (May 10, 2007) (online at www.aei.org/press/26156).

services industry."[32]  Mr. Wallison was appointed to the Commission by then-House Republican Leader John Boehner and Senate Republican Leader Mitch McConnell.[33]

Edward Pinto's biography states that he was an "executive vice president and chief credit officer for Fannie Mae until the late 1980s," and he focuses now "on the role of housing policies in the financial crisis and researching policy considerations and options for rebuilding our housing-finance sector."[34]  On August 14, 2010, Mr. Pinto published a paper arguing that government housing policy was to blame for the economic crisis.[35]

Then-Ranking Member Issa published reports and an article espousing the same position. A minority staff report originally issued on July 1, 2009, argued:  "The housing bubble that burst in 2007 and led to a financial crisis can be traced back to federal government intervention in the U.S. housing market intended to help provide homeownership opportunities for more Americans."[36]  Similarly, in March 2010, then-Ranking Member Issa published an article in the Harvard Journal of Law and Public Policy arguing that the economic crisis "is directly tied to an over-inflated housing bubble" and that the loans that created the bubble "were given in record number to over-extended, under-qualified borrowers to satisfy an increasingly aggressive government drive for home ownership."[37]

### A.     Wallison Leaked Confidential Information

Internal Commission documents obtained by the Committee indicate that Commissioner Wallison violated the Commission's ethics provisions by leaking confidential information.

---

[32] American Enterprise Institute, *Biography of Peter J. Wallison* (accessed July 8, 2011) (online at www.aei.org/scholar/58).

[33] *California's Angelides to Lead Financial Crisis Probe,* Bloomberg (July 15, 2009) (online at www.bloomberg.com/apps/news?pid=newsarchive&sid=a7zD382h2EM8).

[34] American Enterprise Institute, *Biography of Edward Pinto* (accessed July 8, 2011) (online at www.aei.org/scholar/100080).

[35] *Government Housing Policies in the Lead-Up to the Financial Crisis:  A Forensic Study,* (Aug. 14, 2010) (online at www.aei.org/docLib/Pinto-Government-Housing-Policies-Crisis.pdf).

[36] Minority Staff, House Committee on Oversight and Government Reform, *The Role of Government Affordable Housing Policy in Creating the Global Financial Crisis of 2008* (July 1, 2009; updated May 12, 2010) (online at http://oversight.house.gov/images/stories/Reports/20100512affordablehousingpolicyandthefinancialcrisis.pdf).

[37] Rep. Darrell E. Issa, *Unaffordable Housing and Political Kickbacks Rocked the American Economy,* Harvard Journal of Law & Public Policy (Mar. 22, 2010) (online at www.harvard-jlpp.com/33-2/407.pdf).

On August 9, 2010, Commission staff prepared a memo to Commissioners entitled "Analysis of Housing Data and Comparison with Ed Pinto's Analysis."[38]  This memo compared information provided by Mr. Pinto to the Commission on March 16, 2010, against confidential data provided by the Federal Reserve and not otherwise available to the public or AEI.

Several days later, on August 14, 2010, Commissioner Wallison sent an e-mail announcing to Commissioners and various staff that he had provided a copy of this confidential staff memo to Mr. Pinto.[39]

After receiving this information, Chairman Angelides forwarded the e-mail to Gary Cohen, the Commission's General Counsel.  Chairman Angelides wrote that he was "very concerned that the dissemination of this non-public staff report violates the FCIC's ethics guidelines for commissioners as well as our agreement with the Federal Reserve."  He asked the General Counsel for his legal opinion on the matter.[40]  In response, the General Counsel wrote:

> The confidential Commission staff memorandum and the information obtained therein (part of which was obtained from the Federal Reserve under both written and oral confidentiality understanding), clearly constitute Commission Confidential Information and, as such, may not be disclosed by a Commissioner outside of the Commission without prior consent as above.
>
> Sharing this information with Mr. Pinto was a violation of the Commission's Ethics Guidelines, and our written confidentiality agreement with the Federal Reserve, and our staff's understanding with staff members of the Federal Reserve.
>
> Our agreement with the Fed provides for a Commission vote or approval of the Chair and Vice Chair, after prior consultation with the Fed, to release their information.  That was not done here. ...
>
> Disclosure of Commission Confidential information will gravely impair the Commission's ability to conduct its business in the future by making it hard to secure the cooperation of other information providers in accessing their confidential information, and could expose the Commission to damage claims for the improper release thereof.[41]

---

[38] *Analysis of Housing Data and Comparison with Ed Pinto's Analysis*, Memorandum from Ron Borzekowski and Wendy Edelberg to Commissioners, Financial Crisis Inquiry Commission (Aug. 9, 2010) (online at fcic-static.law.stanford.edu/cdn_media/fcic-docs/2010-08-09%20FCIC%20Staff%20Analysis%20of%20Housing%20Data%20and%20Comparison%20with%20Ed%20Pinto%20Analysis.pdf).

[39] E-mail from Peter J. Wallison to Wendy Edelberg, All Commissioners, et al. (Aug.14, 2010 11:11 AM).

[40] E-mail from Phil Angelides to Gary Cohen (Aug. 14, 2010 1:25).

[41] E-mail from Gary Cohen to Phil Angelides (Aug. 14, 2010 7:13 PM).

On August 14, 2010, the General Counsel sent an e-mail to Mr. Pinto warning him about Commissioner Wallison's violation.  He wrote:

> I understand that Commissioner Wallison gave you a confidential staff memorandum for your review and comment. ... The memorandum and the information therein are Commission Confidential Information and must not be disseminated outside of the Commission in any manner.  Please respect the Commission's rules and the confidentiality restrictions under which the Commission received that information by maintaining it in confidence in all respects.[42]

On August 17, 2010, the Commission held a telephone business meeting during which Commissioners Thompson, Georgiou, Born, and Murren all expressed concerns about Commissioner Wallison's unauthorized disclosure to Mr. Pinto.[43]  Chairman Angelides reminded Commissioners that they must act in accordance with Commission procedures relating to the release of confidential information.[44]

Documents obtained by the Committee indicate that this was not the only occasion on which Commissioner Wallison released confidential information.  For example, on January 26, 2011, the Commission's Deputy General Counsel sent an e-mail to Commissioner Wallison stating that "the American Enterprise Institute posted a copy of your 'Dissent from the Majority Report of the Financial Crisis Inquiry Commission' on its website" and that "its posting violates the Commission resolution which is attached to this email."[45]

In addition, in May 2010, Commissioner Wallison wrote an article published in the AEI Financial Services Outlook.[46]  On May 24, 2010, Vice Chairman Thomas' special assistant sent an e-mail to Alex Brill, who works at Vice Chairman Thomas' law firm, Buchanan, Ingersoll, and Rooney.  He wrote:

> Peter crossed a line here that I wonder if he realizes he crossed.  (I'm 75 percent sure he leaked confidential information—although it was information that nobody will dispute is true.)[47]

It is unclear from the documents obtained by the Committee whether this incident was reported to the Commission's General Counsel for further investigation.

---

[42] E-mail from Gary Cohen to Edward Pinto (Aug. 14, 2010 2:43 PM).

[43] Approved Meeting Minutes of Telephonic Business Meeting of August 17, 2010, Financial Crisis Inquiry Commission (Aug. 17, 2010).

[44] *Id*.

[45] E-mail from Deputy General Counsel to Peter Wallison (Jan. 26, 2011).

[46] *Ideas Have Consequences:  The Importance of a Narrative*, AEI Outlook Series, American Enterprise Institute (May 2010) (online at www.aei.org/outlook/100960).

[47] E-mail from Special Assistant to the Vice Chairman to Alex Brill (May 24, 2010).

## B.    Other Republicans Called Wallison a "Parrot" for Pinto

Internal Commission documents obtained by the Committee indicate that staff for Republican Vice Chairman Bill Thomas worried that Commissioner Wallison was unduly influenced by AEI Resident Fellow Edward Pinto's discredited theory that the primary cause of the economic crisis related to government housing policy.

On March 31, 2010, Vice Chairman Thomas' special assistant at the Commission sent an e-mail to Mr. Brill, who works at Vice Chairman Thomas' law firm.  In the e-mail, the Vice Chairman's special assistant explained problems Commissioners and staff were having with Commissioner Wallison.  He wrote:

> Bill spoke to Phil [Angelides] and Wendy [Edelberg, Executive Director] and gave them his thoughts.  Doug [Holtz-Eakin, Commissioner] was around the office today, so Bill looped him in and I explained to Doug what was going on.  Doug said that he has some experience dealing with an intractable Peter before.  Everyone agrees that there is simply no way to make Peter happy re: these staff reports.  However, hopefully, we can keep him engaged enough so that when the time comes, we can sit down and have a reasonable conversation about the most effective way to describe the mortgage market.  Wendy is going to reach out to Ed Pinto, and, hopefully, if we can get Ed to sign on, then Peter will really be sitting alone on this one.
>
> My guess is that the best we are going to do is to get Peter to agree that he really can't say anything until we get all of the data in front of us and that the data is coming.  At that point, this debate over what kinds of mortgages are out there will be a little more public, since the FHFA is coming out with a report that discusses the loan performance of their loans in the next two weeks (apparently, they are trying to beat us to the punch).  And, this conversation really doesn't need to happen until September, so we can all cool off from these hysterics and worry about other things for a little while.  Then, Peter is going to have to sit in a room and tell everyone why his way is the best way to describe the universe.[48]

In response, Mr. Brill wrote back:

> Re: peter, it seems that if you get pinto on your side, peter can't complain.  But is peter thinking idependently [sic] or is he just a parrot for pinto?[49]

The Vice Chairman's special assistant responded:

> I can't tell re: who is the leader and who is the follower.  If Peter is really a parrot for Pinto, he's putting a lot of faith in the guy.  Pinto called tonight, and Wendy scheduled a

---

[48] E-mail from Special Assistant to the Vice Chairman to Alex Brill (Mar. 31, 2010 4:28 PM).

[49] E-mail from Alex Brill to Special Assistant to the Vice Chairman (Mar. 31, 2010 6:48 PM).

call with him for tomorrow morning.  I am going to sit in on the call (quietly).  I want to get a sense of whether this is a strategy that we really can use, or whether Pinto is just like Peter.[50]

Two days later, Mr. Brill followed up with another e-mail to the Vice Chairman's special assistant relaying a conversation in which Vice Chairman Thomas expressed concern that Mr. Pinto might be receiving outside funds for his efforts to influence the Commission.  Mr. Brill wrote:

Maybe this email is reaching you too late but I think wmt [William M. Thomas] is going to push to find out if pinto is being paid by anyone.[51]

### C.   Wallison Inaccurately Claimed Commission Ignored AEI Position

Despite repeated claims by Commissioner Wallison that the Commission failed to consider AEI's position, as represented by Mr. Pinto, that the economic crisis was caused by government housing policies, internal documents obtained by the Committee demonstrate that the Commission went above and beyond in fully considering the flawed AEI position.

In testimony before the Committee on Financial Services on February 16, 2011, Commissioner Wallison stated that the Commission ignored Mr. Pinto's position:

Any objective investigation of the causes of the financial crisis would have looked carefully at this research, exposed it to the members of the Commission, taken Pinto's testimony, and tested the accuracy of Pinto's research.  But the Commission took none of these steps.  Pinto's research was never made available to the other members of the FCIC, or even to the commissioners who were members of the subcommittee charged with considering the role of housing policy in the financial crisis.

Accordingly, the Commission majority's report ignores hypotheses about the causes of the financial crisis that any objective investigation would have considered, while focusing solely on theories that confirm one political narrative about the financial crisis.  This is not the way a serious and objective inquiry should have been carried out, but that is how the Commission used its resources and its mandate.[52]

---

[50] E-mail from Special Assistant to the Vice Chairman to Alex Brill (Mar. 31, 2010 7:12 PM).

[51] E-mail from Alex Brill to Special Assistant to the Vice Chairman (Apr. 2, 2010).

[52] House Committee on Financial Services, Testimony of Peter J. Wallison, *The Final Report of the Financial Crisis Inquiry Commission* (Feb. 16, 2011) (online at financialservices.house.gov/media/pdf/021611wallison.pdf).

Commissioner Wallison made the identical complaint in his dissent to the Commission's final report.[53]

Internal Commission documents obtained by the Committee contradict this claim. Commission staff conducted a recorded interview of Mr. Pinto on July 19, 2010.[54]  On August 9, 2010, the Commission's Executive Director, Wendy Edelberg, sent an e-mail to all Commissioners regarding Mr. Pinto's work.  In addition to referencing previous materials that had been circulated to Commissioners, Ms. Edelberg attached a new memo prepared by Commission staff analyzing Mr. Pinto's work.  She wrote:

> Commissioners:  Our July 7, 2010 memo to Commissioners with the subject "Analysis of housing data," provided a summary of the performance of various segments of the mortgage market during the crisis.  Following up on this previous memo, the attached memo presents additional analysis that more directly compares our results to the analysis provided to the commission by Mr. Ed Pinto in his "Triggers" memo.[55]

Commission staff also prepared a summary of all of the work they conducted analyzing Mr. Pinto's work in response to Commissioner Wallison's requests.  The summary states:

> The Commission did look carefully at Ed Pinto's research, took Pinto's testimony and tested the accuracy of his research.  On March 16, 2010 Commissioner Wallison emailed Ed Pinto's "Trigger" memos to all commissioners.  FCIC staff spent a great deal of time looking at Ed Pinto's work. The FCIC allocated approximately 12 hours of staff interviews and meetings with Mr. Pinto, and spent approximately 20 hours reviewing Mr. Pinto's documents and data.  Specifically Wendy Edelberg met with Ed Pinto once for several hours (in December 2009) and had at least 2 extensive phone calls with him (one in April and another in August).  [Two Commission staff] met with Ed Pinto early on and reviewed all of his materials with him.  This meeting was 3-4 hours (on 2/2/10).  [A third staff member] spent 3.5-4 hours with Ed Pinto and [a fourth staff member] for review of Pinto's materials.  [The third staff member] also participated in another meeting wherein Ed and Commissioner Wallison came to FCIC offices.  And the staff formally interviewed him on July 19, 2010 for more than an hour. ...

> [The first staff member] spent 20+ hours going through his document and came to the conclusion that Pinto's data didn't correctly add up.  Aside from some arithmetic errors, it became apparent that the analysis was likely based on faulty premises.  He then focused on two tasks.  First, using tabulated data provided by the Federal Reserve (other sources

---

[53] Financial Crisis Inquiry Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States – Dissenting Statement of Commissioner Peter J. Wallison* (Jan. 2011) (online at http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_wallison_dissent.pdf).

[54] Financial Crisis Inquiry Commission, Staff Audiotape of Interview with Ed Pinto, Fannie Mae (July 19, 2010) (online at fcic.law.stanford.edu/interviews/view/378).

[55] E-mail from Wendy Edelberg to All Commissioners and Personal Staff (Aug. 9, 2010).

were also pursued), he analyzed the relevant performance of the varied loans Pinto lumps together in his analysis.  The results of this work are in the housing PSR, two memos to the Commission and in the book.

He then began creating and gathering an extensive set of loan-level data to further examine the question of how many high-risk loans there were before the crisis, as measured by ex-ante risk.  He interviewed several prominent mortgage economists for advice regarding the best data and methodology to use and began discussions with FHFA, FHA, private data vendors and others in an effort to gather the data. Special computer resources were being built in-house when this latter effort was halted after being deemed infeasible, and after the determination was made that the initial analyzes were sufficient to analyze Pinto's main claim.[56]

### D.    All Other Republican Commissioners Rejected AEI Position

After praising Commission staff for fully considering the position put forth by Mr. Pinto, the three other Republican Commissioners rejected this position and refused to join Commissioner Wallison's dissent, which asserted that the primary cause of the economic crisis was government housing policies.

For example, on August 15, 2010, Republican Commissioner Holtz-Eakin sent an e-mail to Vice Chairman Thomas criticizing Commissioner Wallison and commending Commission staff for their work on this issue.  He wrote:

> I continue to think that Peter overplays the mortgage issue, but the staff memo did not dismiss it in any way.[57]

In their separate statement, Commissioners Thomas, Hennessey, and Holtz-Eakin rejected the idea that government housing policy—or any one factor—was the single largest contributor to the economic crisis.  They wrote:

> During the course of the Commission's hearings and investigations, we heard frequent arguments that there was a single cause of the crisis.  For some it was international capital flows or monetary policy; for others, housing policy; and for still others, it was insufficient regulation of an ambiguously defined shadow banking sector, or unregulated over-the-counter derivatives, or the greed of those in the financial sector and the political influence they had in Washington.

> In each case, these arguments, when used as single-cause explanations, are too simplistic because they are incomplete.  While some of these factors were essential contributors to the crisis, each is insufficient as a standalone explanation.[58]

---

[56] Memorandum, Commission Staff (Jan. 23, 2011).

[57] E-mail from Douglas Holtz-Eakin to Bill Thomas (Aug. 15, 2010).

[58] Financial Crisis Inquiry Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States – Dissenting Statement of*

Instead, they described not one, but "ten causes, global and domestic ... essential to explaining the financial and economic crisis."  They were:

(1)     the credit bubble;
(2)     the housing bubble;
(3)     nontraditional mortgages;
(4)     credit ratings and securitizations;
(5)     financial institutions concentrated correlated risk;
(6)     leverage and liquidity risk;
(7)     risk of contagion;
(8)     common shock;
(9)     financial shock and panic; and
(10)    financial crisis causes economic crisis.[59]

In addition, the three Republican Commissioners commended the Commission staff for their professionalism.  They wrote:

We wish to compliment the Commission staff for their investigative work.  In many ways it helped shape our thinking and conclusions.[60]

Similarly, the other Commissioners also rejected Commissioner Wallison's argument that the Commission did not fully evaluate the role of the Community Reinvestment Act (CRA) in the economic crisis.  Commissioner Wallison's dissent blamed the CRA for significantly driving the growth of non-traditional mortgages and the decline in underwriting standards.[61]  After examining the CRA in detail, the Commission's final report concluded that "CRA-related subprime loans appeared to perform better than other subprime loans" and "CRA-covered loans in the low- and moderate-income areas they serve were half as likely to default as similar loans by independent mortgage companies."[62]

---

*Commissioner Keith Hennessy, Commissioner Douglas Holtz-Eakin, and Vice Chairman Bill Thomas* (Jan. 2011) (online at http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_hennessey_holtz-eakin_thomas_dissent.pdf).

[59] *Id.*

[60] *Id.*

[61] Financial Crisis Inquiry Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States – Dissenting Statement of Commissioner Peter J. Wallison* (Jan. 2011) (online at http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_wallison_dissent.pdf).

[62] Financial Crisis Inquiry Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (Jan. 2011).

Commissioners Thomas, Hennessey, and Holtz-Eakin also rejected Commissioner Wallison's assertion that the CRA was a significant cause of the financial crisis. Their joint dissent stated:

> Neither the Community Reinvestment Act nor removal of the Glass-Steagall firewall was a significant cause. The crisis can be explained without resorting to these factors.[63]

Despite the fact that the other Republican Commissioners were satisfied that Mr. Pinto's views were thoroughly considered, Commissioner Wallison repeatedly expressed anger that the AEI position was being rejected based on its faulty data and assumptions.

For example, on May 13, 2010, Chairman Angelides sent an e-mail to Commissioner Wallison explaining that the Commission staff had fully considered Mr. Pinto's position, but that it was fundamentally flawed. He wrote:

> With respect to Mr. Pinto, the staff has indicated to me that they have conveyed to both Mr. Pinto and you their view that his approach is flawed. ... For what I have seen, the staff has spent more time responding to your questions and requests for information than any other Commissioner.[64]

Rather than accepting the conclusion that Mr. Pinto's data and assumptions were flawed, Commissioner Wallison continued to complain that Commission staff were ignoring him. On July 26, 2010, Commissioner Wallison and several other Commissioners held a working group conference call. After the call, Commissioner Wallison sent an e-mail to all Commissioners, the Commission's Executive Director and General Counsel, and other Commission staff. He wrote:

> I don't like being told that I disagree with everything. I believe that I disagree with the things that are wrong and my point of view is valid and entitled to be heard. In this message, I'm going to explain why I raised the questions I did, and why I will continue to raise these questions. You should know that I have no compunction about filing a separate statement if I am not persuaded by data, by facts that have been tested and are not subject to dispute. Many of the statements I heard and read today are part of conventional wisdom; that in itself does not recommend them to me. I heard that we should accept the point of view of "experts" as evidence, as in a trial. As we all should know, in a trial each side can select its experts. All the experts I have ever suggested for

---

[63] Financial Crisis Inquiry Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States – Dissenting Statement of Commissioner Keith Hennessy, Commissioner Douglas Holtz-Eakin, and Vice Chairman Bill Thomas* (Jan. 2011) (online at http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_hennessey_holtz-eakin_thomas_dissent.pdf).

[64] *Id.*

the Commission's hearings have been rejected or ignored.  There is a price to pay for that.[65]

## III.   QUESTIONS ABOUT VICE CHAIRMAN THOMAS AND THE CEO OF A POLITICAL CONSULTING FIRM

Internal Commission documents obtained by the Committee raise questions about the extent to which Vice Chairman Thomas and his Commission staff were providing information to, and receiving information from, a CEO of a political consulting firm who is also employed by the Vice Chairman's law firm.

Alex Brill is the CEO of Matrix Global Advisors, a firm that provides "economic and political consulting services for clients seeking to effect change in Washington."  The firm advertises that it "works with clients spanning a variety of industries and has advised both small firms and large corporations," including a "Wall Street investment bank seeking insights into tax policy [and] financial services legislation."[66]

Mr. Brill is also an Economic Policy Advisor at the law firm of Buchanan, Ingersoll, and Rooney in Washington, DC.  His biography states that he is "a consulting advisor to Buchanan Ingersoll & Rooney's Federal Government Relations Section," where Vice Chairman Thomas is a Senior Advisor.  In this role, Mr. Brill "provides clients with economic and legislative insight" into matters including "financial markets and policies affecting capital investment."  His biography does not disclose the firm's clients.[67]

Mr. Brill's biography states that he previously "served as senior advisor to former chairman of the House Ways and Means Committee Bill Thomas," and that he was "Congressman Thomas' top policy and political advisor."  His biography states that he "is also a research fellow at the public policy think tank American Enterprise Institute."[68]

The law firm aggressively markets both Vice Chairman Thomas and Mr. Brill to obtain clients.  Its website states:

Our team includes many professionals who have served in high-level government positions, including a former chair of the Committee on Ways and Means of the United States House of Representatives, the former chief economist and senior advisor to the former chair of the House Committee on Ways and Means.

---

[65] E-mail from Peter Wallison to Wendy Edelberg, Derivatives Commissioners, et al. (July 26, 2010 8:33 PM).

[66] Matrix Global Advisors, *Our Clients* (accessed July 8, 2010) (online at www.matrixglobaladvisors.com/our-clients/).

[67] Buchanan, Ingersoll, and Rooney, *Biography of Alex M. Brill* (accessed July 8, 2011) (online at www.bipc.com/alex-m-brill/).

[68] *Id.*

The firm's website also states:

In 2010, *Influence Magazine* ranked us as the 15th largest law firm for lobbying revenue and 21st among all law firms and lobbying firms. **Our bi-partisan team of government affairs professionals has the attention—and the ear—of the federal government, and we use this influence to advance causes and cases for clients all over the nation.**[69]

The Ethics Guidelines for Commission Staff state that the internal workings of the Commission may not be disclosed to individuals outside the Commission. The Guidelines state:

All information concerning the internal non-public workings of the Commission, confidential information obtained by the Commission during the course of its investigations, and confidential non-public work product of the Commission, shall be maintained as "Commission Confidential Information," and shall be held in confidence and not disclosed outside of the Commission.[70]

In addition, Commission staff signed Confidentiality and Non-Disclosure Agreements establishing procedures to maintain the confidentiality of the deliberative processes and materials the Commission received.[71]

Committee staff have identified no record of Mr. Brill being an official employee, consultant, contractor, or adviser to the Commission. Although some Commissioners utilized non-Commission staff for scheduling, appointments, and other administrative functions, the documents obtained by the Committee indicate that, by virtue of his relationship with Vice Chairman Thomas, Mr. Brill received a significant amount of internal information about the Committee's work and provided substantive input.

For example, on August 17, 2010, Vice Chairman Thomas' special assistant at the Commission sent an e-mail to Mr. Brill with a draft outline of a preliminary investigative report prepared by Commission staff that addressed Wells Fargo's acquisition of Wachovia. Mr. Brill replied to the e-mail with comments on the outline. He wrote:

III.     Wells Fargo Acquired Wachovia Without "Government Assistance" After
          Change in the Tax Code

that's humor, right? The "govt asst" IS the tax code change. And the word "code" refers to the statute—something that can only be changed by Congress, not Treasury. Maybe it is just staff shorthand but I hope III gets filled out a lot.[72]

---

[69] Buchanan, Ingersoll, and Rooney, *Federal Government Relations* (accessed July 8, 2011) (online at www.bipc.com/federalgovernmentrelations/) (emphasis in original).

[70] Financial Crisis Inquiry Commission, Ethics Guidelines for Staff (online at fcic.law.stanford.edu/about/policies/staff-ethics)

[71] Financial Crisis Inquiry Commission, Confidentiality and Nondisclosure Agreement (online at http://fcic.law.stanford.edu/about/policies/staff-confidentiality-agreement)

Mr. Brill went on to suggest that Vice Chairman Thomas' special assistant monitor this issue:

> I'd suggest you stay on top of this one still.  I'm tired of tarp this, tarp that.  I haver [sic] no idea how to value this regulatory tax gift but it could be significant and somewhat off the radar.  Its the only tax thing so it is the only thing where wmt [Vice Chairman Bill Thomas] can say he's got a value-add perspective.  And, from the outline you shared, I wonder if this was done because Bair wasn't enthusiastic about doing something herself.[73]

During this e-mail exchange, the Vice Chairman's special assistant also described conversations among Commissioners and staff about deliberations regarding potential witnesses for an upcoming hearing.  He wrote to Mr. Brill:

> We also had a big conversation yesterday about witnesses.  We left it at (big surprise) that the staff recommendations would be fine.  Bill expressed a general interest in not having CEOs.  But, all of the big-wigs (Kovacevich, Steel, Fuld, et. al.) are very much on the table.  I think that our research director really wants Jamie Dimon there because he thinks that Dimon knows more about the markets than anyone else.  But, Bill and Phil were in agreement that their preference was not to call Dimon for a second time.[74]

In another incident, on March 10, 2010, the Vice Chairman's special assistant forwarded to Mr. Brill a Commission media advisory about an upcoming hearing that had not yet been released publicly.  He also forwarded an internal Commission e-mail discussing a *Wall Street Journal* article that exposed information about the upcoming hearing that was leaked.[75]

In response, Mr. Brill wrote:

> What's your guess on the source of this info to wsj?  The witnesses or the commissioners?  Probably both.  The release seems like a good idea as it defines the hearing more accurately than a story saying it is greenspan/citi/fannie when it actually has other regulators as well.[76]

---

[72] E-mail from Alex Brill to Special Assistant to the Vice Chairman (Aug. 18, 2010 7:55 AM).

[73] E-mail from Alex Brill to Special Assistant to the Vice Chairman (Aug. 18, 2010 9:47 AM).  *See also Wells Fargo Sweetened Wachovia Bid for Tax Gain, Bair Told FCIC,* Bloomberg (Jan. 26, 2011) (online at www.businessweek.com/news/2011-01-26/wells-fargo-sweetened-wachovia-bid-for-tax-gain-bair-told-fcic.html).

[74] E-mail from Special Assistant to the Vice Chairman to Alex Brill (Aug. 18, 2010 8:16).

[75] Financial Crisis Inquiry Commission, *Media Advisory:  Financial Crisis Inquiry Commission Announces Next Public Hearing* (Mar. 11, 2010) (online at fcic-static.law.stanford.edu/cdn_media/fcic-news/2010-0311-Advisory.pdf).

[76] E-mail from Alex Brill to Special Assistant to the Vice Chairman (Mar. 10, 2010 5:07 PM).

During this exchange, Mr. Brill sought information regarding the Commission's plans to investigate foreign banks.  Mr. Brill wrote:

> Also—you don't need to answer this if you don't want if its confidential but are you guys asking hard questions to foreign banks too?  Are they a good control group maybe or perhaps they are just as responsible for being stupid as the domestic banks.  I have no idea but I assume that DB, UBS, that weird french bank, bbva, etc are also worth studying.  Did Iceland collapse completely in some manner?  Would probably be popular with commissioners too.  Just a suggestion.[77]

In response, the Vice Chairman's special assistant confirmed internal Commission plans to investigate foreign banks and listed several targets by name.  He wrote:

> We are going to be questioning foreign banks.  I know that we have people from Deutche, UBS, BNP Paribas, RBS and Lazard Freres on our list for various purposes.  However, we don't have the stick (subpoena power) with them.  So, we can't push too hard.[78]

In another incident, on March 31, 2010, Mr. Brill sent an e-mail to the Vice Chairman's special assistant seeking internal Commission information about an upcoming hearing with Citigroup.  He wrote:

> Fyi, just heard from my friend who represents Citi.  I guess Citi feels afraid that they will be painted as one of the worst offenders of subprime when really they think that they only dabbled in subprime.  I don't know the truth in any of this but I guess the titles of the panels make this look like citi is the subprime devil while WMT was explaining to me that Citi is a great target to study because the did a bit of everything and that is more true for Citi than for anyone else.  Any thoughts?[79]

The Vice Chairman's special assistant replied to Mr. Brill by providing an assessment of how the Commission would treat Citigroup at the hearing.  He wrote:

> They aren't going to be painted as a particularly bad offender of subprime origination, because they weren't a bad offender in that area.  However, they ended up taking $55B in losses associated with subprime and then got $45B in TARP and a government guarantee on $300B of assets.  And their risk management re: their subprime exposure was, by any account, pretty awful.  And, it is true that they are a good example because they did a little of everything, which means that we can discuss the entire subprime-universe during

---

[77] E-mail from Alex Brill to Special Assistant to the Vice Chairman (Mar. 10, 2010 9:43 PM).

[78] E-mail from Alex Brill to Special Assistant to the Vice Chairman (Mar. 11, 2010 7:11 PM).

[79] E-mail from Alex Brill to Special Assistant to the Vice Chairman (Mar. 31, 2010 5:18 PM).

their hearing.  So, while I don't think they will come across as the person who was ripping off the American public, I think they may come across as a pretty poorly managed company.[80]

The documents produced to the Committee do not indicate whether Mr. Brill conveyed this information to Citigroup officials.  Similarly, the documents do not indicate whether any of Mr. Brill's business interests at his company or the law firm benefitted from any of the other internal Commission information he obtained.

## IV.   UNSUBSTANTIATED ALLEGATIONS BY CHAIRMAN ISSA

Internal Commission documents obtained by the Committee indicate that allegations made by Chairman Issa about problems within the Commission are largely unsubstantiated, overtly partisan, and unjustified by the record before the Committee.

### A.   Financial Mismanagement

In his July 27, 2010, letter, Chairman Issa alleged that "potential financial mismanagement" caused the Commission to seek a budget increase from $8 million to $9.8 million.  Chairman Issa stated:

> It is unclear how the FCIC has run out of money so quickly. ... [A]ccording to the FCIC's records, it had spent just $1.4 million on staff salaries as of March 31, 2010, a fraction of its $8 million budget.  Furthermore, at least twelve FCIC staff members are on loan from other federal agencies, meaning their salaries are paid not by the FCIC but by their parent agencies.  In light of these facts, the American people have a right to know how the FCIC has exhausted its $8 million budget and why it deserves another $1.8 million of taxpayer funds.[81]

Chairman Issa's allegations reflect a misunderstanding of the Commission's budget process.  Internal Commission documents obtained by the Committee indicate that the Commission had not "run out of money" at this time, but had determined months earlier, based on investigative planning, and on a bipartisan basis, that the budget increase was necessary to enable it to fulfill its mission.

The Commission was established in May 2009 when Congress passed the Fraud Enforcement and Recovery Act.[82]  The Act authorized "such sums as are necessary" for the

---

[80] E-mail from Special Assistant to the Vice Chairman to Alex Brill (Mar. 31, 2010 4:28 PM).

[81] Letter from Member Darrell E. Issa to Phil Angelides (July 27, 2010).

[82] P.L. 111-21.

Commission's operations.[83]   The Commission received an initial appropriation of $8 million in the Supplemental Appropriations Act of 2009 enacted June 24, 2009.[84]

After the first few months of hiring and investigative planning, the Commission unanimously determined that the initial $8 million appropriation would not be sufficient for its planned activities for the following year.   On November 17, 2009, the Commission held a closed meeting during which the Commissioners determined on a bipartisan basis that additional funds would be necessary and charged Republican Vice Chairman Bill Thomas with making the request to Congress.   The approved minutes from the closed session stated:

> There was general consensus that the Commission's appropriation of $8 million dollars would not suffice to accomplish the work of the Commission in the manner desired and that an additional allocation should be sought.   Vice-Chairman Thomas will take the lead with Congress on this matter.[85]

To implement this plan, Chairman Angelides and Vice Chairman Thomas sent a joint letter the following month, on December 10, 2009, to Senators Kent Conrad and Johnny Isakson, requesting the additional funds.   They wrote:

> As Chairman and Vice Chairman of the Financial Crisis Inquiry Commission (the Commission), this letter will serve as a request that based upon our budget analysis, the Commission believes, to be reasonably successful in our statutory charge that the $8 million initial funding level should be increased to $11 million.   This request is made in the full knowledge of the difficult budgetary conditions in which we find ourselves.   We believe this request is sufficient to fulfill our duties.   This letter will be the only request for additional funds during the existence of the Commission.[86]

The documents indicate that Vice Chairman Thomas was fully supportive of this request, based on the investigative planning that had occurred to date.   On March 25, 2010, Vice Chairman Thomas' special assistant on the Commission sent an e-mail to Vice Chairman Thomas noting that the requested increase would actually be lower than the original estimate. He wrote:

> Attached is the budget memorandum. ... Included is our estimated additional budget required.   Note that we've requested $2.66 million (down from $3), because we don't

---

[83] *Id.*

[84] P.L. 111-32.

[85] Approved Minutes of Closed Session Meeting of Tuesday, Nov. 17, 2009, Financial Crisis Inquiry Commission (Nov. 17, 2009).

[86] Letter from Phil Angelides and Bill Thomas to Senators Kent Conrad and Johnny Isakson (Dec. 10, 2009).   *See also* Letter from Phil Angelides and Bill Thomas to House Appropriations Committee Chairman David Obey and Ranking Member Jerry Lewis (Dec. 11, 2009).

believe that we need the additional funding beyond what we have outlined in the memo. Can you take a look and approve for sending?[87]

In response, Vice Chairman Thomas replied, "It is ok by me."[88]

The final increase to the Commission's budget was less than the estimate in March.  On July 29, 2010, Congress appropriated an additional $1.8 million in the Supplemental Appropriations Act of 2010.[89]  There is no indication that the request for additional funds was a result of mismanagement, as Chairman Issa alleged.

B.    **Conflicts of Interest and Partisan Staff**

In his July 27, 2010 letter, Chairman Issa alleged that various Democratic Commissioners and staff had conflicts of interest that compromised their ability to work on the Commission.  He also alleged that staff who previously worked for Democrats would be incapable of working on the Commission in an objective way.  He stated:

> In addition to potential financial mismanagement, it appears that commissioners and staff of the FCIC may have conflicts of interest created by their previous roles in the public and private sectors which may interfere with the Commission's ability to conduct a thorough and even-handed investigation. ...

> I am troubled by the extensive ties of some of the senior staff at a putatively bipartisan commission to partisan Democrat politics. ... [T]he FCIC's efforts will have been wasted if the American people come to believe that it has served as nothing more than a cheering section for the Administration and congressional Democrats in their efforts to defend a partisan and ineffective financial regulatory reform bill.[90]

Chairman Issa's letter focused its accusations on only one Commissioner, Democrat Byron Georgiou, who is currently running for U.S. Senate.  In addition, Mr. Georgiou previously ran for the congressional seat in Chairman Issa's district.  According to the *Las Vegas Sun,* Mr. Georgiou made multiple congressional "runs in California in the early 1990s, including one for the 49th District, the seat now held by Darrell Issa."[91]

---

[87] E-mail from Special Assistant to the Vice Chairman to Bill Thomas (Mar. 25, 2010, 3:07 PM).

[88] E-mail from Bill Thomas to Special Assistant to the Vice Chairman (Mar. 25, 2010, 4:08 PM).

[89] P.L. 111-212.

[90] Letter from Darrell E. Issa to Phil Angedlides (July 27, 2011).

[91] *Who is Byron Georgiou and Why Should He Scare the Democratic Establishment?*, Las Vegas Sun (Mar. 28, 2011) (online at www.lasvegassun.com/blogs/ralstons-flash/2011/mar/28/who-byron-georgiou-and-why-he-should-scare-democra/).

With respect to the Commission staff targeted by Chairman Issa, internal Commission documents obtained by the Committee indicate that staffing decisions were made with the approval of both the Democratic Chairman, Phil Angelides, and the Republican Vice Chairman, Bill Thomas, and the staff was not separated by party lines.  According to the Commission's Rules of Procedure, approved and ratified by the Commission on September 16, 2009:

> All staff shall be appointed and terminated by the Chairman and Vice Chairman, acting jointly.[92]

The only exceptions to this policy were the special assistants to the Chairman and Vice Chairman.

During a transcribed interview with Committee staff, Executive Director Wendy Edelberg explained that the Commission had a unified staff.  When asked whether staff were organized on a partisan basis, she replied:  "Oh, no, there was no structuring along party lines. We were structured by tasks."[93]

In addition, the Commission implemented several policies on a bipartisan basis to prevent potential conflicts of interest.  For example, the Commission adopted an ethics policy for Commissioners and staff that provided guidance regarding avoiding conflicts of interest.[94]  The Commission also walled-off staff from investigations when there was an appearance of a conflict.  The documents obtained by the Committee included instances of voluntary staff recusals, as well as instances in which the General Counsel, as Chief Ethics Officer, provided advice regarding ethical issues.

For example, the former Assistant Director and Deputy General Counsel for the Commission disclosed potential conflicts of interest and withdrew himself from certain Commission matters.[95]

Similarly, on March 23, 2010, Chairman Angelides sent an e-mail seeking an ethics opinion from the Commission's General Counsel concerning political contributions made to his campaign for Treasurer in 2002 by an officer of JPMorgan Chase.  The General Counsel concluded that these actions "do not create a conflict or require that you take any action to recuse yourself from Commission deliberations concerning J.P. Morgan Chase."[96]

---

[92] Financial Crisis Inquiry Commission, Rules of Procedure (Sept. 16, 2009).

[93] House Committee on Oversight and Government Reform, Transcribed Interview of Wendy Edelberg, at 117 (June 9, 2011).

[94] In addition to the ethics policy, the Commission had a records management policy, employee handbook, and a confidentiality and nondisclosure policy.  All employees, detailees, and consultants were required to sign a Confidentiality and Nondisclosure Agreement.

[95] E-mail from Assistant Director and Deputy General Counsel to Gary Cohen (July 16, 2010).

[96] E-mail from Gary Cohen to Phil Angelides (Mar. 23, 2010).

In another example, the General Counsel provided ethics advice concerning Commissioners and staff staying at the MGM Grand in connection with a Commission field hearing in Las Vegas, Nevada, finding no conflict with the Commission being charged a government rate or with the Commissioners receiving fruit baskets upon their arrival.[97]

Chairman Issa's letter focused exclusively on Democratic Commissioners and staff, providing no analysis of the potential conflicts or partisanship among Republican Commissioners or staff.  For example, Chairman Issa failed to mention that Vice Chairman Thomas works at the law firm of Buchanan, Ingersoll, and Rooney, which markets the Vice Chairman's ties to corporate clients and boasts that the firm's lobbyists "use this influence to advance causes and cases for clients all over the nation."  Chairman Issa's letter also failed to provide any analysis of the potential influence of the conservative American Enterprise Institute among Republican Commissioners and staff.  Vice Chairman Bill Thomas, Commissioner Peter Wallison, Commissioner Douglas Holtz-Eakin, and Vice Chairman Thomas' special assistant were all connected to AEI.  (See Section II, above).

## C.      Decision to Delay Report

On January 25, 2011, Chairman Issa sent a letter to Chairman Angelides alleging that the Commission's decision to issue its report on January 27, 2011, instead of December 15, 2010, was a result of "continued management problems."  He wrote:

> [O]n November 17, 2010, the FCIC voted to extend its mandatory reporting deadline of December 15, 2010.  It is unclear on what legal authority this action was taken since the law states that the FCIC was to report to Congress no later than December 15 and does not provide for any procedure to grant an extension.  The inability of the FCIC to report to Congress by its statutory deadline points to continued mismanagement problems.[98]

Chairman Issa's letter failed to note that short delays of this kind are typical and have occurred numerous times in the past on similar commissions, including those led by both Republicans and Democrats.  For example, in 1999, then-Rep. Bill Thomas co-chaired the National Bipartisan Commission on the Future of Medicare.  Although the Commission's report was due on March 1, 1999, it was not submitted until March 16, 1999.[99]

Other examples include the following:

---

[97] E-mail from Gary Cohen to Phil Angelides (Sept. 7, 2010).

[98] Financial Crisis Inquiry Commission, *Financial Crisis Inquiry Commission Announces New Date for Final Report* (Nov. 17, 2010).

[99] Press Release, National Bipartisan Commission on the Future of Medicare, *National Medicare Commission to Continue Working to Make Recommendations; Panel Will Meet During the Week of March 8 in Washington, D.C.* (Feb. 26, 1999).

- A report by the Commission on Wartime Contracting in Iraq and Afghanistan was due on March 1, 2009, but was not submitted until June 10, 2009.[100]

- A report by the Congressional Commission on the Strategic Posture of the United States was due on December 1, 2008, but was not submitted until May 6, 2009.[101]

- A report by the Commission on the Prevention of Weapons of Mass Destruction Proliferation and Terrorism was due on November 12, 2008, but was not submitted until December 3, 2008.[102]

- A report by the Commission on Military Training and Gender-Related Issues was due on September 16, 1998, but was not submitted until July 30, 1999.[103]

- A report by the Commission on Affordable Housing and Health Facility Needs for Seniors in the 21st Century was due on December 31, 2001, but was not submitted until June 30, 2002.[104]

- A report by the Commission to Assess the Organization of the Federal Government to Combat the Proliferation of Weapons of Mass Destruction was due on April 11, 1998, but was not submitted until July 14, 1999.[105]

---

[100] P.L. 110-181.  *See* Commission on Wartime Contracting in Iraq and Afghanistan, *At What Cost? Contingency in Iraq and Afghanistan* (June 10, 2009) (online at www.wartimecontracting.gov/index.php/reports).

[101] P.L. 110-181.  P.L. 110-417, section 1060.  *See* Congressional Commission on the Strategic Posture of the United States, *America's Strategic Posture* (May 6, 2009) (online at www.usip.org/programs/initiatives/congressional-commission-the-strategic-posture-the-united-states).

[102] Press Release, Commission on the Prevention of Weapons of Mass Destruction Proliferation and Terrorism, *WMD Commission to Report Findings on Preventing Nuclear and Biological Terrorism Threats* (Nov. 18, 2008).

[103] P.L. 105-85.  *See* Congressional Commission on Military Training and Gender-Related Issues, *Final Report Findings and Recommendations* (July 30, 1999) (online at www.dtic.mil/dtfs/doc_research/p18_16v1.pdf).

[104] P.L. 106-74.  *See* Commission on Affordable Housing and Health, *A Quiet Crisis in America* (June 30, 2001) (online at govinfo.library.unt.edu/seniorscommission/pages/final_report/finalreport.pdf).

[105] P.L. 104-293.  *See* Commission to Assess the Organization of the Federal Government to Combat the Proliferation of Weapons of Mass Destruction, *Combating Proliferation of Weapons of Mass Destruction* (July 14, 1999) (online at www.fas.org/spp/starwars/program/deutch/11910book.pdf).

### D.    Disclosure of Confidential Information

On June 21, 2011, Chairmen Issa and McHenry sent a letter to the Office of the Comptroller of the Currency (OCC) expressing concern that the Commission may have improperly disclosed sensitive information that the Commission obtained from OCC.  They wrote:

> We are concerned that a significant amount of this information may have been made public in violation of a confidentiality agreement reached between the FCIC and the OCC.  While we believe in maximizing transparency, we are concerned that the FCIC may have violated its agreement with the OCC and unduly aided the plaintiff's bar to launch lawsuits against financial firms.[106]

Chairmen Issa and McHenry requested a "summary of the OCC's concerns related to the release of confidential OCC information by the FCIC" and a "description of any challenges the OCC has encountered in performing its regulatory responsibilities as a result."[107]

On June 30, 2011, the OCC responded to the letter sent by Chairmen Issa and McHenry, confirming that "over OCC objection, the FCIC released Reports of Examination and Supervisory Letters for several large national banks" and "made public interviews with OCC officials regarding those institutions."[108]

Although Chairmen Issa and McHenry asked the OCC to provide "a description of any challenges the OCC has encountered in performing regulatory responsibilities," the OCC did not cite any specific challenges it had encountered.[109]  Instead, the OCC asserted broadly that "release of this information is not only disruptive to the examination process, but could have a destabilizing effect on the banks involved, impact financial markets, trigger shareholder and other lawsuits, and set a dangerous precedent."[110]

---

[106]   Letter from Congressman Darrell Issa, Chairman of the Committee on Oversight and Government Reform, and Congressman Patrick McHenry, Chairman of the Subcommittee on TARP, Financial Services, and Bailouts of Public and Private Programs, to Julie L. Williams, Chief Counsel, Office of the Comptroller of the Currency (June 21, 2011).

[107] *Id.*

[108] Letter from Daniel P. Stipano, Deputy Chief Counsel, Office of the Comptroller of the Currency, to Congressman Darrell Issa, Chairman, Committee on Oversight and Government Reform (June 30, 2011).

[109] *Id.*

[110] *Id.*

### *Commission Approval of Review Process*

Internal Commission documents obtained by the Committee indicate that the release of information by the Commission was proper, did not violate the confidentiality agreement, and assisted Congress and the public by revealing the significant deficiencies at Citigroup.

The Commission voted unanimously on multiple occasions to implement a detailed process for determining when to make public sensitive documents it obtained from corporations and their regulators.  On November 16, 2010, the Commission's General Counsel presented a memo to the Commissioners entitled, "Considerations with Respect to the Public Release of Confidential Documents and Materials in the Report, the E-Book and Website."[111]  The memo proposed a process for determining how to handle sensitive documents.  It stated:

> [T]he Commission has received millions of pages of documents, conducted numerous surveys, interviewed hundreds of witnesses, held 19 days of hearings, compiled video records of testimony, and completed numerous reports. ... It is our intent to use in the Report and our e-book both public and nonpublic documents and to create on our website a resource of public and nonpublic documents relevant to the Commission's Report and inquiry, all with the purpose of meeting our statutory mandate to report to the President, Congress and the public on the causes of the financial and economic crisis.[112]

Regarding the release of sensitive materials, the General Counsel wrote:

> The decision to release publicly confidential documents is one which should be made by the full Commission, either directly or through a process of delegation. ... It is unwieldy and impractical to expect that the full Commission will review all of the Web Elements and Report Elements, so a procedure for approval should be considered. ...I recommend that the Executive Director or General Counsel determine which documents should be recommended to the Commission for a determination in accordance with its processes for inclusion in Report Elements or Web Elements.  This will primarily occur in situations where the staff has received objections to disclosure and the determination to override the objections must be made.[113]

The General Counsel explained that the Commission's authority to release documents publicly was the same as that of congressional committees, including the Oversight Committee. He wrote:

> The Commission is formed under Congress, and is entitled to the benefit of Congress's authority and power to obtain information, including but not limited to proprietary

---

[111] Memo to Commissioners of the FCIC on "Considerations with Respect to the Public Release of Confidential Documents and Materials in the Report, the E-Book and Website," Gary J. Cohen (Nov. 16, 2010).

[112] *Id.*

[113] *Id.*

information. …While there is no express provision of the Constitution or specific statute authorizing the conduct of congressional investigations, the Supreme Court has firmly established that such power is so essential to the legislative function as to be implied from the general vesting of legislative powers in Congress. ... As the Commission's enabling legislation manifests the clear congressional intent to establish an independent legislative branch entity with investigative powers, authorities and prerogatives equivalent to those of past and present standing and special investigatory committees, the decision to release confidential documents or materials as part of its statutory duty to report on the causes of the crisis rests in the Commission's discretionary determination that such public release will further fulfillment of its mandated statutory mission, a decision that cannot be limited by any court ruling or regulatory or statutory standard.[114]

The General Counsel also made clear that all of the confidentiality agreements between the Commission and outside entities allowed the Commission to disclose confidential information.  He wrote:

The FCIC has entered into at least 69 confidentiality agreements of various forms pursuant to which it has committed to a process concerning the Commission's use of documents and other information submitted to it. ... [A]ll allow the FCIC to disclose the confidential information it determines appropriate in any interim or final report or in connection with public hearings upon the agreement of the Chairman and the Vice Chairman or upon a majority vote of the FCIC. .. Many of the agreements specifically reference, for example, certain bank regulatory reports confidentiality provisions, trade secrets and similar items protected from disclosure by statute or regulation as examples of the types of the documents entitled to confidential treatment in accordance with the letters.  But that does not override the Commission's ability to release the documents if it so determines.[115]

After reviewing the General Counsel's memo, all nine Commissioners who participated in the meeting approved the proposed process.  According to the minutes of the November 17, 2010, meeting:

Chairman Angelides and General Counsel Gary Cohen introduced Mr. Cohen's memo on suggested procedures for review and approval with respect to the public release of confidential documents and materials in the Report, the E-Book, and the Website.  Discussion ensued among Commissioners on this matter.  Mr. Cohen clarified that if there are unresolved matters concerning the release of confidential documents and materials that have been objected to by the submitting party and have not been resolved, these matters will come before the Commission for review and action prior to public release.  It was further clarified that no confidential items can be publicly released except in accordance with Commission rules and, where there are confidentiality agreements, under the terms of those agreements. ...

---

[114] *Id.*

[115] *Id.*

MOTION:  Born moved and Thompson seconded a motion to approve review and clearance process as outlined in Gary Cohen's memo (attached).

APPROVED:  9-0 (Commissioner Holtz-Eakin was absent.)[116]

***Commission Approval of Disclosure Process***

In preparing for the release of the Commission's report, the Commission held a meeting on January 24, 2011.  During this meeting, the Commission reviewed a memo from the General Counsel entitled "Further Considerations with Respect to the Release of Confidential Documents and Materials in the Report, the E-Book, and Website."[117]

In that memo, the General Counsel wrote that "all documents referred to in the Report and the dissents have been cleared for use herein (clearance was confirmed by the Commissioners at their meeting of January 6, 2011), and on the date the Report is released the Commission's website will be populated by substantially all of the written documents referred to in the Report."[118]

The General Counsel also explained the process for "clearing and posting" additional documents, including "documents and follow-up answers to questions asked at public hearings," "audio tapes and transcripts of interviews to which objections have been raised after the objections are resolved or overruled," and "other materials relevant to our inquiry and the Report which were requested, received and reviewed or prepared by the staff during the course of our investigation."[119]

The General Counsel highlighted for Commissioners that this process "will likely result in posting a substantial number of documents ... to which objections have been raised by the document providers," including "[r]equests by various bank regulatory agencies such as the Fed, the OTS or OCC, the FDIC or the SEC that bank examination material not be released due to the chilling effect that such release would have on banks willingness to be candid in future examinations."[120]  He added that, although "regulatory agencies have generally requested that bank examination reports not be released," "what these examinations revealed comprises a significant portion of the Commission's Report, and staff believes that disclosing these materials is merited."[121]

---

[116] APPROVED Minutes of Telephonic Business Meeting of November 17, 2010 (Agenda Item 3 for FCIC Meeting of Dec. 15, 2010).

[117] Memo to Commissioners of the FCIC on Further Considerations with Respect to the Public Release of Confidential Documents and Materials in the Report, the E-Book and Website, Gary J. Cohen (Jan. 21, 2011).

[118] *Id.*

[119] *Id.*

[120] *Id.*

[121] *Id.*

According to minutes of the January 24, 2011, meeting, the Commissioners unanimously approved the resolution.  The minutes state:

> RESOLVED, that the Commission delegates to the Executive Director, the General Counsel and Deputy General Counsel the power to review, resolve or override, on behalf of the Commission, objections made to the public release of confidential documents or interviews, on a case-by-case basis, after weighing the nature of the objections against the benefit to the report and the American public of such public release, and to approve the posting of such documents in the electronic presentations;

> **RESOLVED, that if the Executive Director, the General Counsel and Deputy General Counsel determine necessary or appropriate, they may seek the advice of the Chairman and Vice Chairman regarding whether to override objections made to the public release of confidential documents or interviews;**

> RESOLVED FURTHER, that the Commission adopts as the action of the Commission the recommendations of the Executive Director, General Counsel and Deputy General Counsel regarding the release and posting of such confidential documents, interviews or other materials, as well as public documents, for inclusion in the Commission's electronic presentations.[122]

### *Information Disclosed Citigroup's Deficiencies*

The information disclosed to the public by the Commission fully supported the Commission's finding that Citigroup's management exercised deficient risk management and valuation functions.

In conjunction with its final report, the Commission released an OCC review of Citigroup's management and oversight originally issued on February 14, 2008.  This review, Supervisory Letter 2008-5, presents "the results of reviews we conducted in light of the substantial financial losses realized in the third and fourth quarter of 2007" and covers two specific examinations of Citigroup, including "a review of director and management oversight and governance" and an "examination focused on the valuation and risk management practices against Citigroup Markets and Banking Group positions."[123]  The review found that Citigroup's "[b]oard and senior management have not ensured an effective and independent risk management process is in place," that "management was more focused on short-term performance and profitability along with achieving top industry rankings across many major products rather than on risk or potential loss," and that "[o]ver-reliance was placed on credit

---

[122] Minutes of FCIC Meeting of January 24, 2011 (Agenda Item 3 for FCIC Business Meeting of Feb. 9, 2011) (emphasis in original).

[123] Office of the Comptroller of the Currency, Supervisory Letter 2008-5 Issued to Citigroup Inc. (Feb. 14, 2008) (online at http://fcic-static.law.stanford.edu/cdn_media/fcic-docs/2008-02-14_OCC_Letter_from_John_C_Lyons_to_Vikram_Pandit_Serious_ Problems_at_Citibank.pdf).

rating agency ratings without considering the appropriateness of these ratings to specific products or the true risk of the underlying collateral."[124]

In addition to releasing OCC's Supervisory Letter, the Commission also released a 2007 annual inspection report of Citigroup issued by the Federal Reserve Bank of New York on April 15, 2008. This report "reflects a downgrade to fair or '3' from satisfactory at the previous inspection."[125] The report noted that a "fair" rating reflects "a combination of weaknesses in risk management and financial condition that range from fair to moderately severe."[126] The report also noted that this downgrade "reflects serious deficiencies in Board & Senior Management oversight, policies/procedures/limits, monitoring & MIS, and internal controls."[127] The report concluded:

> Because of the nature and seriousness of the overall weaknesses, it is our intention to enter into an enforcement action with the firm, whereby both Citigroup and the Federal Reserve System agree on remedial action that must promptly be taken.[128]

According to the final Commission report, Citigroup's former CEO downplayed the significance of these findings. He argued that this "was not a fundamental situation, it was not about the capital we had, not about the funding we had at that time, but with the stock price where it was ... perception becomes reality."[129]

The Commission disagreed and detailed many problems with Citigroup's management, including its risk management and valuation functions. The Commission report found that Citigroup was so highly leveraged in late 2008 that its "own calculations suggested that a drop in deposits of just 7.2% would wipe out its cash surplus."[130]

Similarly, in their dissent, Commissioners Thomas, Hennessey, and Holtz-Eakin wrote that an "essential cause of the financial and economic crisis was appallingly bad risk management by the leaders of some of the largest financial institutions in the United States and

---

[124] *Id.*

[125] Letter from John J. Ruocco, Assistant Vice President, Federal Reserve Bank of New York, to Board of Directors (c/o Vikram Pandit, CEO), Citigroup Inc. (Apr. 15, 2008) (online at http://fcic-static.law.stanford.edu/cdn_media/fcic-docs/2008-04-15_FRBNY_Letter_from_John _J_Ruocco_from_Board_of_Directorrs_Re_annual_report_for_Citigroup_Inc_as_of_December_ 31_2007.pdf).

[126] *Id.*

[127] *Id.*

[128] *Id.*

[129] Financial Crisis Inquiry Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (Jan. 2011).

[130] *Id.*

Europe."[131]  They noted that, like other CEOs who appeared before the Commission, the former CEO of Citigroup was "willing to admit that he had poorly managed his firm's liquidity risk, but unwilling to admit that his firm was insolvent or nearly so."[132]  Commissioners Thomas, Hennessey, and Holtz-Eakin noted that these "claims were highly unpersuasive."[133]

---

[131] Financial Crisis Inquiry Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States – Dissenting Statement of Commissioner Keith Hennessy, Commissioner Douglas Holtz-Eakin, and Vice Chairman Bill Thomas* (Jan. 2011) (online at http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_hennessey_holtz-eakin_thomas_dissent.pdf).

[132] *Id.*

[133] *Id.*